**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------X

JOHN DOE,                                               :

                  Plaintiff,          :    Civil Action No: 5:15-cv-322 TJM/DEP

            -against-                    :

                                           :    **Jury Trial Demand**

CORNELL UNIVERSITY,                        :

                  Defendant.        :    **VERIFIED COMPLAINT**

------------------------------------------------------------------X

Plaintiff John Doe[1] by his attorneys Nesenoff & Miltenberg, LLP, as and for his Verified

Complaint against Cornell University respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.      This case arises out of the actions taken and procedures employed by Defendant

Cornell University ("Defendant Cornell" or "Cornell") concerning allegations made against

Plaintiff John Doe ("John Doe"), a male senior student at Cornell as a result of false allegations

of nonconsensual sexual activity with fellow Cornell senior student Jane Doe.

2.      These allegations purportedly refer to what was clearly consensual sexual

activity that occurred on or about December 14, 2013 (the "Incident").

3.      On February 18, 2014, some two (2) months later, Jane Doe contacted Cornell's

Office of the Judicial Administrator ("JA"), and reported that she was raped by John Doe on

December 14, 2013, while she was incapacitated.

4.      Judicial Administrator Mary Beth Grant thereafter requested that Cornell

conduct a formal investigation of the matter and that Dean of Faculty Joseph Burns appoint a

---

[1] Plaintiff has filed, contemporaneously with this Complaint, a Motion to proceed pseudonymously.

panel of three faculty members (the "Panel") to ultimately review the investigative report and make a determination as to the alleged misconduct.

5.        After an excessively delayed investigation process, which included interviews with at least ten witnesses who observed John Doe and Jane Doe in the minutes and hours preceding the Incident, Cornell's JA prepared an Investigative Report of the Office of the Judicial Administrator dated April 30, 2014 (the "Investigative Report"). The Investigative Report consisted of a summary of the findings and a recommendation that John Doe be expelled from Cornell, or, in the alternative, that his degree be held for a period of not less than two years.

6.        Upon its review of the Investigative Report and responsive statements from John Doe and Jane Doe, on May 20, 2014, the Panel issued a Report of the Reviewers, in which they unanimously agreed that "under a preponderance of the evidence, [Jane Doe] both (a) did not give consent to vaginal penetrative sexual activity nor to manipulation of her breasts, and (b) was physically and mentally incapacitated by alcohol consumption to the point that she was unable to give such consent" (the "Decision"). As John Doe's sanction, Cornell initially determined that expulsion was appropriate, and, upon reconsideration, modified John Doe's sanction to withhold his diploma for two (2) years, provided that he meets certain enumerated conditions (the "Sanction").

7.        In addition to the damages sustained by John Doe at Cornell throughout the delayed investigation process, including his inability to attend his own graduation or receive his diploma on graduation day, John Doe has sustained tremendous damages to his career prospects as a result of the Decision and Sanction, including the loss of five (5) job offers to date, due to the fact that he is unable to produce his diploma upon demand to such prospective employers.

8.      Throughout the investigative process, Cornell failed to abide by its own guidelines and regulations and acted in direct violation of federal and/or state law.

9.      A non-exhaustive list of Cornell's wrongful actions include the following: (i) Cornell failed to conduct a timely investigation of the allegations and failed to timely bring the case to a close within sixty (60) days while requiring John Doe's compliance with same; (ii) Cornell failed to conduct a thorough and impartial investigation; (iii) Cornell employed a single-investigator model which resulted in a lack of due process for John Doe; (iv) Cornell purported to perform a Blood Alcohol Content analysis to form conclusions that were unsupported and highly prejudicial; (v) Cornell engaged in an investigation biased against John Doe as the male accused; (vi) Cornell wholly adopted Jane Doe's unsupportable theory of "sailboat community values" as evidence; (vii) Cornell relied on an investigation consisting of a skewed rendition of the facts, cherry-picked witness statements and ignored important qualifying statements; (viii) Cornell made assessments of credibility and evidentiary weight with respect to each fact witness without any ascertainable rationale or logic; (ix) Cornell failed to afford John Doe the requisite presumption of innocence required by a preponderance of the evidence standard; and (x) the sanction was unwarranted and disproportionate in light of the circumstances, all of which demonstrated substantial procedural errors in violation of Title IX.

10.     When Cornell subjected John Doe to disciplinary action, it did so in an arbitrary and capricious way, and in discrimination against him on the basis of his male sex. Cornell failed to adhere to its own guidelines and regulations, and the guidelines and regulations themselves are insufficient to protect the rights of male students. The decision reached was discriminatory; given the evidence (or lack thereof), a discriminatory bias against males was required for a conclusion of sexual misconduct to be reached.

11.     John Doe has been greatly damaged by the actions of Defendant Cornell: his career prospects have been severely compromised as he is unable to produce a diploma to potential employers; the monies spent on obtaining a college education at Defendant Cornell squandered. Specifically, John Doe has lost five (5) job offers to date, worth an estimated value of approximately $200,000.00 each.

12.     John Doe therefore brings this action to obtain relief based on causes of action for, among other things, violations of Title IX of the Education Amendments of 1972 and state law.

## THE PARTIES

13.     John Doe, is a natural person, citizen of the United States, and resident of the State of California. During the events described herein, John Doe was a student at Cornell and resided at 201 Wyckoff Avenue, Ithaca, New York 14850, a private house not owned by Cornell.

14.     Upon information and belief, Defendant Cornell University is a private, liberal arts college in the city of Ithaca, New York, with an address of 300 Day Hall, Ithaca, New York 14853.

15.     John Doe and Defendant Cornell are sometimes hereinafter collectively referred to as the "Parties."

## JURISDICTION AND VENUE

16.     This Court has diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1332 and under 28 U.S.C. § 1367 because: (i) John Doe and Defendant Cornell are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

17.     This Court has personal jurisdiction over Defendant Cornell on the grounds that it is conducting business within the State of New York.

18.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because Cornell is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**I.      Agreements, Representations, Covenants &
         Warranties Between John Doe and Cornell**

19.     John Doe worked diligently for four years at an esteemed public high school in Northern California, where he obtained a 3.83 GPA, scored above the 95th percentile on his SAT's, obtained perfect scores on the SAT II in math and chemistry, and took seven Advanced Placement courses. While in high school, John Doe developed a particular interest in chemistry and became involved in scientific research internships to pursue his interest in the sciences. He was also a varsity athlete in cross country, a member of the track and tennis teams, he started an NGO group on campus, was an Officer of the Astronomy Club, a member of the Science Bowl Club, played the piano for ten years and was named an AP Scholar with Distinction. John Doe's immigrant parents strived for the "American Dream" of educating John Doe at a prestigious University. His work ethic paid off when, as a result of his academic achievements, John Doe received a "Likely Letter" from Cornell University on March 14, 2010, further demonstrating his successful candidacy for an undergraduate education at Cornell.

20.     Setting his sights on an Ivy League education, John Doe applied to Cornell University and was accepted to the College of Arts & Sciences class of 2014 for chemistry. He ultimately transferred to the School of Chemical and Biomolecular Engineering where he focused his studies on chemical engineering.

21.     Upon his acceptance, Defendant Cornell provided John Doe with copies of its school policies, including the Campus Code of Conduct and Policy 6.4: Prohibited Discrimination, Protected-Status Harassment, Sexual Harassment, and Sexual Assault and Violence ("Policy 6.4"), available on Defendant Cornell's Internet website.

22.     Cornell's Policy 6.4, applicable to cases involving allegations of sexual discrimination, sexual harassment, and sexual assault states in relevant part:

> The university's goal of a diverse and inclusive environment includes a commitment to maintain a university environment that is safe and free from prohibited discrimination, protected-status harassment, sexual harassment, and sexual assault/violence. The university has adopted policies in support of this goal and complies with all applicable federal, state, and local laws. Acts of discrimination, protected-status harassment, sexual harassment, and sexual assault/violence undermine the university's mission and commitment to inclusiveness by threatening careers, educational experience, and well-being of those associated with the university. The sexual harassment or sexual assault/violence of students interferes with students' rights to receive an education free from discrimination and, in the case of sexual assault/violence, is a crime. This policy provides expectations for a work and educational environment free from discrimination, harassment, and sexual assault/violence, and provides a process for addressing matters that impact those expectations.
>
> Sexual violence refers to physical acts perpetrated without consent when a person is incapable of giving consent. A number of different acts fall into the category of sexual violence, including rape, sexual assault, sexual battery, sexual abuse, and sexual coercion. All such acts of sexual violence are forms of sexual harassment that are covered under Title IX and should be reported as soon as possible to the [Cornell University Police Department], who will take appropriate action and inform the Title IX coordinator and deputy coordinators.

23.     Cornell's Campus Code of Conduct and Policy 6.4 set forth the procedures by which Cornell students who have been accused of violating one or more of the enumerated policies are investigated, heard, and, possibly, disciplined.

24.     The JA is responsible for receiving all complaints and providing procedures to ensure a fair process for the accused and for the complainant. The JA has exclusive responsibility for accepting and processing prohibited discrimination and protected-status harassment complaints, including sexual assault/violence, and will undertake to resolve these complaints **impartially, promptly, and confidentially** through informal intervention, mediation, or formal investigation.

25.     In addition, Policy 6.4 states that upon the JA's initial review of a complaint, if the JA determines that the complaint (a) describes an alleged violation of its policy, it will notify the "accused" that he or she has been named in a complaint and proceed under the policy accordingly; or (b) does not describe an alleged violation, it will notify the complainant that the complaint is dismissed.

26.     According to Policy 6.4, if the JA determines that the complaint describes an alleged violation of its policy, an investigation will be commenced. The purpose of such investigation being "to gather evidence relating to the alleged discrimination, harassment, sexual assault/violence or retaliation to determine whether the accused engaged in conduct constituting discrimination, harassment, or retaliation by a preponderance of the evidence."

27.     Cornell's Policy 6.4 expressly covenants to provide the following rights to the accused student in a sexual misconduct investigation:

- To have the investigation completed within 60 days;

- To seek the advice of a personal attorney or advisor, who may attend their own clients' or advisees' investigative interview;

- To be kept informed of the investigation's status;

- To receive a copy of the investigation report summary and be permitted a reasonable opportunity (ten business days) to submit written comments

and ask the reviewer to review the evidence, determination and/or recommended sanctions or remedial measures contained in the report;

- To receive a copy of the final determination in writing.

28.     Pursuant to Policy 6.4, the investigator may dismiss a complaint and close the case where, *inter alia,* the complaint is not supported by sufficient facts, lacks merit based upon the available evidence, or does not fall within the jurisdiction of the investigator.

29.     Upon concluding the investigation, the investigator must produce a written investigation report which includes the following: "the scope of the investigation, a summary of the findings, recommendations for any corrective actions and/or sanctions, any non-punitive, preventative remedies for the complainant…"

30.     A respondent student has the right to appeal the resolution of a matter within ten business days by asking the vice president for student and academics services ("VPSAS") or his or her designee to review the evidence, determination, and/or recommended sanctions or remedial measures (or lack thereof) contained in the report. The VPSAS will conduct a review, and may accept, modify or reject the determination or recommended sanctions and/or remedial measures. An Appeal may be based on any of the following grounds:

- The remedial actions awarded the complainant are not commensurate with the injury or is unjust;

- The sanction is not commensurate with the violation or is unjust;

- The investigator or reviewer violated the fair application of relevant university procedures and such violation may have had a prejudicial effect upon the outcome;

- The investigator or reviewer committed a prejudicial error in interpreting the policy;

- The investigator or reviewer rendered a decision clearly against the evidence;

8

> • New evidence was discovered after the decision and could not have readily been discovered before the decision, which would change the outcome.

## II.     The Night of December 13-14, 2013

31.     John Doe and Jane Doe had known each other since spring semester 2011 when they were in the same course. They were acquaintances and had all classes together, as they were in the same major in the School of Chemical and Biomolecular Engineering.

32.     On Friday, December 13, 2013, an end of semester event for Chemical Engineering students was held at the Statler Hotel. John Doe and Jane Doe, both seniors and Chemical Engineering majors, attended the event. A cocktail reception began at 6:00 p.m. and dinner was served at 7:00 p.m. The party consisted of dinner and drinks with classmates, Teaching Assistants, graduate students and professors from the Chemical Engineering school. Witness O.G. observed that Jane Doe and John Doe "seemed happy and friendly" and noticed them talking to each other at the event.

33.     All students were given two drink tickets to use during the event. The gathering concluded around 8:30 p.m.

34.     After the holiday party, Jane Doe and some of her friends returned to her apartment, a privately owned apartment off campus about half a block away, to drop off their purses and winter boots. They then joined their classmates, Teaching Assistants, graduate students and professors at a residence located in Collegetown at around 10:00 p.m., where they continued socializing, dancing and drinking. Even though everyone had been drinking, witness M.N. indicated that Jane Doe was *not* intoxicated to the point that she did not know what was going on.

35.     While at the after party in Collegetown, John Doe and Jane Doe participated in a game of beer pong together and continued to talk. Witness M.V. noticed Jane Doe and John Doe getting close and flirting.

36.     John Doe and Jane Doe continued to flirt throughout the evening, by dancing together, talking, and Jane Doe touching John Doe's hair. Witness N.N. indicated Jane Doe "wasn't drunk, maybe a couple of drinks, but not messy drunk." Additionally, Witness L.T. stated that although Jane Doe seemed to consume a lot of alcohol, she "didn't notice anyone having trouble walking or slurring [their] speech."

37.     John Doe consumed approximately five or six drinks over a ten hour period throughout the evening. Jane Doe alleged she consumed approximately fifteen drinks throughout the evening, consisting of three glasses of wine, half a bottle of Malibu Rum, another third a bottle of rum, two more glasses of wine, a bottle of wine, two shots of unknown hard alcohol and one beer. Although John Doe was in Jane Doe's presence the whole evening, he did not observe her consuming fifteen drinks.

38.     Jane Doe had previously teased her friends for being "lightweights," in reference to their inability to consume as much alcohol as she could. For instance, on Slope Day, she allegedly completed a "century" (a 1.5 ounce shot of beer every minute for 100 minutes), the equivalent to 12.5 beers in 1.67 hours, and was the only one of her friends who did not get sick afterwards.

39.     At around 2:30 or 3:00 a.m. on December 14, 2013, John Doe, Jane Doe, and Witnesses L.T., M.N., M.V. and V.P. left the party together and walked back to Jane Doe's apartment. Some members of this group had to retrieve their belongings dropped off earlier in the evening.

40.     Although everyone had been drinking, no one was very intoxicated as there had been professors present at both the holiday party and the after party. Specifically, neither John Doe nor Jane Doe had trouble walking home despite the snow and icy conditions and neither was slurring their speech. Witness V.P. indicated that everyone was "buzzed" but that Jane Doe did not appear intoxicated, let alone incapacitated. In fact, she was able to walk home through inclement weather, ascend the flight of stairs in her building and unlock the door to her apartment, without any assistance.

41.     John Doe, Jane Doe and Witnesses L.T., M.N., M.V. and V.P. remained in Jane Doe's apartment for approximately twenty five minutes. They engaged in conversation in Jane Doe's kitchen, discussing various topics such as their previous sexual experiences. The Witnesses indicated that no member of the group appeared overly intoxicated, to the point of being incapacitated.

42.     At some point during the conversation, Jane Doe removed her bra from under her shirt, in front of the whole group. As she did this, she motioned toward John Doe and got closer to him.

43.     When the four friends departed, John Doe remained behind, and Jane Doe did not protest. Witness V.P. testified that Jane Doe seemed fine when he left Jane Doe and John Doe at the apartment. Additionally, Witness M.V. testified that if he felt John Doe was too drunk to be there with Jane Doe, he would have made him leave. Further, M.V. stated that "if [he] felt [Jane Doe] was in any way in danger [he] would not have left."

44.     Jane Doe claims that she agreed to let John Doe spend the night at her apartment, due to the cold weather and the distance to John Doe's apartment. Jane Doe did not

have a couch so it was understood that John Doe would sleep in her bed with her. She attributed this hospitality to her German family's alleged "sailboat community ideals."

45.    After M.N., M.V., L.T. and V.P. departed, John Doe informed Jane Doe that he was interested in her. John Doe and Jane Doe began to kiss while standing up. The kissing continued as they moved towards the bed. They spoke occasionally in between kissing, and at one point Jane Doe apologized for the mess in her room. They verbally communicated about hooking up, with Jane Doe advising that she was "horny" but that she did not want to have sex. Jane Doe removed her own dress and underwear, and John Doe followed, by removing his pants and underwear. Jane Doe begin to manipulate John Doe's penis and John Doe began to digitally penetrate Jane Doe.

46.    John Doe and Jane Doe engaged in consensual sexual activity for approximately one hour.

47.    Both John Doe and Jane Doe were awake and coherent at all times during the sexual activity, communicating non-verbally by touching, stroking and kissing each other.

48.    Jane Doe demonstrated her consent through both words and actions, by actively participating in the sexual activity, stating her willingness to engage in sexual activities as long as it wasn't sexual intercourse, manually manipulating John Doe's penis, removing her own clothing and underwear and continuing to kiss and touch John Doe throughout the sexual encounter.

49.    John Doe and Jane Doe faced each other during the entire hour of sexual activity and Jane Doe brushed her fingers through John Doe's hair.

50.    John Doe and Jane Doe fell asleep together in Jane Doe's bed and woke up later that morning around 8:30 a.m. when an alarm clock went off.

51.     When they awoke, John Doe and Jane Doe engaged in conversation, including a discussion about her love of rabbits and the fact that she wanted to take a shower, before John Doe indicated that he would leave.

52.     Given they had mutual friends and were a part of the same major, Jane Doe advised John Doe to not "make it weird."

53.     Jane Doe had breakfast with her close friend, Witness C.G., two days later, on the morning of Monday December 16, 2013. Witness C.G. described Jane Doe's appearance as "disheveled," and stated she looked "tired and with messy hair." As Witness C.G. was not present on the evening of December 13, 2013, Jane Doe recounted the events of the night for her, including the sexual activity engaged in with John Doe. Notably, the Investigative Report misrepresented the testimony provided by C.G. in stating that this breakfast took place the morning *after* the Incident, on Saturday December 14, 2013, when in fact it did not take place until two days later, on December 16, 2013. Further, the Investigative Report erroneously attributed Jane Doe's disheveled appearance to the Incident, despite the fact that the sexual activity between Jane Doe and John Doe occurred more than two days prior, and Jane Doe had presumably taken at least one shower in the interim. Despite Vice President of Student and Academic Services Susan Murphy's subsequent acknowledgement of this error, the Investigative Report was neither corrected nor was the JA's Decision modified accordingly.

54.     The relationship between John Doe and Jane Doe did not change after the Incident, as they continued to attend the same classes, sit nearby each other and complete their finals for the winter semester.

55.     Witnesses indicated there was no readily apparent change in Jane Doe's behavior subsequent to the sexual encounter with John Doe; in fact, when she went out for her

friend's birthday in January 2014, she consumed a "fishbowl" and "heavily flirt[ed]" with Witness L.T.'s ex-boyfriend.

56.      On February 18, 2014, more than two (2) months after the sexual encounter, Jane Doe filed a complaint against John Doe, requesting a formal investigation of a matter involving sexual assault and/or sexual harassment. The complaint alleged that John Doe raped Jane Doe on December 14, 2013, while she was incapacitated. A temporary no contact order was put in place on February 24, 2014.

### III.    Failure to Conduct a Thorough and Impartial Investigation

57.      Cornell's Policy 6.4 requires that the investigation of a complaint involving sexual misconduct be conducted thoroughly and impartially. Notwithstanding, Cornell performed a one sided and biased investigation in favor of Jane Doe's allegations of sexual misconduct.

58.      Upon the filing of Jane Doe's complaint, Judicial Administrator Mary Beth Grant ("Ms. Grant") requested that Dean of Faculty Joseph Burns assemble a panel of three faculty members to review the matter.

59.      Clint Dupew ("Mr. Dupew") and Coordinator Inclusion and Diversity Program Rose Braman ("Ms. Braman") began an investigation into Jane Doe's allegations of sexual misconduct with an interview of Jane Doe, on February 18, 2014.

60.      Also on February 18, 2014, John Doe received a phone call from the JA requesting his appearance at the JA's office on February 24, 2014. John Doe was informed that a complaint had been filed against him, but he was not provided any details about the nature of the allegations.

61.     Thus, John Doe was caused to suffer considerable stress and anxiety for approximately one week, as he awaited his meeting with the JA and an explanation of the allegations against him.

62.     Six days later, on February 24, 2014, John Doe appeared at the JA office with Judicial Code Counselor David Coriell ("Mr. Coriell"). At that time, Ms. Grant informed John Doe that Jane Doe had filed a complaint against him relating to the events of December 13, 2013. Ms. Grant forced John Doe to sign a paper acknowledging receipt of the complaint, as well as a No Contact Order that John Doe was required to adhere to.

63.     Subsequently, Mr. Dupew and Ms. Braman began to question John Doe about the evening of December 13-14, 2013. Mr. Dupew initially asked a number of very broad questions, none of which focused on the amount of alcohol consumed by Jane Doe, followed by more specific questions regarding the sexual activity.

64.     Thereafter, by email to Mr. Dupew dated March 2, 2014, John Doe sent a list of potential witnesses that could speak to the events of the night of December 13-14, 2013. The list included Witnesses L.T., M.N., N.N., M.V., A.P. and O.G.

65.     Nearly two months after his initial interview, on April 16, 2014, John Doe returned to the JA office, accompanied by Mr. Coriell, for a follow up interview. Mr. Dupew asked John Doe questions similar to those from the first interview, apparently seeking inconsistencies in his statements. During John Doe's second interview, Mr. Dupew indicated that Jane Doe, according to her, had consumed an estimated eighteen drinks on the night of the Incident. Mr. Dupew never asked John Doe whether he personally observed this.

66.     At the conclusion of the interview, John Doe inquired as to the status of the Investigative Report, given he was expecting to graduate from Cornell in less than two months.

Mr. Dupew advised, in the presence of Mr. Coriell, that if he were to find any fault on the part of John Doe, "personally seeing that [John Doe was] a graduating senior, worst case scenario I will not recommend suspension or expulsion. You are too close to graduation and this would not make sense." Mr. Dupew further advised John Doe and Mr. Coriell that John Doe's case was "air-tight" in that John Doe's defense was fully corroborated by witness testimony.

67.     At no time did Mr. Dupew inquire whether John Doe was in possession of any documents that would support his statement.

68.     In addition to the interviews of John Doe and Jane Doe, the investigation consisted solely of witness interviews. According to the Investigative Report, "No physical or tangential documentary evidence was provided or otherwise considered."

69.     Throughout the investigative process, Cornell obtained at least four (4) witness statements which demonstrated that Jane Doe was not exhibiting visible signs of intoxication during the time prior to, leading up to, and/or during the intimate encounter with John Doe. For instance: (i) Witness M.N. was with Jane Doe at the Statler party, at the after party in Collegetown, and also went back to Jane Doe's apartment afterwards with the group of friends. She stated: "…I did not feel [Jane Doe] was intoxicated to the point she was not aware of what was going on..."; and "They were both drinking but aware of surroundings and such"; (ii) Witness V.P. was also with Jane Doe at the Statler party as well as the after party and observed Jane Doe "didn't appear intoxicated." In fact, Witness V.P. reported "she seemed fine"; (iii) Witness N.N. attended both events on December 13, 2013; he indicated Jane Doe "wasn't drunk, maybe a couple of drinks, [but] not messy drunk." He further stated he did not recall anyone "really drunk, crazy, or stumbling at the after-party;" and (iv) Witness L.T. who attended the party and returned to Jane Doe's apartment afterwards, indicated that she "didn't notice anyone

having trouble walking or slurring [their] speech." Yet, the investigators disregarded these eyewitness accounts in making their determination that Jane Doe was not able to consent to the sexual encounter due to her level of intoxication, a conclusion based solely on Jane Doe's uncorroborated and self-reported level of intoxication.

70.     Moreover, Cornell failed to conduct a fair investigation of Jane Doe's claims when interviewing witnesses with knowledge. Specifically, several witnesses stated they were confused and misled by the questions presented by the JA; the JA's questions were not straightforward; and the JA failed to provide any context so as to allow for the full and fair discovery of facts and details each witness had to offer. The JA's line of questioning and method of investigation was therefore arbitrary and capricious.

71.     Additionally, while hearings before a panel of board members were part of the campus adjudication process at Cornell prior to 2013, they have since been eliminated. Cornell now employs a single-investigator model for the investigation of sexual misconduct cases, which effectively obliterates John Doe's rights to defend himself against allegations of the utmost serious nature, namely, sexual assault. Specifically, John Doe was denied the opportunity to challenge the credibility of witnesses, or draw out distinctions and details used by witnesses to qualify their stated observations of Jane Doe's level of intoxication.  Moreover, John Doe was denied the opportunity to confront or cross-examine Jane Doe about important factors such as: (i) her incredible claims of the volume of alcohol consumed; (ii) her actual weight (important to challenging her estimated Blood Alcohol Content as discussed in more detail below); (iii) her unsubstantiated theory of "sailboat community values"; and (iv) her convenient memory lapses for certain portions of the evening. By allowing the JA to take on the role of "judge, jury and

17

executioner," there were no safeguards or checks and balances in place along the way to ensure that the JA's ultimate conclusion was objective and sound.

72.     Upon conclusion of the investigation, investigators Mr. Dupew and Ms. Braman issued the Investigative Report of the Office of the Judicial Administrator, dated April 30, 2014. The Investigative Report concluded that Jane Doe "was intoxicated to the point of being mentally incapacitated and incapable of consent to engage in such sexual activity. Therefore [John Doe] sexually assaulted [Jane Doe] as defined by Cornell University Policy 6.4." The Investigative Report therefore recommended that the Reviewers expel John Doe, or, in the alternative, hold John Doe's degree for a period of not less than two years.

73.     Despite Cornell's self-imposed policy that an investigation be completed and a finding rendered within 60 days, the investigation was not completed until the Investigative Report was issued on April 30, 2014, which was 71 days following the JA's first meeting with Jane Doe. Further, despite Ms. Grant's assurance that John Doe would receive a copy of the Investigative Report on the evening of April 30, 2014, Cornell caused John Due additional stress and anxiety when the Investigative Report was not transmitted to him until two days later, on May 2, 2014.

74.     The JA offered several countless excuses for this delay, including "the office has been plagued with some illnesses" and "I have been out of town on a family matter," or "I wound up not having time after the hearing." In fact, in a recent article in the Cornell Daily Sun dated March 11, 2015, Cornell admits that the JA "has repeatedly failed to meet deadlines outlined by Cornell's Policy 6.4 and federal recommendations when handling sexual assault investigations" and acknowledged the harmful effects this delay has on accused students (*See* http://cornellsun.com/blog/2015/03/11/speedy-thorough-handling-of-sexual-assault-cases/).

75.    Notwithstanding its own failures to adhere to its policies and despite Judicial Administrator Mary Beth Grant's acquiescence to an extension, Cornell unreasonably demanded John Doe's strict compliance with same. Specifically, John Doe's reasonable request for a five (5) business day extension (until May 23, 2014) to respond to the Investigative Report consisting of information gathered over several months' of investigation, due in large part to the fact that the timing of his response coincided with his academic obligations with respect to final examinations, was denied. Sexual Assault Investigatory Panel Chair Irby Lovette reasoned that the extension must be denied on the grounds that permitting same would potentially result in John Doe and Jane Doe running into each other at graduation. Mr. Lovette's justification certainly overlooked the fact that John Doe and Jane Doe had sat an arm's length away from each other in class all semester. Mr. Lovette indicated he would only permit an extension until 1:00 p.m. on the following Monday, May 19, 2014.

76.    Thus, John Doe submitted his written input on May 19, 2014, within ten (10) business days of receipt of the Investigative Report, in accordance with Policy 6.4.

77.    Jane Doe submitted her written input on May 15, 2014.

78.    Notably, by email correspondence to John Doe on May 2, 2014, Judicial Administrator Mary Beth Grant identified the existence of a potential conflict of interest between herself and a review panelist who was "a friend of [hers]." While Ms. Grant acknowledged this conflict of interest, she did not take any measures to eliminate the conflict prior to the panel of reviewers' receipt of the Investigative Report.

79.    A panel of three faculty members appointed by the Dean of Faculty (the "Panel") met on May 19, 2014 to discuss the matter, and finalized their decision via

correspondence dated May 20, 2014. The Report of Reviewers dated May 20, 2014 agreed with all recommendations made by the JA investigators and concluded as follows:

> After fully reviewing and discussing the Investigative Report and the Responses from both parties, including a review and careful point-by-point discussion of the Respondent's Response document and associated Exhibits, the panel has unanimously accepted the principle findings of the investigative report and supports the recommended penalty of expulsion outlined therein. The Reviewers find no reason to suspect that the report and/or investigative process were inherently biased against the Respondent.

80.     Thereafter, John Doe diligently submitted his Appeal from the Report of Reviewers on June 3, 2014, in accordance with the ten (10) business day deadline imposed by Policy 6.4. Yet, Cornell inexplicably provided substantial leeway to Jane Doe, in allowing her a thirteen (13) business day/seventeen (17) calendar day extension until June 20, 2014 to submit her Appeal to the Report of Reviewers. Jane Doe was provided an extension without question, in comparison to the substantial resistance encountered by John Doe in response to his prior request for an extension. Moreover, while Jane Doe was permitted an opportunity to review and respond to John Doe's Appeal, John Doe was never provided an opportunity to even review Jane Doe's Appeal.

81.     By letter dated July 16, 2014, Vice President for Student and Academic Services Susan H. Murphy advised that she concurred with the finding that Jane Doe "did not give consent to the sexual activity that occurred on December 14, 2013." She further noted, "while one might disagree with the precision of the calculation of the blood alcohol level cited by the investigator, I conclude, based on the many statements provided, that the complainant consumed considerable quantities of alcohol and consequently was not able to consent to the sexual activity."

82.     The Decision for expulsion was modified in that John Doe would be permitted to return to Cornell and receive his diploma after two years, upon full compliance with certain enumerated conditions.

83.     Notwithstanding, in addition to the damages sustained throughout the delayed investigation process, including John Doe's inability to attend his own graduation or receive his diploma, John Doe has sustained tremendous damages to his career prospects as a result of the Decision and Sanction, including the loss of five (5) job offers to date, due to the fact he is unable to produce a diploma.

84.     Cornell engaged in a biased fact finding process in violation of Title IX.

85.     Cornell demonstrated significant procedural errors in violation of John Doe's rights to fair process.

86.     Cornell's failure to afford a balanced treatment of the evidence received from Jane Doe versus John Doe also constituted a violation of its duties to provide an "adequate, reliable, and impartial investigation" and a "prompt and equitable" process under Title IX.

**IV.     Failure to Conduct a Timely Investigation**

87.     Cornell was first notified about Jane Doe's possible allegations of sexual misconduct as early as February 18, 2014.  Cornell's investigation took 91 days, beginning on February 18, 2014 and ending on May 20, 2014.

88.     When John Doe inquired as to the status of the investigation, Mr. Dupew offered a variety of excuses for the delayed investigation process; for instance, the Office of the Judicial Administrator was backlogged due to a bout of the flu among the office administrators, or the JA was working on "other more serious cases" so this one was put on the back burner.

89.     Moreover, despite its own self-imposed guidelines, Cornell engaged in a dilatory investigative process by delaying the questioning of witnesses, and acting without any sense of urgency to resolve the matter despite John Doe's upcoming (anticipated) graduation date.

90.     Thus, Cornell failed to conduct a timely investigation of the allegations and failed to timely bring the case to a close within 60 days in violation of Policy 6.4.

**V.     Failure to Redact Unfairly Prejudicial Evidence**

91.     Cornell's policies require it to gather and present evidence in a fair manner. Under Policy 6.4, Cornell is required to resolve complaints "impartially, promptly, and confidentially."

92.     As such, Cornell was obligated to refrain from admitting evidence that would be likely to mislead a disciplinary panel or cause it to confuse the issues presented before it. Cornell, however, presented the panel with evidence regarding Jane Doe's Blood Alcohol Content ("BAC") at the time of the alleged sexual misconduct. The Investigative Report took at face value Jane Doe's testimony, given more than two months after the Incident, that she consumed an unlikely fifteen drinks on December 13-14, 2013.

93.     Using an unverified online BAC calculation tool from Cornell's own Gannett Health Services, the investigators nonsensically determined that, based solely on Jane Doe's self-reported alcohol consumption and unsubstantiated body weight, her BAC was approximately .33, a level resulting in effects similar to "surgical anesthesia." Further, in an email from Mr. Dupew to the Panel dated May 7, 2014, Mr. Dupew suggested the investigators "believe the Complainant's BAC may have actually been higher; up to a tenth of a point higher…" Notably, had Jane Doe's BAC been up to a tenth of a point higher, a BAC of .43 is nearly fatal. Hence, if

Jane Doe's self-reported consumption is to be believed, it would certainly be the case that witnesses would have noticed an extreme level of intoxication, yet none of the witnesses interviewed reported this. Moreover, Mr. Dupew never questioned John Doe, or Witness L.T. or Witness M.N. about Jane Doe's alcohol consumption, despite the fact that John Doe as well as L.T. and M.N. were with Jane Doe throughout the evening. In fact, omitted from the Investigative Report was Witness L.T.'s account of the evening which directly contradicted Jane Doe's self-reported alcohol consumption. Specifically, Witness L.T. recalled that Jane Doe consumed significantly less than reported by Jane Doe herself. Had Mr. Dupew considered this eyewitness testimony, Jane Doe's estimated BAC level would undoubtedly have been altered considerably. Furthermore, when questioned by the Panel as to how exactly Mr. Dupew determined the number of drinks consumed by Jane Doe, Mr. Dupew admitted that the numbers used in his BAC calculation were based solely on Jane Doe's self-reported account.

94.     Both the witness testimony as well as Jane Doe's own testimony undermines the credibility of the BAC calculation; for instance, Jane Doe recalled a conversation she had with John Doe, she recalled the different types of alcohol allegedly consumed throughout the evening, and she recalled utilizing sailing social customs allegedly learned from her parents. The JA therefore accepted as fact this estimated BAC level, without any corroboration and rendered a medical/forensic analysis thereon without the benefit of any medical training or expert opinion.

95.     While the Panel initially questioned the JA's analysis and calculation of Jane Doe's BAC, it was ultimately pacified by the JA's illogical and unsupported explanation that "the BAC estimate is based on [Jane Doe's] account of what she consumed…[t]he report's estimate of 15 drinks is conservative in that the estimate disregarded anything that may have been potentially double reported by [Jane Doe]."

96.     In reliance on this unfounded and irrational BAC calculation, the JA concluded in the Investigative Report that Jane Doe was "intoxicated to the point of being mentally incapacitated and incapable of consent to engage in …sexual activity."

97.     The inclusion of such unsubstantiated evidence unfairly prejudiced John Doe and led to a wrongful finding that John Doe "raped and sexually assaulted" Jane Doe.

98.     Given the lack of any logical explanation or corroboration, combined with the testimony of Witness L.T. who indicated that Jane Doe's weight is substantially more than the number utilized by Mr. Dupew in his BAC calculation, the ultimate adoption of such evidence was troubling, to say the least.

99.     Cornell's failure to redact such prejudicial evidence constituted a violation of its duties to provide an "adequate, reliable, and impartial investigation" and a "prompt and equitable" process under Title IX.

**VI.     Gender Bias Against John Doe as the Male Accused**

100.    Cornell was required to conduct an impartial and unbiased investigation process.

101.    Upon information and belief, there are no reported incidents of male complainants against female students for sexual assault and/or there are no reports of female accused students being disciplined for sexual misconduct against male complainants.

102.    Upon information and belief, Cornell is knowledgeable of the fact that complaints of sexual misconduct are disproportionately lodged by females against males.

103.    In fact, individuals of the Cornell community have indicated that when males are accused by female complainants of sexual misconduct, they are invariably found guilty.

104.     At all times, Jane Doe's voluntary (and admittedly gluttonous) use of alcohol was used to bolster her allegations of unwanted sexual touching.  Yet, John Doe's consumption of alcohol that evening was not taken into account as a "mitigating factor" for the same alleged actions.

105.     Cornell's disparate and discriminatory treatment of John Doe with respect to the use of alcohol on the evening of December 13-14, 2013 is evident in the JA's citation in the Investigative Report to the annual report of the Judicial Administrator dated December 17, 2009, which states: "The fact that an accused person had been drinking, is neither a defense to sexual assault nor an exonerating circumstance…"; and the annual report of the Judicial Administrator dated April 13, 2010, which provides: "[F]ailure to recognize that the victim was too drunk to consent is no defense to a charge of sexual assault as defined by the Cornell Code and in the case law interpreting it."

106.     The Public Record from the University Review Board dated December 17, 2009 further advises: "Although the Judicial Administrator bears the burden of proof on lack of consent, she is entitled to satisfy that burden through the complainant's testimony alone; corroboration is not required." Such a biased and one-sided policy plainly drafted in favor of a female complainant and against a male accused is extraordinarily prejudicial.

107.     Thus, the JA's citation to the annual reports of the Judicial Administrator dated December 17, 2009 and April 13, 2010 ("Annual Reports"), and the Annual Reports themselves, demonstrate Cornell's bias against male students accused of sexual misconduct in violation of Title IX.

108.     Additionally, the Panel took at face value Jane Doe's unfounded allegation that she was adhering to German "sailboat community values," when she offered to allow John Doe

to spend the night at her apartment and sleep in her bed. Nowhere does the JA cite to any supporting evidence of such a phenomenon, nor does the JA provide a basis for its wholesale adoption of same.

109.    Furthermore, while the testimony from at least five eyewitnesses indicated Jane Doe was able to provide consent for the sexual activity with John Doe, the only support for Jane Doe's claim that she was not able to give consent comes directly from Jane Doe herself, and Witness C.G., who was not present on the evening of December 13-14, 2013. Nonetheless, the Panel found Jane Doe's account more credible than numerous eyewitness accounts which contradicted her testimony.

110.    Moreover, the Investigative Report conveniently omitted significant details provided by John Doe during his two interviews that go toward the essential issue of Jane Doe's consent. Specifically, John Doe described the Incident in considerably more detail than what was represented in the Investigative Report; for instance, the behaviors and actions of Jane Doe that unmistakably demonstrated both her initiation of the sexual encounter, as well as her receptiveness to the sexual activity. Yet, because his testimony was inconsistent with the testimony provided by Jane Doe, the JA elevated Jane Doe's testimony as sacrosanct, then deliberately omitted portions of John Doe's testimony which were inconsistent with hers. The remainder of his testimony was mischaracterized within the Investigative Report. In fact, an individual of the Cornell community emphatically believes that the Investigative Report was slanted in that it did not accurately and/or thoroughly represent John Doe's version of the evening.

111.    Upon information and belief, once a male student is accused of sexual misconduct at Cornell, he will be invariably found responsible. The investigative reports are deliberately drafted against the male student accused.

112.    Thus, the Panel's reliance on Jane Doe's unsupported statements when specifically contradicted by numerous witness accounts, combined with the omission of portions of John Doe's testimony, evidence a slanted investigation and clear gender bias against the male accused in violation of John Doe's right to fair process.

## VII.   The Acceptance of Cherry-Picked Statements to Paint John Doe as a "Sexual Predator"

113.    In its Investigative Report, the JA provides a skewed rendition of the facts, cherry-picked witness statements and ignored important qualifying statements all in an effort to fit within the narrative that John Doe was guilty of sexually touching Jane Doe without her consent, and had to have known that she was too intoxicated to give consent. For instance, the following key details were completely omitted from the Investigative Report:

114.    John Doe stated that when they awoke the next morning, he and Jane Doe engaged in conversation, including a discussion about her love of rabbits and the fact that she wanted to take a shower before John Doe indicated that he would leave.

115.    Witness M.V. stated: (i) "I felt like she was interested in him and it made me uncomfortable that I was there"; (ii) "[Jane Doe] didn't say anything to any of us about being alone with [John Doe] so we felt like they were OK"; and (iii) "If I felt that [John Doe] was too drunk to be there with [Jane Doe] I would have made him leave.  And if I felt [Jane Doe] was in any way in danger I would have not left, or made [John Doe] leave."

116.    Witness M.N. stated: (i) "…I did not feel [Jane Doe] was intoxicated to the point she was not aware of what was going on..."; and (ii) "They were both drinking but aware of

surroundings and such." Notably, M.N. **never stated** that "[the Complainant seemed tipsy; she had a fair amount, but was able to walk," yet this statement was erroneously attributed to Witness M.N. in the Investigative Report and was accepted as a finding of fact about Jane Doe's level of intoxication.

117.    Further, Witnesses M.N., L.T. and M.V. all stated that John Doe was with the group when everyone walked over to Jane Doe's apartment.  L.T., M.V. and O.G. all indicated that John Doe and Jane Doe were interacting, even flirting, with each other throughout the evening, during the holiday party and at the after-party. Notwithstanding, the JA prejudicially mischaracterized John Doe as "following the group" and "checking in" on Jane Doe out of concern for her, then proceeding to engage in "predatory behavior" and "[take] advantage of an intoxicated individual."   In no way do the collective statements from the witnesses lead to the conclusion that John Doe was a "sexual predator" or engaged in "predatory behavior," yet that was the conclusion presented to the Panel.

118.    The Investigative Report mischaracterized John Doe as a predator, mischaracterized Jane Doe's state of intoxication, and mischaracterized the testimony leading up to and during the encounter. Such mischaracterizations and assessments demonstrated a bias in favor of Jane Doe's narrative that she was too intoxicated to consent.

119.    Additionally, throughout the Investigative Report, the JA makes assessments of credibility and evidentiary weight with respect to each fact witness without any ascertainable rationale or logic. Overall, such credibility and evidentiary weight assessments clearly demonstrated a bias in favor of Jane Doe's narrative that she was too intoxicated to consent. For instance:

> (i) C.G. was deemed "extremely credible" and "significant weight was given to this witness since she was the first person to whom

[Jane Doe] gave an account after the incident." However, significantly, C.G. was best friends with Jane Doe, was not present on the evening in question, and merely served the function of a receptacle of self-serving statements by Jane Doe. Moreover, the Investigative Report erroneously noted that C.G. had breakfast with Jane Doe the morning after the Incident, on December 14, 2013. However, as acknowledged subsequently by Vice President Susan Murphy, this information was inaccurately presented by the investigators, as C.G. did not see Jane Doe until *two days later,* on Monday, December 16, 2013. Thus, any reference to Jane Doe's "disheveled" or "messy" appearance as reported by C.G. simply cannot be attributed to the events of December 13, 2013. Accordingly, the fact that C.G.'s statements were given "significant weight" is extremely problematic as her testimony was merely used to prejudice John Doe;

(ii) A.L. was "extremely credible" and "weight was give[n] only as to [Jane Doe's] likelihood of intoxication." However, A.L. never provided any observations of intoxication specific to John Doe or Jane Doe. He only stated, in general terms, that "most people [were] drunk" and that whenever he talked to Jane Doe that evening, she had a "cup in [her] hands." There is no basis for extrapolating from this statement that the "cup in [Jane Doe's] hands" was a *different* cup each time, nor does it indicate how much time had elapsed during his observations and what, if any correlation, that might have on how many cup(s) Jane Doe may have had during that time. At best, A.L.'s observations are neutral, and, at worst, they do not provide any insight into Jane Doe's level of intoxication;

(iii) M.N. was found to be "extremely credible" and "significant weight was given to this witness as she was present throughout many of the events leading up to the alleged assault." However, the JA ignored M.N.'s qualifications, "...but not incapacitated" and "but was able to walk" and even prejudicially misquoted her as stating that "[Jane Doe] seemed tipsy; she had a fair amount, but was able to walk." In fact, M.N. *never* stated that Jane Doe seemed tipsy;

(iv) V.P. was considered "credible," but "seemed to underestimate the effects of alcohol when compared to other's account." For the first time, the JA does not assess the witness as "extremely credible" and passes negative judgment on the witness's observations of the evening, which coincides with the fact that this was the first witness to blatantly state that "[Jane Doe] didn't appear intoxicated" and that "she seemed fine." Apparently,

V.P.'s observations undermined the JA's narrative that Jane Doe was unable to consent, so the JA undermined V.P.;

(v) Witness H.P. was found to be "extremely credible" and "significant weight is given to this witness as to his ability to observe independently that [Jane Doe] was intoxicated and he himself was not in an intoxicated state." However, H.P.'s own statement admits that he has no basis for passing judgment on Jane Doe's level of intoxication, "intoxicated, not terribly, but…[he] had never seen her intoxicated." Notwithstanding, the JA illogically accords "significant weight" to H.P.'s assessment of Jane Doe's level of intoxication. Furthermore, as Witness L.T. recounted, the JA's conclusion about H.P.'s own intoxication was inaccurate, "On our way, we ran into [HP] who [MN] and [Jane Doe] both knew. It was kind of an awkward exchange of words because [HP] was obviously *very intoxicated.*" H.P. was observed in this very intoxicated state at 3:00 a.m. that morning, according to L.T.'s account. The JA's significant reliance on H.P. as an "extremely credible" witness strains credulity;

(vi) Witness N.N. was found "credible" and "some weight was given to this witness since he was neutral on what was observed yet, he was not able to speak to anything directly related to the allegations." This assessment couldn't be further from the truth. N.N. stated that he "attended the events [in question] on December 13, 2013" and that he "observed [Jane Doe] to be drinking" that "[Jane Doe] wasn't drunk, maybe a couple of drinks, [but] not messy drunk." Contrary to the JA's assessment, N.N.'s observation of Jane Doe's level of intoxication is "directly related to the allegations" and demonstrates that Jane Doe was not drunk;

(vii) L.T. was "credible" and "some weight was given to this witness since she was consistently present throughout." M.N. was "present throughout many of the events," and assessed as "extremely credible" and given "significant weight." However, L.T. was also "consistently present throughout," yet, inexplicably, labeled as merely "credible" and accorded "some weight." L.T. indicated that she "didn't notice anyone having trouble walking or slurring [their] speech." Importantly, L.T. provided a supplemental statement (submitted as Exhibit 1 to John Doe's Appeal from the Report of the Reviewers on June 3, 2014), wherein she refutes the number of drinks Jane Doe claims she consumed that evening, refutes Jane Doe's actual body weight, and advised that Jane Doe called her a "lightweight" because "[she] is unable to consume alcohol the way [Jane Doe] does." In the face of such damning

evidence, it is no coincidence that L.T.'s statements were only given "some weight."

120.      Further, the Investigative Report severely misrepresented the testimony provided by Witnesses L.T., M.N. and M.V. by selectively omitting portions of their statements and presenting others out of context. For instance, the Investigative Report quotes L.T. as stating "[Jane Doe] was intoxicated, [but the witness was] not sure of [Jane Doe's] level of drunkenness. [Though][Jane Doe] seem[ed] to consume a lot of alcohol." Witness L.T. subsequently advised that she was inaccurately misquoted; specifically, not only is "intoxicated" not a part of her lexicon, but she also does not recall making any statement about Jane Doe's level of "drunkenness." The JA haphazardly pieced together L.T.'s testimony to fit into Jane Doe's narrative. Moreover, the JA officer who interviewed L.T. erroneously advised that everything L.T. said would be kept confidential from both John Doe and Jane Doe, which obviously was a false assurance.

121.      Similarly, the Investigative Report substantially altered Witness M.N.'s testimony by stringing together different portions of her dialogue and omitting other portions in order to create an account that fit Jane Doe's narrative. Subsequent to her review of the Investigative Report, Witness M.N. clarified that she specifically advised the investigator that although Jane Doe did consume alcohol on December 13, 2013, they were at a holiday party with the Chemical Engineering department; thus, no one drank to the point of blacking out in front of their professors. She further specified that while everyone did consume alcohol, no one was visibly intoxicated beyond the typical jovial mood that occurs when a group of friends drink together. Thus, the JA investigator misconstrued his long and arduous dialogue with M.N. in concluding that M.N.'s testimony implied "[Jane Doe] was drinking....more than usual."

122.     Overall, the Investigative Report's cherry-picked statements from the witnesses' observations, the omission of key, qualifying facts and outright fabrication of supporting facts, combined with the JA's slant on the witnesses' accounts of the evening regarding Jane Doe's level of intoxication leads to the foregone conclusion that she was "mentally incapacitated."

### VIII.    Failure to Abide by the Requisite Preponderance of the Evidence Standard

123.     The U.S. Department of Education Office of Civil Rights and Cornell's Policy 6.4 require that a preponderance of the evidence standard be used to evaluate allegations of sexual misconduct. Policy 6.4 defines "preponderance of the evidence" as: "The greater weight of the credible evidence required to establish a meritorious claim under this policy, including claims of sexual harassment, assault, or violence (e.g. it is more likely than not that sexual harassment, assault, or violence has occurred). This preponderance is based on the more convincing evidence and its probable truth and accuracy, not on the amount of evidence."

124.     The preponderance of the evidence standard does not equate to judging the accused as guilty until proven innocent. In fact, nowhere in the Department of Education's guidelines or Cornell's policies is such a standard referenced. However, Cornell's investigation process demonstrated a clear gender bias which resulted in a Decision that did not afford John Doe the requisite presumption of innocence.

125.     Specifically, the Panel improperly placed the burden of proof on John Doe to establish that Jane Doe consented to the sexual activity, instead of placing the burden of proof on Jane Doe, the complainant, to establish that she did not consent.

126.     Cornell's Policy 6.4 defines consent as follows: "*words or actions* that show a voluntary agreement to engage in mutually agreed-upon sexual activity. Consent is not present

when one is incapable of consent, subject to coercion or threat of coercion, or subject to forcible compulsion."

127.     Jane Doe demonstrated her consent to the sexual activity through her words, by verbally agreeing to participate in the sexual encounter, as well as through her actions, by actively engaging in kissing John Doe, manually stimulating his penis, removing her own clothes and underwear, and touching and stroking John Doe throughout the sexual encounter.

128.     Yet, the Report of Reviewers disregarded these key aspects of the sexual encounter, in finding that a preponderance of the evidence supported Jane Doe's factual allegations that she did not consent to "sexual intercourse" (even though it was undisputed that the parties did not have sexual intercourse).

129.     Upon accepting Jane Doe's uncorroborated account of the events, the JA discriminated against John Doe, based solely on his gender. A fair reading of the evidence reveals that Jane Doe's account is contradicted and inconsistent, while John Doe's account is corroborated and substantiated. Yet the burden of proof was incorrectly placed on John Doe and his account of the events was inexplicably deemed less credible than Jane Doe's.

130.     Furthermore, upon information and belief, the standard utilized by Cornell in investigating sexual misconduct complaints was revised in 2013 from a "clear and convincing evidence" standard to the much lower "preponderance of the evidence" standard. Yet, Cornell failed to provide notice of the change in policy to its student body, including John Doe. Upon information and belief, Cornell now provides training related to its sexual misconduct policies to all incoming students, a practice demonstrating the level of importance Cornell places on advising its students of the applicable standards. Thus, the failure of Cornell to properly advise

John Doe as to the change in its governing standard related to sexual misconduct cases was in and of itself a violation of Title IX.

### IX.  The Sanction Was Unwarranted and Disproportionate in Light of the Circumstances

131.    Cornell improperly relied on a Public Record from February 10, 2010 to justify its recommendation that expulsion was the appropriate remedy to impose on John Doe. The referenced Public Record refers to appropriate sanctions issued to an individual who rapes another member of the Cornell community. Equating John Doe to a rapist, who took advantage of an incapacitated victim, and "saw her as someone he could exploit," was entirely unfounded and damaging. Notably, not one of the witness statements obtained during the investigation process established that Jane Doe was intoxicated to the point that she was not able to consent. Yet, the Panel accepted at face value Jane Doe's unsubstantiated statements and disregarded exculpatory witness observations in making this assessment.

132.    Additionally, in making its Decision, the JA and Mr. Dupew relied on a set of "rules" written by Cornell University Law School Professor Cynthia Bowman back in 2010. Ironically, following the Office of Civil Rights Dear Colleague Letter of 2011 and Cornell's subsequent decision to change the evidence standard, Cynthia Bowman publicly expressed great concern over what that set of rules would do to the rights of students, acknowledging in an article dated April 4, 2012 that "[t]he consequences for someone expelled for sexual assault are enormous and will follow him throughout his life, leading to rejection by other schools…a great deal of stigma … [t]o impose those consequences on someone requires a rigorous standard of proof and many due process protections to ensure fairness." *See* http://cornellsun.com/blog/2012/04/04/rights-advocates-spar-over-policy-on-sexual-assault/.

Nonetheless, the Panel relied on this set of rules in determining that John Doe's expulsion was warranted.

133.    Notably, Mr. Dupew is no longer employed by Cornell. Upon information and belief, a substantial changing of the guards has occurred within the Cornell Judicial Administration since the conclusion of John Doe's case last year. Additionally, upon information and belief, Cornell's disciplinary investigations are now conducted entirely by campus police officers rather than Judicial Administrators. Specifically, Scott R. Grantz is not only the new associate JA but is also an accreditation officer in the Cornell University Police Department.

134.    As both John Doe and Jane Doe were last semester seniors at the time the investigation concluded, there was little to be gained in meting out the severe sanction of expulsion or withholding John Doe's degree for two years. Further, the Sanction was disproportionately severe in that John Doe was a student in good standing, excelled academically, had no prior disciplinary record, and Cornell had no reported precedents for a student found responsible for similar charges.

135.    As a result of Defendant Cornell's actions, John Doe's economic future is significantly compromised.

## X.    John Doe's Entire Future is <u>Severely Damaged by Cornell's Actions</u>

136.    In addition to damages sustained as a result of the delayed investigation process, John Doe's inability to attend his own graduation or receive his diploma on graduation day caused tremendous damages to John Doe's career prospects, including the loss of five (5) job offers to date.

137.    The economic damages sustained as a result of the loss of *each* job offer has an estimated value of $200,000.00.

138.    Even though John Doe will be permitted to receive his diploma in two years, his academic and disciplinary record is irrevocably and irreversibly tarnished and will not withstand scrutiny by a potential employer.

139.    As a result of Defendant Cornell's actions, John Doe's parents' financial resources used to provide John Doe with an Ivy League education have been squandered.

140.    Without appropriate redress, the unfair outcome of the Hearing will continue to cause irreversible damages to John Doe, with no end in sight. John Doe seeks redress from this Court to undo the wrongs occasioned by Cornell.

## AS AND FOR A FIRST CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972

141.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

142.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

143.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972, even though there is very little direct federal funding of school sports.

144.    Upon information and belief, Defendant Cornell receives federal funding for research and development.

145.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance

procedures providing for the prompt and equitable resolution of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (*emphasis added*).  Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[2]

146.     The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also *"[accord] due process to both parties involved..."*[3]

147.     The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment...";

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint..."[4]

148.     A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."[5]

---

[2] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn.98-101.
[3] *Id.* at 22 (emphasis added).
[4] *Id.* at 20.
[5] *Id.* at 21.

149.     Based on the foregoing, *supra,* at ¶¶ 31-140, Defendant Cornell has deprived John Doe, on the basis of his sex, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of Defendant Cornell's guidelines and regulations.

150.     Based on the foregoing, *supra,* at ¶¶ 31-140, Defendant Cornell conducted its investigation of the incident of December 13-14, 2013 and subsequent investigation and review, in a manner that was biased against the male being accused. From the outset, the Investigative Report, Report of the Reviewers and Appeal Decision were slanted in favor of Jane Doe and took her statements at face value. Absent from the Decision or the Sanction is corroboration for Jane Doe's allegations that she was mentally incapacitated and therefore unable to consent, or that her Blood Alcohol Content was as determined by the JA.

151.     Cornell has created an environment where an accused male student is fundamentally denied due process by being prosecuted through the conduct process under a presumption of guilt.   Such a one-sided process deprived John Doe, as a male student, of educational opportunities at Cornell on the basis of his sex.

152.     During the investigation, no credible or reliable evidence was presented in support of Jane Doe's claim that she lacked the ability to consent; to the contrary, all of the eye-witnesses to her behavior just prior to the Incident concurred that she was in control and was not intoxicated. Notwithstanding, Defendant Cornell accepted Jane Doe's claim that she lacked the ability to consent over John Doe's claim that he did not perceive anything about her that would suggest she could not consent, revealing gender discrimination against the male accused in Cornell's investigation process.

153.    Defendant Cornell had no intention of following its own policies and procedures for John Doe as the male accused of sexual misconduct when it found John Doe responsible for sexual misconduct in the face of contradictory witness statements demonstrating Jane Doe was not incapacitated.

154.    Defendant Cornell's stated policies and procedures, together with its violations thereof with respect to John Doe only, as the male accused of sexual assault, demonstrate Defendant Cornell's gender-biased practices with respect to males accused of sexual assault at Cornell.

155.    Based on the foregoing, *supra,* at ¶¶ 31-140, Defendant Cornell imposed sanctions on John Doe that were disproportionate to the severity of the charges levied against him and without any consideration of his clean disciplinary record at Cornell.

156.    Based on the foregoing, *supra,* at ¶¶ 31-140, Defendant Cornell's guidelines and regulations are set up to disproportionately affect the male student population of the Cornell University community as a result of the higher incidence of female complainants of sexual misconduct against male complainants of sexual misconduct.

157.    Based on the foregoing, *supra,* at ¶¶ 31-140, male respondents in sexual misconduct cases at Cornell are discriminated against solely on the basis of sex.  They are invariably found guilty, regardless of the evidence, or lack thereof.

158.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR A SECOND CAUSE OF ACTION
#### Breach of Contract

159.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

39

160.     Based on the aforementioned facts and circumstances, Defendant Cornell breached express and/or implied agreement(s) with John Doe.

161.     Defendant Cornell committed several breaches of its agreements with John Doe, including, without limitation:

> Cornell University prohibits its faculty, administrative and academic staff members, postdocs, and undergraduate and graduate students from engaging in any form of prohibited discrimination, protected-status harassment, sexual harassment, and sexual assault/violence, and expects these individuals to refrain from committing acts of discrimination, bias, or sexual assault/violence within the university's jurisdiction.

> The university's goal of a diverse and inclusive environment includes a commitment to maintain a university environment that is safe and free from prohibited discrimination, protected-status harassment, sexual harassment, and sexual assault/violence. The university has adopted policies in support of this goal and complies with all applicable federal, state, and local laws. Acts of discrimination, protected-status harassment, sexual harassment, and sexual assault/violence undermine the university's mission and commitment to inclusiveness by threatening careers, educational experience, and well-being of those associated with the university. The sexual harassment or sexual assault/violence interferes with students' rights to receive an education free from discrimination and, in the case of sexual assault/violence, is a crime.

> Cornell University's commitment to diversity and inclusiveness is grounded in providing an environment that is free from all prohibited discrimination, protected-status harassment, sexual assault/violence, and bias activity, in particular when such actions are directed at a member or group of the Cornell community because of that individual's or group's actual or perceived age, color, creed, disability, ethnicity, gender, gender identity or expression....

> Acts of prohibited discrimination and protected-status (including sexual) harassment and sexual violence constitute violations of federal law.

> The university establishes an internal university process for presenting and responding to discrimination-related complaints.

[Office of Workforce Policy and Labor Relations] and/or the JA have exclusive responsibility for accepting and processing prohibited discrimination and protected-status harassment complaints, including sexual assault/violence, and will undertake to resolve these complaints impartially, promptly, and confidentially through informal intervention, mediation, or formal investigation.

If, after its initial review, WPLR or the JA determines that complaint (a) describes an alleged violation of this policy, it will notify the "accused" that he or she has been named in a complaint and proceed under this policy; or, (b) does not describe an alleged violation of this policy, it will notify the complainant that the complaint is dismissed, and the complainant will be informed of his or her right, if any, to appeal under this policy and/or to seek external avenues of complaint resolution.

The investigator conducts these formal investigations, which must be completed within 60 days, subject to extension by the investigator as may be necessary or for good cause. During investigations, the investigator must keep both parties informed on the investigation's status, as appropriate.

Cornell's Policy 6. 4 provides that an accused student has the right to: have the investigation completed within 60 days; seek the advice of a personal attorney or advisor, who may attend their own clients' or advisees' investigative interview; to be kept informed of the investigation's status; to receive a copy of the investigation report summary and be permitted a reasonable opportunity (ten business days) to submit written comments and ask the reviewer to review the evidence, determination and/or recommended sanctions or remedial measures contained in the report; and to receive a copy of the final determination in writing.

Upon concluding an investigation, the investigator must produce a written investigation report, which must include the following: the scope of the investigation; a summary of the findings; recommendations for any corrective actions and/or sanctions; any non-punitive; preventative remedies for the complainant; if warranted, recommended action to restore the accused's reputation, such as notifying persons who participated in the investigation and/or a public announcement of the outcome.

162.    As a direct and foreseeable consequence of these breaches, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of career opportunities, economic injuries and other direct and consequential damages.

163.    John Doe is entitled to recover damages for Defendant Cornell's breach of the express and/or implied contractual obligations described above.

164.    As a direct and proximate result of the above conduct, actions and inactions, John Doe has suffered physical, psychological, emotional and reputational damages, economic injuries and the loss of educational and career opportunities.

165.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A THIRD CAUSE OF ACTION
### Breach of the Covenant of Good Faith and Fair Dealing

166.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

167.    Based on the aforementioned facts and circumstances, Defendant Cornell breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with John Doe by meting out a disproportionate Sanction of expulsion or withholding his degree for two years, notwithstanding the lack of evidence in support of Jane Doe's claim of sexual assault.

168.    As a direct and foreseeable consequence of these breaches, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of career opportunities, economic injuries and other direct and consequential damages.

169.    John Doe is entitled to recover damages for Defendant Cornell's breach of the express and/or implied contractual obligations described above.

170.     As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Unfair or Deceptive Trade Practices

171.     John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

172.     New York General Business Law § 349: Deceptive Acts and Practices Unlawful provides consumer protection by declaring as unlawful "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state…" *See* New York General Business Law § 349.

173.     Cornell's Policy 6.4 states, among other things:

> Cornell University's commitment to diversity and inclusiveness is grounded in providing an environment that is **free from all prohibited discrimination**, protected-status harassment, sexual assault/violence, and bias activity, in particular when such actions are directed at a member or group of the Cornell community because of that individual's or group's actual or perceived age, color, creed, disability, ethnicity, gender, gender identity or expression….

174.     Cornell's Policy 6.4 sets forth the procedure by which Cornell students who have been accused of violating one or more of the policies are investigated, heard, and, possibly, disciplined.

175.     The JA is responsible for accepting and processing prohibited discrimination and protected-status harassment complaints, including sexual assault/violence, and must undertake to resolve these complaints impartially, promptly and confidentially through informal intervention, mediation, or formal investigation.

176.     Policy 6.4 expressly covenants to provide the following rights to the accused student in a sexual misconduct proceeding: to have the investigation completed within 60 days; to seek the advice of a personal attorney or advisor, who may attend their own clients' or advisees' investigative interview; to be kept informed of the investigation's status; to receive a copy of the investigation report summary and be permitted a reasonable opportunity (ten business days) to submit written comments and ask the reviewer to review the evidence, determination and/or recommended sanctions or remedial measures contained in the report; and to receive a copy of the final determination in writing.

177.     Policy 6.4 requires an investigator to produce a written investigation report within 60 days.

178.     Defendant Cornell has engaged in the following acts or practices that are deceptive or misleading in a material way, or committed deceptive acts or practices, which were aimed at the consumer public at large, that were a representation or omission likely to mislead a reasonable consumer acting reasonably under the circumstances: by causing John Doe to believe that Cornell would follow its policies, copies of which were provided to John Doe and are also available on Cornell's Internet website; and by causing John Doe to believe that if he paid tuition and fees to Cornell, that Cornell would uphold its obligations, covenants and warranties to John Doe described in its policies.

179.     Defendant Cornell had no intention of following its own policies and procedures for John Doe as the male accused of sexual assault when it found John Doe responsible for sexual misconduct in the face of contradictory witness statements demonstrating Jane Doe was not incapacitated and was therefore capable of consenting to the sexual activity.

44

180.     Defendant Cornell's stated policies and procedures, together with its violations thereof only with respect to John Doe as the male accused of sexual assault, demonstrate Cornell's deceptive practices with respect to males accused of sexual assault at Cornell.

181.     Based on the foregoing facts and circumstances, Cornell engaged in unfair or deceptive trade practices in violation of N.Y. GBS. LAW § 349.

182.     As a result of Cornell's deceptive acts and practices, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

183.     As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Estoppel and Reliance

184.     John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

185.     Cornell's various policies constitute representations and promises that Cornell should have reasonably expected to induce action or forbearance by John Doe.

186.     Cornell expected or should have expected John Doe to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that Cornell would not tolerate, and John Doe would not suffer, harassment by fellow students and would not deny John Doe his procedural rights should he be accused of a violation of Cornell's policies.

187.     John Doe relied to his detriment on these express and implied promises and representations made by Cornell.

188.     Based on the foregoing, Cornell is liable to John Doe based on Estoppel.

189.     As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

190.     As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Negligence

191.     John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

192.     Cornell owed duties of care to John Doe. Such duties included, without limitation, a duty of reasonable care to conduct an impartial and thorough investigation of the allegations of sexual misconduct against him.

193.     Cornell breached its duties owed to John Doe.

194.     As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

195.     As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Violation of New York State Human Rights Law

196.     John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

197.     Defendant Cornell is an education corporation organized and operating as such under the laws of the State of New York.

198.    The New York State Human Rights Law § 296(4) provides "[i]t shall be an unlawful discriminatory practice for an education corporation or association ... to permit the harassment of any student or applicant, by reason of his race, color, religion, disability, national origin, sexual orientation, military status, sex, age, or marital status[.]" N.Y. Exec. Law § 296(4).

199.    Cornell's Policy 6.4 states, among other thing:

> Cornell University's commitment to diversity and inclusiveness is grounded in providing an environment that is **free from all prohibited discrimination**, protected-status harassment, sexual assault/violence, and bias activity, in particular when such actions are directed at a member or group of the Cornell community because of that individual's or group's actual or perceived age, color, creed, disability, ethnicity, gender, gender identity or expression….

> Cornell University prohibits its faculty, administrative and academic staff members, postdocs, and undergraduate and graduate students from engaging in any form of prohibited discrimination, protected-status harassment, sexual harassment, and sexual assault/violence, and expects these individuals to refrain from committing acts of discrimination, bias, or sexual assault/violence within the university's jurisdiction.

200.    Based on the foregoing *supra,* at ¶¶ 100-112, Cornell permitted discrimination against John Doe on the basis of his sex.

201.    Based on the foregoing *supra,* at ¶¶ 100-112, Cornell authorized, condoned and/or acquiesced to discriminatory conduct against John Doe.

202.    Based on the foregoing *supra,* at ¶¶ 100-112, Cornell knew or should have known of such discriminatory conduct and failed to undertake action to prevent it.

203.    Defendant Cornell engaged in the following discriminatory acts or practices against John Doe as the male accused: Cornell subjected John Doe to disciplinary action in an arbitrary and capricious way, and in discrimination against him on the basis of his male sex; upon accepting Jane Doe's uncorroborated account of the events, the JA discriminated against

John Doe, based solely on his gender; Cornell failed to adhere to its own guidelines and regulations, and the guidelines and regulations themselves are insufficient to protect the rights of male students; the Decision was discriminatory in that given the evidence (or lack thereof), a discriminatory bias against males was required for a conclusion of sexual misconduct to be reached.

204.    Based on the foregoing facts and circumstances, Cornell engaged in unlawful discriminatory practices in violation of N.Y. Exec. Law § 296(4).

205.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

206.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Violation of New York State Civil Rights Law

207.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

208.    Section 40–c of the New York State Civil Rights Law provides that "[n]o person shall, because of race, creed, color, national origin, sex, marital status, sexual orientation or disability ... be subjected to any discrimination in his or her civil rights, or to any harassment[.]" N.Y. Civ. Rights Law § 40–c(2).

209.    Based on the foregoing *supra,* at ¶¶ 100-112, Cornell permitted discrimination against John Doe on the basis of his sex.

210.    Based on the foregoing *supra,* at ¶¶ 100-112, Cornell knowingly and intentionally discriminated against John Doe on the basis of his sex.

211.    Based on the foregoing *supra,* at ¶¶ 100-112, Cornell knew or should have known of such discriminatory conduct and failed to undertake action to prevent it.

212.    Defendant Cornell engaged in the following discriminatory acts or practices against John Doe as the male accused: Cornell subjected John Doe to disciplinary action in an arbitrary and capricious way, and in discrimination against him on the basis of his male sex; upon accepting Jane Doe's uncorroborated account of the events, the JA discriminated against John Doe, based solely on his gender; Cornell failed to adhere to its own guidelines and regulations, and the guidelines and regulations themselves are insufficient to protect the rights of male students; the Decision was discriminatory in that given the evidence (or lack thereof), a discriminatory bias against males was required for a conclusion of sexual misconduct to be reached.

213.    Based on the foregoing facts and circumstances, Cornell engaged in unlawful discriminatory practices in violation of John Doe's rights to fair process.

214.    Based on the foregoing facts and circumstances, Cornell engaged in unlawful discriminatory practices in violation of New York State Civil Rights Law § 40–c(2).

215.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

216.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A NINTH CAUSE OF ACTION
### Declaratory Judgment

217.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

218.     Cornell has committed numerous violations of the Parties' contracts and of federal and state law.

219.     John Doe's future and career prospects have been severely damaged.  Without appropriate redress, the unfair outcome will continue to cause irreversible damages to John Doe's future employment prospects, with no end in sight.

220.     As a result of the foregoing, there exists a justiciable controversy between the Parties with respect to the outcome, permanency, and future handling of John Doe's formal student record at Cornell.

221.     By reason of the foregoing, John Doe requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by the Panel at Cornell be reversed; (ii) John Doe's reputation be restored; (iii) John Doe's disciplinary record be expunged; (iv) the record of John Doe's suspension from Cornell be removed from his education file; (v) any record of the complaint against John Doe be permanently destroyed; and (vi) Cornell's rules, regulations and guidelines are unconstitutional as applied.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, John Doe demands judgment against Defendant Cornell University as follows:

(i)     on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)     on the second cause of action for breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)     on the third cause of action for breach of the covenant of good faith and fair dealing, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)     on the fourth cause of action under New York General Business Law § 349 Deceptive Acts and Practices Unlawful, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)     on the fifth cause of action for estoppel and reliance, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)     on the sixth cause of action for negligence, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)     on the seventh cause of action under New York State Human Rights Law § 296(4), a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(viii)     on the eighth cause of action under New York State Civil Rights Law § 40–c(2), a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ix)     a declaratory judgment pursuant to 28 U.S.C. § 2201, a judicial declaration that: (i) the outcome and findings made by Cornell be reversed; (ii) John Doe's reputation be restored; (iii) John Doe's disciplinary record be expunged; (iv) the record of John Doe's suspension from Cornell be removed from his education file; (v) any record of the complaint filed against John Doe's be permanently destroyed; and (vi) Cornell's rules, regulations and guidelines are unconstitutional as applied; and

52

(x)    awarding John Doe such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

John Doe herein demands a trial by jury of all triable issues in the present matter.


Dated:   New York, New York
         March 19, 2015


NESENOFF & MILTENBERG, LLP
*Attorneys for Plaintiff John Doe*

By: _____

Andrew T. Miltenberg, Esq. (517014)
Kimberly C. Lau, Esq. (517016)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
klau@nmllplaw.com