**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**VITO PRASAD,**

                      **Plaintiff,**

                                        **Civil Action No. 5:15-cv-322**

     **v.**

**CORNELL UNIVERSITY,**

                      **Defendant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


**DECISION & ORDER**

## I.    INTRODUCTION

Plaintiff Vito Prasad commenced this action against Defendant Cornell University asserting claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 _et seq._ ("Title IX"), and New York state law.  The claims arise from Plaintiff's disciplinary proceeding at Cornell University.  Defendant moves to dismiss the action, which Plaintiff opposes.

The Court has considered the parties' submissions, including their supplemental briefings, and reaches the instant decision without the need for oral argument.  For the reasons that follow, Defendant's motion is granted in part and denied in part.

## II.    STANDARD OF REVIEW

On a Rule 12(b)(6) motion, the Court must  accept "all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." _Holmes v._

*Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) (internal quotation marks omitted).  This tenet does not apply to legal  conclusions, non-factual matter, or "conclusory statements" set forth in a complaint.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 -79 (2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  While Rule 8(a)(2) "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me-accusation." *Id.* (citation and internal quotation marks omitted).[1]  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" is insufficient. *Id.* (citation omitted).  A plaintiff must show "more than a sheer possibility that a defendant acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555.  If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id*. at 570.

---

[1]Rule 8(a)(2) provides that a pleading shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Plaintiff's Amended Complaint is hardly a short or plain statement of his claims.  Rather, it is a 52-page, 221+ paragraph document consisting of factual assertions, conclusions, and arguments.

## II.    BACKGROUND[2]

Plaintiff Vito Prasad ("Prasad" or "Plaintiff") was, at pertinent times, a senior student at Defendant Cornell University ("Defendant" or "Cornell").  Plaintiff is a male who was the respondent in a sexual assault complaint made by Jane Doe ("Doe" or "the complainant"),[3] a female senior student at Cornell.  Am. Compl. ¶ ¶ 31-55.  The claims in this action arise from Cornell's handling of this sexual assault complaint.

### a.  Cornell's Code of Conduct and Policy 6.4

Cornell has promulgated a policy regarding  Prohibited Discrimination, Protected-Status Harassment, Sexual Harassment, and Sexual Assault and Violence ("Policy 6.4").  *Id.* ¶ 23.  Policy 6.4 provides in relevant part:

> Sexual violence refers to physical acts perpetrated without consent when a person is incapable of giving consent.  A number of different acts fall into the category of sexual violence, including rape, sexual assault, sexual battery, sexual abuse and sexual coercion.  All such acts of sexual violence are forms of sexual harassment that are covered under Title IX and should be reported as soon as possible to the [Cornell University Police Department], who will take appropriate action and inform the Title IX coordinator and deputy coordinators.

---

[2]For the purposes of this motion, the factual allegations in the Amended Complaint are assumed to be true. *See Fahs Constr. Group, Inc. v. Gray*, 2011 U.S. Dist. LEXIS 7822, at *5-6 (N.D.N.Y. Jan. 27, 2011).

[3]This action was originally commenced using the pseudonyms "John Doe" and "Jane Doe" for Plaintiff and the complainant, respectively.  After the Hon. David E Peebles, United States Magistrate Judge, determined that Plaintiff could not proceed anonymously, *see* March 25, 2015 Order, dkt. #5, Plaintiff filed his Amended Complaint using his and the complainant's actual names. *See* Am. Compl., dkt. # 11.  However, because "the public generally has a strong interest in protecting the identities of sexual assault victims so that other victims will not be deterred from reporting such crimes," *Doe No. 2 v. Kolko*, 242 F.R.D. 193, 195 (E.D.N.Y. 2006), and because the Cornell disciplinary proceeding determined that Plaintiff did sexually assault the complainant, the Court will proceed using the pseudonym "Jane Doe" for the complainant.

*Id.* ¶ 22.[4]   Cornell's Campus Code of Conduct provides that offenses involving sexual violence, "while still violations of the Campus Code of Conduct," are to be investigated under Policy 6.4.  Roth Decl., Def. Ex. B, at 40.  Prasad was provided copies of the Campus Code of Conduct and Policy 6.4 upon his admission to Cornell.  Am. Compl. ¶ 21.

Policy 6.4 establishes detailed procedures for the investigation of, *inter alia*, sexual assault complaints, and for the appeal of disciplinary action taken by Cornell.  Under these procedures, Cornell's Office of the Judicial Administrator ("JA") has exclusive responsibility for accepting and processing such complaints. *Id.* ¶ 24.

If the JA determines that a complaint describes a violation of Policy 6.4 requiring formal investigation, the JA will notify the "accused" that he or she has been named in a complaint and an investigation will be commenced.  *Id.* ¶ 25.  The purpose of the investigation is "to gather evidence relating to the alleged discrimination, harassment, sexual assault/violence or retaliation to determine whether the accused engaged in [the alleged] conduct . . . by a preponderance of the evidence."  *Id.* ¶ 26.  Policy 6.4 provides to an accused student the right to have the investigation completed within 60 days, "subject to extension by the investigator as may be necessary or for good cause;" to seek the advice of a personal attorney or advisor who may attend the student's investigative interview; and to be kept informed of the investigation's status. *Id.*  ¶ 27.

---

[4] A copy of Policy 6.4 is attached to Nelson E. Roth's April 30, 2015 declaration as Exhibit A, and has been reviewed by the Court for purposes of deciding the instant motion. *See Faiz v. Colgate University*, 2014 U.S. Dist. LEXIS 164168, at *12 (N.D.N.Y. Nov. 24, 2014)(In deciding a motion to dismiss, a court may review documents "integral to the complaint," as well as any statements or documents incorporated into the complaint by reference.).

Upon concluding an investigation, the investigator produces a written Investigative Report indicating "the scope of the investigation, a summary of the findings, recommendations for any corrective actions and/or sanctions, [and] any non-punitive, preventative remedies for the complainant." *Id.* ¶ 29. The Investigative Report is then presented to a panel of three faculty members appointed by the Dean of Faculty ("the Reviewers") for their review. Policy 6.4, at 58.

The Investigative Report must be provided to the complainant and the accused student, who each have ten (10) business days to submit written comments and "ask the [Reviewers] to review the evidence, determination and/or recommended sanctions or remedial measures contained in the report." Am. Compl. ¶ 27. The Reviewers may accept or modify the investigator's recommendation, or may return the case to the investigator for further investigation. *Id.*

The accused student has ten (10) business days to appeal the Reviewers' final determination. *Id.* ¶ 30. The appeal is to the Vice President for Student and Academic Services, who may accept, modify, or reject the Reviewers' determination and sanctions. *Id.*

**b. The Underlying Incident**

Plaintiff and Doe had many classes together at Cornell as they were both seniors majoring in Chemical Engineering. *Id.* ¶ 31. On Friday, December 13, 2013, an end-of-semester celebration for Chemical Engineering students was held, which Plaintiff, Doe, other undergraduate classmates, teaching assistants, graduate students, and professors from the Chemical Engineering school attended. *Id.* ¶ 32. The celebration consisted of

5

dinner and drinks, with each student receiving two "drink tickets" to use during the event.

A student witness, identified as O.G., observed that Doe and Plaintiff "seemed happy and

friendly" and noticed them talking to each other at the event.  *Id.*[5]  The event lasted from

approximately 6:00 p.m. to 8:30 p.m.  *Id.* ¶ 33.

        After the event, Doe and some of her friends returned to her apartment

approximately one-half block away to drop off their purses and winter boots.  These

individuals then joined their classmates, teaching assistants, graduate students and

professors at around 10:00 p.m. for an "after-party" held at a nearby residence.  *Id.* ¶ 34.

Doe and her friends socialized, danced and drank at the after-party.  *Id.*  "Even though

everyone had been drinking, witness M.N. indicated that Doe was not intoxicated to the

point that she did not know what was going on."  *Id.*   While at the after-party, Prasad and

Doe participated in a game of "beer pong" and continued to talk.  Witness M.V. noticed

Doe and Prasad "getting close and flirting."  *Id.* ¶ 35.

        Prasad and Doe continued to flirt throughout the evening by dancing together,

talking, and with Doe touching Prasad's hair.  *Id.* ¶ 36.   Witness N.N. indicated that Doe

"wasn't drunk, maybe a couple of drinks, but not messy drunk."  *Id.*  Additionally, witness

L.T. stated that although Doe seemed to consume a lot of alcohol, she "didn't notice

anyone having trouble walking or slurring [their] speech."  *Id.*  Prasad consumed

approximately five or six alcoholic drinks over a ten hour period throughout the evening.

Doe subsequently alleged that she consumed approximately fifteen alcoholic drinks

_____

        [5] Throughout Plaintiff's rendition of the facts, he interlaces statements made by witnesses in
the subsequent investigation. The actual statements were not provided to the Court.  For purposes of
this motion, the Court presumes the truth of Plaintiff's factual assertions about the content of the
witnesses' statements.

throughout the evening.  *Id.* ¶ 37.[6]  "Although Prasad was in [Doe's]  presence the whole

evening, he did not observe her consuming fifteen drinks."  *Id.*

At around 2:30 or 3:00 a.m. on December 14, 2013, Prasad, Doe, and witnesses

L.T., M.N., M.V. and V.P. left the after-party together and walked to Doe's apartment.  *Id.* ¶

39.  Plaintiff alleges that "[a]lthough everyone had been drinking, no one was very

intoxicated . . . . [N]either Prasad nor [Doe] had trouble walking home despite the snow

and icy conditions and neither was slurring their speech."  *Id.* ¶ 40.  Witness V.P. indicated

that everyone was "buzzed" but that Doe did not appear intoxicated, let alone

incapacitated.  *Id.*

Prasad, Doe, L.T., M.N., M.V. and V.P. remained in Doe's apartment for

approximately twenty-five minutes.  *Id.* ¶ 41.  They engaged in conversation in Doe's

kitchen, discussing various topics such as their previous sexual experiences.  *Id.*  The

witnesses indicated that no member of the group appeared intoxicated to the point of

being incapacitated.  *Id.*

At some point during the conversation and in front of the entire group, Doe removed

her bra from under her shirt.  *Id.* ¶ 42.   As she did this, she motioned toward Prasad and

got closer to him.  *Id.*   When the four friends departed, Prasad remained behind and Doe

did not protest.  *Id.* ¶ 43.   Witness V.P. stated that Doe seemed fine when he left Doe and

Prasad at the apartment.  *Id.*   Additionally, witness M.V. stated that if he felt Prasad was

too drunk to be there with Doe, he would have made Prasad leave.  *Id.*   M.V. also stated

---

[6]According to Doe, this consisted of three glasses of wine, half a bottle of Malibu Rum, another third of a bottle of rum, two more glasses of wine, a bottle of wine, two shots of unknown hard alcohol, and one beer. Am. Compl. ¶ 37.

that "if [he] felt [Doe] was in any way in danger [he] would not have left." *Id.*

Doe claims that she agreed to let Prasad spend the night at her apartment due to the cold weather and the distance to Prasad's apartment. *Id.* ¶ 44. Doe did not have a couch so it was understood that Prasad would sleep in her bed with her. *Id.* Doe attributed this hospitality to her German family's "sailboat community ideals." *Id.*

After M.N., M.V., L.T. and V.P. departed, Prasad informed Doe that he was interested in her. *Id.* ¶ 45. Prasad and Doe began to kiss while standing up. *Id.* The kissing continued as they moved towards the bed. *Id.* They spoke occasionally between kissing, and at one point Doe apologized for the mess in her room. *Id.* "They verbally communicated about 'hooking up,' with Doe advising that she was 'horny' but that she did not want to have sex." *Id.* Doe removed her own dress and underwear, and Prasad followed by removing his pants and underwear. *Id.* Doe began to manipulate Prasad's penis and Prasad began to digitally penetrate Doe. *Id.*

Plaintiff alleges that he and Doe engaged in consensual sexual activity for approximately one hour. *Id.* ¶ 46. He further alleges that both he and Doe were awake and coherent at all times during the sexual activity, communicating non-verbally by touching, stroking and kissing each other. *Id.* ¶ 47. In addition, Prasad alleges that Doe demonstrated her consent "through both words and actions, by actively participating in the sexual activity, stating her willingness to engage in sexual activities as long as it wasn't sexual intercourse, manually manipulating Prasad's penis, removing her own clothing and underwear, and continuing to kiss and touch Prasad throughout the sexual encounter." *Id.* ¶ 48. He also contends that he and Doe faced each other during the entire hour of sexual

8

activity and that Doe brushed her fingers through his hair.  *Id.*  ¶ 49.

Prasad and Doe fell asleep together in Doe's bed and woke up later that morning around 8:30 a.m. when an alarm clock went off.  *Id.* ¶ 50.  When they awoke, Prasad and Doe "engaged in conversation, including a discussion about her love of rabbits and the fact that she wanted to take a shower."  *Id.* ¶ 51.  Given that they had mutual friends and were a part of the same major, Doe advised Prasad to not "make it weird."  *Id.* ¶ 52.

On Monday, December 16, 2013, Doe had breakfast with her close friend, witness C.G.  C.G. described Doe's appearance as "disheveled," and stated that she looked "tired and with messy hair."  *Id.* ¶ 53.   Because C.G. was not present on the evening of December 13-14, 2013, Doe recounted the events of the night for her, including the sexual activity she engaged in with Prasad.  *Id.*  The subsequent Investigative Report "misrepresented the testimony provided by C.G. in stating that this breakfast took place the morning after the Incident, on Saturday December 14, 2013, when in fact it did not take place until two days later, on December 16, 2013.   Further, the Investigative Report erroneously attributed [Doe's] disheveled appearance to the Incident, despite the f act that the sexual activity between [Doe] and Prasad occurred more than two days prior, and [Doe] had presumably taken at least one shower in the interim."  *Id.*

On February 18, 2014, Doe filed a complaint against Prasad, requesting a formal investigation of a matter involving sexual assault and/or sexual harassment.  *Id.* ¶ 56.  The complaint alleged that Prasad raped Doe on December 14, 2013 while she was incapacitated.  *Id.*

9

### c.  The Investigation and Cornell's Determinations

Upon the filing of Doe's complaint, Judicial Administrator Mary Beth Grant requested the Dean of Faculty, Joseph Burns, to assemble a panel of three faculty members to serve as reviewers in the matter.  *Id.* ¶ 58.  Associate Judicial Administrator Clint Dupew and Rose Braman, the Coordinator of the Inclusion and Diversity Program at Cornell,[7] began an investigation into Doe's allegations.  They interviewed Doe on February 18, 2014, and a telephone call was placed to Prasad requesting his appearance at the JA's office on February 24, 2014.  *Id.* ¶¶ 59-60.  Prasad was informed during the telephone call that a complaint had been filed against him, but he was not provided any details about the nature of the allegations.  *Id.* ¶ 60.

Prasad appeared at the JA's office on February 24, 2014.  *Id.* ¶ 62.  He was accompanied by Judicial Code Counselor David Coriell.  *Id.*[8]  Ms. Grant informed Prasad that Doe had filed a complaint against him relating to the events of December 13-14, 2013.  *Id.*  Ms. Grant "forced Prasad to sign a paper acknowledging receipt of the complaint, as well as a No Contact Order that Prasad was required to adhere to."  *Id.*  Mr. Dupew and Ms. Braman then began questioning Prasad about the evening of December 13-14, 2013.  *Id.* ¶ 63.  "Mr. Dupew initially asked a number of very broad questions, none of which focused on the amount of alcohol consumed by [Doe], followed by more specific

---

[7]From the information presented to the Court, it is unclear whether Ms. Braman was a member of the JA's office.  Further, Policy 6.4 calls for the appointment of a single investigator, *see* Policy 6.4(E), p. 18, and Dr. Susan H. Murphy, the Vice President for Student and Academic Services at Cornell who ultimately reviewed Plaintiff's appeal, references information provided by a single investigator in her July 16, 2014 decision.  *See* Roth Dec. Ex. C.

[8]Judicial Codes Counselors may represent accused students in proceedings brought under Policy 6.4.

questions regarding the sexual activity." *Id.*

On March 2, 2014, Prasad sent an email to Mr. Dupew with a list of potential witnesses that Dupew could speak to regarding the events of December 13-14, 2013. *Id.* ¶ 64. The list included witnesses L.T., M.N., N.N., M.V., A.P. and O.G. *Id.*

On April 16, 2014, Prasad returned to the JA's office accompanied by Mr. Coriell for a follow-up interview. *Id.* ¶ 65. "Mr. Dupew asked Prasad questions similar to those from the first interview, apparently seeking inconsistencies in his statements." *Id.* During Prasad's second interview, Mr. Dupew indicated that Doe had asserted that she had consumed an estimated eighteen drinks on the night of the Incident. *Id.*[9] Mr. Dupew never asked Prasad whether he personally observed Doe consume this amount of alcohol. *Id.* At the conclusion of the interview, Prasad inquired as to the status of the Investigative Report because he was expecting to graduate in less than two months. *Id.* ¶ 66.

> Mr. Dupew advised, in the presence of Mr. Coriell, that if he were to find any fault on the part of Prasad, "personally seeing that [Prasad was] a graduating senior, worst case scenario I will not recommend suspension or expulsion. You are too close to graduation and this would not make sense." Mr. Dupew further advised Prasad and Mr. Coriell that Prasad's case was "air-tight" in that Prasad's defense was fully corroborated by witness testimony.

*Id.*

Upon the conclusion of the investigation, Mr. Dupew and Ms. Braman issued the Investigative Report of the Office of the Judicial Administrator, dated April 30, 2014. *Id.* ¶ 72. It indicated that the investigation consisted of interviews of Prasad, Doe, and several

---

[9]Although the Amended Complaint alleges elsewhere that Doe claimed that she consumed the equivalent of 15 alcoholic drinks on the night of the incident, it alleges at ¶ 65 that Dupew told Plaintiff on April 16, 2014 that Doe asserted she consumed 18 alcoholic drinks.

witnesses.  *Id.* ¶ 68.   According to the Investigative Report, "[n]o physical or tangential documentary evidence was provided or otherwise considered," *id.* ¶ 68, yet the investigators used an unverified on-line Blood Alcohol Content ("BAC") calculation tool from Cornell's Gannett Health Services to determine Doe's blood alcohol content on the night in question.  *Id.* ¶ 93.  The investigators determined that, based on Doe's self-reported alcohol consumption and her stated body weight, her BAC was approximately .33.  *Id.* ¶ 93.[10]  The investigators also cited to the December 17, 2009 Annual Report of the Judicial Administrator, which states: "The fact that an accused person had been drinking, is neither a defense to sexual assault nor an exonerating circumstance ..."; and to the April 13, 2010 Annual Report of the Judicial Administrator, which states: "[F]ailure to recognize that the victim was too drunk to consent is no defense to a charge of sexual assault as defined by the Cornell Code and in the case law interpreting it." *Id.* ¶ 105.  The investigators concluded that Doe "was intoxicated to the point of being mentally incapacitated and incapable of consent to engage in such sexual activity.  Therefore [Prasad] sexually assaulted [Doe] as defined by Cornell University Policy 6.4." *Id.* ¶ 72.  The investigators recommended that Prasad be expelled, or, in the alternative, that his degree be held for a period of time not less than two years.  *Id.*

The Investigative Report was transmitted to Prasad on May 2, 2014.  *Id.*   In a May 7, 2014 email from Mr. Dupew to the Reviewers, Dupew indicated that the investigators "believe[d] the complainant's BAC may have actually been higher; up to a tenth of a point

---

[10]Plaintiff argues that such a BAC is "similar to surgical anesthesia." Am. Compl. ¶ 93.

higher," or a BAC of .43.  *Id.*[11]

Plaintiff complains that, despite Cornell's policy that an investigation be completed within 60 days absent good cause, the investigation was not completed until the Investigative Report was issued on April 30, 2014, which was 71 days following Doe's complaint.  *Id.* ¶ 73.  Plaintiff asserts that good cause for the delay was not provided.  *Id.* ¶ *74.*  Further, despite Ms. Grant's assurance that Prasad would receive a copy of the Investigative Report on the evening of April 30, 2014, the Investigative Report was not transmitted to him until May 2, 2014.  *Id.* ¶ 73.

> Notwithstanding its own failures to adhere to its policies . . . , Cornell unreasonably demanded Prasad's strict compliance with same. Specifically, Prasad's reasonable request for a five (5) business day extension (until May 23, 2014) to respond to the Investigative Report consisting of information gathered over several months' of investigation, due in large part to the fact that the timing of his response coincided with his academic obligations with respect to final examinations, was denied.  Sexual Assault Investigatory Panel Chair Irby Lovette reasoned that the extension must be denied on the grounds that permitting same would potentially result in Prasad and [Doe] running into each other at graduation. Mr. Lovette's justification certainly overlooked the fact that Prasad and [Doe] had sat an arm's length away from each other in class all semester.  Mr. Lovette indicated he would only permit an extension until 1:00 p.m. on the following Monday, May 19, 2014.

*Id.* ¶ 75.

The Reviewers met on May 19, 2014 to discuss the matter, and initially questioned the investigators' calculation of Doe's BAC.  *Id.* ¶ 95.  However, the Reviewers ultimately accepted the investigators' explanation that the BAC estimate was based on Doe's self-reported weight and consumption of 15 alcoholic drinks. *Id.*  ¶¶ 95-96.  The Reviewers agreed with all recommendations made by the investigators, and unanimously accepted

---

[11]Plaintiff argues that such a BAC would have been "nearly fatal." Am. Compl. ¶ 93.

13

the findings and the recommended penalty of expulsion. *Id.* ¶ 79. The Reviewers finalized their decision in a letter to Plaintiff on May 20, 2014. *Id.*

Prasad submitted his appeal from the Reviewers' decision on June 3, 2014, in accordance with the deadline of ten (10) business days imposed by Policy 6.4. *Id.* ¶ 80. "Yet, Cornell inexplicably provided substantial leeway to [Doe], in allowing her a thirteen (13) business day/seventeen (17) calendar day extension until June 20, 2014 to submit her Appeal to the Report of Reviewers. [Doe] was provided an extension without question, in comparison to the substantial resistance encountered by Prasad in response to his prior request for an extension. Moreover, while [Doe] was permitted an opportunity to review and respond to Prasad's Appeal, Prasad was never provided an opportunity to even review [Doe's] Appeal." *Id.*

By letter dated July 16, 2014, Dr. Susan H. Murphy, Vice President for Student and Academic Services, advised that she concurred with the Reviewers' finding that Doe "did not give consent to the sexual activity that occurred on December 14, 2013." *Id.* ¶ 81. Dr. Murphy noted that "while one might disagree with the precision of the calculation of the blood alcohol level cited by the investigator, I conclude, based on the many statements provided,[12] that the complainant consumed considerable quantities of alcohol and consequently was not able to consent to the sexual activity." *Id.* However, Dr. Murphy stated that although she was "upholding the expulsion imposed in this matter," she believed that Plaintiff's "level of culpability may warrant re-examination of this sanction at

---

[12] As indicated in the text, *infra*, it does not appear that Dr. Murphy actually reviewed the witness statements when reaching her July 16, 2014 decision, but rather relied on the representations in the Investigative Report about the statements. *See* Roth Decl., Ex. D (Murphy Nov. 10, 2014 Memo.).

14

some time in the future, thus permitting [Plaintiff] to earn his Cornell degree, subject to

conditions" outlined by Dr. Murphy.  *See* Roth Decl., Ex. C, Murphy 07/16/14 Opinion.[13]

_____

[13]The conditions imposed by Dr. Murphy are:

1. A statement from the respondent himself (not drafted by his lawyer) describing what he has learned from the incident and the subsequent activity in which he has engaged. This statement should include not only his personal reflection but also what he has learned from the literature about sexual assault, the role of consent (and how it can or cannot be granted) in sexual activity and the role bystanders can play to prevent sexual violence.

2. A modified statement to be used by the University for sexual violence prevention and awareness education, based on the statement required in the first condition above but without any information that would permit the identification of the respondent or the complainant, describing the incident, the role alcohol, poor judgment, and any other pertinent factor played in contributing to the incident, the impact of the incident on respondent's life, and what respondent has learned from the incident.

3.  A psychological assessment by a licensed mental health professional to examine issues of power and violence against women. Once the assessment is complete, the licensed therapist may make additional recommendations to assess the issues that led to the referral and the Respondent must complete these recommendations. Respondent must sign any releases of information needed to allow the counselors to communicate with the Office of the Vice President for Student and Academic Services to confirm compliance and to provide information about treatment. It is Respondent's responsibility to return the appropriate forms to the Office of the Vice President for Student and Academic Services after the assessment and to ask the counselor to inform that office once treatment is complete.

4. An Alcohol and Other Drug (AOD) assessment by a licensed AOD treatment professional and completion of the appropriate counseling program based on that assessment and recommendations of the counselor(s). Respondent also must sign any releases needed to allow the University to provide collateral information to the counselors prior to the initial evaluation and for the results of the evaluation and treatment (if appropriate) to be shared with the Office of the Vice President for Student and Academic Services to confirm compliance and to provide information about treatment and recommendations.

5. No documented activity in violation of the law, or if he is enrolled in an educational institution, of campus rules.

6. Respondent must also submit a statement setting forth the activity he engaged in from the time of his suspension to the date of his request that the expulsion be reconsidered, including

(continued...)

Dr. Murphy  concluded:

> If, at the end of two years (*i.e.*, June 2016), the respondent fully complies with the conditions . . .,  the Vice President for Student and Academic Services (or the person responsible for hearing final appeals of student cases should the current procedure be modified) should consider whether the sanction of expulsion should be modified to a suspension, thus permitting the respondent to receive his Cornell degree, with the notation "Indefinite suspension with conditions May 2014; conditions met June 2016.  Degree awarded." This wording would replace the wording of expelled June 2014 that currently is on his transcript.
>
> * * *
>
> This decision is the final action in this case.

*Id.*[14]

Prasad asserts that has been damaged by Cornell's actions in that his career prospects have been severely compromised because of his inability to produce a diploma to potential employers.  He contends that he has lost five (5) job offers to date, worth an estimated value of approximately $200,000.00 each.  *Id.*  ¶¶11, 136-140.  He also asserts

---

[13](...continued)
a listing of public service activities he has engaged in, community activities, any courses he may have taken, and any employment he may have held. These activities will be considered in deciding whether to modify the sanction or not.

Roth Decl., Ex. C.

[14]Defendant asserts that "[a]fter Plaintiff wrote a letter to Cornell's President, Dr. Murphy prepared a further memorandum, making clear that Plaintiff could obtain his degree sooner than two years if he met the conditions." Def. Mem. L., p. 5 (citing Roth Decl. Exs. C & D).  However, this "further memorandum," prepared on November 10, 2014, was in response to Plaintiff's attorneys' letter to the Cornell President in which the attorneys "raised questions about alleged legal deficiency in Cornell's disciplinary procedure and invited discussion of possible settlement of claims asserted by Mr. Prasad." Roth Decl., Ex. D.  Thus, the November 10, 2014 memorandum appears to be Dr. Murphy's response to the assertion of legal claims against Cornell, not further advice to Plaintiff about obtaining his degree in the future.  Further, the memorandum does not appear to be part of disciplinary process and procedure dictated by Policy 6.4.

16

that Cornell's actions caused the monies he spent on obtaining a college education at Cornell "to be squandered." *Id.*

### d. Plaintiff's Complaints about Cornell's Investigation & Determinations

Plaintiff lodges several complaints about Cornell's investigation and determinations in this matter.

### 1. Failure to Conduct a Timely Investigation

Plaintiff contends that Cornell failed to conduct a timely investigation despite the guidelines imposed by its own rules and policies. In this regard, Plaintiff contends that Cornell was first notified of Doe's allegations on February 18, 2014, yet Cornell's investigative process took 91 days, ending on May 20, 2014. *Id.* ¶ 87.[15] Plaintiff further contends that "Cornell engaged in a dilatory investigative process by delaying the questioning of witnesses, and acting without any sense of urgency to resolve the matter despite Prasad' s upcoming (anticipated) graduation date." *Id.* ¶ 89. Plaintiff asserts that when he inquired about the status of the investigation before the Investigative Report was issued, "Mr. Dupew offered a variety of excuses for the delayed investigation process" including that the "Office of the Judicial Administrator was backlogged due to a bout of the flu among the office administrators, or that the JA was working on 'other more serious cases' so [Plaintiff's case] was put on the back burner." *Id.* ¶ 88.

### 2. Disregarded Eyewitness Accounts and Relied on Improper Evidence

Plaintiff also complains that investigators disregarded eyewitness accounts, and relied on improper evidence, in making their determination that Doe was not able to

---

[15]May 20, 2014 is the date that the Reviewers issued their decision in the matter.

consent to the sexual encounter due to her level of intoxication.  Plaintiff alleges that the investigators disregarded at least four (4) witness statements that demonstrated that Doe was not exhibiting visible signs of intoxication during the time leading up to the intimate encounter with Prasad.  *Id.* ¶ 69.[16]  Moreover, he asserts that "Mr. Dupew never questioned Prasad, or Witness L.T. or Witness M.N. about [Doe's] alcohol consumption, despite the fact that Prasad as well as L.T. and M.N. were with [Doe] throughout the evening.  In fact, the Investigative Report omitted Witness L.T.'s account of the evening which directly contradicted [Doe's] self-reported alcohol consumption." *Id.* ¶ 92.[17]

Plaintiff also argues that investigators should not have calculated Doe's BAC using an on-line calculator in which they inputted Doe's self-reported weight and alcohol consumption.  Moreover, Plaintiff argues that if Doe's BAC had been a .43 as the investigators suggested, it would have resulted in a "nearly fatal" condition.  *Id.* ¶ 93.  Therefore, Plaintiff maintains, "[if] [Doe's] self-reported consumption [was] to be believed, it would certainly [have been] the case that witnesses would have noticed an extreme level

_____

[16]These included: (i) a statement from M.N. who was with Doe at the dinner party, at the after- party, and who went back to Doe's apartment afterwards with the group of friends.  M.N. stated: " ...I did not feel [Doe] was intoxicated to the point she was not aware of what was going on..."; and "They were both drinking but aware of surroundings and such"; (ii) a statement from V.P. who was also with Doe at the dinner party and the after-party and observed that Doe "didn't appear intoxicated," but rather reported that "[Doe] seemed fine"; (iii) a statement from N.N., who attended both events on December 13, 2013 and who indicated that Doe "wasn't drunk, maybe a couple of drinks, [but] not messy drunk."  N.N.  further stated that he did not recall anyone "really drunk, crazy, or stumbling at the after-party;" and (iv) a statement from L.T. who attended the after-party and returned to Doe's apartment afterwards, who stated that she "didn't notice anyone having trouble walking or slurring [their] speech." Am. Compl. ¶ 69.

[17]L.T. recalled that Doe consumed significantly less alcohol than she reported. Am. Compl. ¶ 93.

18

of intoxication, yet none of the witnesses interviewed reported this."  *Id.*[18]

### 3.  Investigative Report Slanted Against Plaintiff

Plaintiff also complains that the investigators prepared an Investigative Report that

slanted the evidence against him.  In this regard, he notes that in meeting with the

investigators he:

> described the Incident in considerably more detail than what was represented in the Investigative Report; for instance, the behaviors and actions of [Doe] that unmistakably demonstrated both her initiation of the sexual encounter, as well as her receptiveness to the sexual activity. Yet, because his testimony was inconsistent with the testimony provided by [Doe], the JA elevated [Doe's] testimony as sacrosanct, then deliberately omitted portions of Prasad's testimony which were inconsistent with hers. The remainder of his testimony was mischaracterized within the Investigative Report.

*Id.* ¶ 110.

In addition, Plaintiff alleges that investigators misconstrued witnesses' statements.[19]

He notes that M.N. stated: (i) " ...I did not feel [Doe] was intoxicated to the point she was

not aware of what was going on..."; and (ii) "[Plaintiff and Doe] were both drinking but

aware of surroundings and such."  However, the Investigative Report indicated that M.N.

stated that "[Doe] seemed tipsy; she had a fair amount, but was able to walk," and found

that M.N.'s statement supported Doe's level of intoxication. *Id.* ¶ 116.

Further, M.N., L.T. and M.V. all stated that Prasad was with the group when

---

[18]When questioned by the Reviewers, Mr. Dupew admitted that the numbers used in his BAC calculation were based solely on Doe's self-reported weight and alcohol consumption. Am. Compl. ¶ 93.

[19]Plaintiff also  contends that several witnesses stated they were confused and misled by the questions presented by the JA; the JA's questions were not straightforward; and the JA failed to provide any context so as to allow for the full and fair discovery of facts and details each witness had to offer, indicating that the JA's line of questioning and method of investigation was arbitrary and capricious. Am. Comp. ¶ 70.

19

everyone walked to Doe's apartment upon leaving the after-party, and all indicated that Prasad and Doe were interacting, even flirting, with each other throughout the evening. However, the "JA prejudicially mischaracterized Prasad as 'following the group' and 'checking in' on [Doe] out of concern for her, then proceeding to engage in 'predatory behavior' and '[take] advantage of an intoxicated individual.'" *Id.* ¶ 117.  Plaintiff maintains that such "mischaracterizations and assessments demonstrated a bias in favor of [Doe's] narrative that she was too intoxicated to consent." *Id.* ¶ 118.

Plaintiff also points out that witness A.L. merely observed that "most people [were] drunk," and stated that whenever he talked to Doe on the evening in question, she had a "cup in [her] hands."  *Id.*  ¶ 119.  However, the investigators concluded that A.L. was "extremely credible" and gave weight to A.L.'s statement as an indication of Doe's "likelihood of intoxication."  *Id.*  Plaintiff points out that A.L. provided no indication of the amount of alcohol Doe consumed or that Doe exhibited any signs of intoxication, only that she held a cup in her hand throughout the night. *Id.*

Plaintiff also complains that the investigators discounted, without explanation, V.P.'s statement that Doe "didn't appear intoxicated" and that "she seemed fine," stating instead that V.P. "seemed to underestimate the effects of alcohol when compared to others' accounts."  *Id.*  Plaintiff points to the investigators' assessment of V.P.'s statements as an indication of the outcome-determinative bias of the investigation.

Plaintiff also points out that the investigators deemed witness H.P. to be "extremely credible" and gave "significant weight . . . to his ability to observe independently that [Doe] was intoxicated [because] he himself was not in an intoxicated state." *Id.*  However,

20

Plaintiff notes that H.P. merely stated that Doe seemed "intoxicated, not terribly, but... [he] had never seen [Doe] intoxicated." *Id.* Furthermore, Plaintiff points out that L.T. gave a statement indicating that H.P. was "very intoxicated" when H.P. interacted with Doe on the night in question,[20] again indicting the investigators' outcome-determinative bias. *Id.*

Still further, Plaintiff points out that the investigators only gave "some weight" to L.T.'s statements about the night in question, but gave "significant weight" to M.N.'s statements, despite that both witnesses indicated that they were present throughout the entire evening. Plaintiff attributes this differentiation in treatment of the two witnesses' statements to the fact that L.T.'s statements did not support the investigators' predetermined outcome. *Id.*[21]

Plaintiff also asserts:

[T]he Investigative Report severely misrepresented the testimony provided by Witnesses L.T., M.N. and M.V. by selectively omitting portions of their statements and presenting others out of context. For instance, the Investigative Report quotes L.T. as stating "[Doe was intoxicated, [but the witness was] not sure of [Doe's] level of drunkenness. [Though] [Doe] seem[ed] to consume a lot of alcohol." Witness L.T. subsequently advised that she was inaccurately misquoted; specifically, not only is "intoxicated" not a part of her lexicon, but she also does not recall making any statement about Doe's level of "drunkenness." The JA haphazardly pieced together L.T.'s testimony to fit into [Doe's] narrative. . . .

Similarly, the Investigative Report substantially altered Witness M.N.'s testimony by stringing together different portions of her dialogue and omitting other portions in

---

[20]L.T. stated: "On our way, we ran into [HP] who [M.N.] and [Doe] both knew. It was kind of an awkward exchange of words because [HP] was obviously very intoxicated." Am. Compl. ¶ 119.

[21]L.T. stated that she "didn't notice anyone having trouble walking or slurring [their] speech," and L.T. provided a supplemental statement (supposedly submitted as Exhibit 1 to Prasad's Appeal from the Report of the Reviewers on June 3, 2014), wherein she refutes the number of drinks Doe claims she consumed that evening, refutes Doe's actual body weight, and advised that Doe called L.T. a "lightweight" because "[she] is unable to consume alcohol the way [Doe] does."

order to create an account that fit [Doe's] narrative.  Subsequent to her review of the Investigative Report, Witness M.N. clarified that she specifically advised the investigator that although [Doe] did consume alcohol on December 13, 2013, they were at a holiday party with the Chemical Engineering department; thus, no one drank to the point of blacking out in front of their professors. She further specified that while everyone did consume alcohol, no one was visibly intoxicated beyond the typical jovial mood that occurs when a group of friends drink together.  Thus, the JA investigator misconstrued his long and arduous dialogue with M.N. in concluding that M.N.'s testimony implied "[Doe] was drinking. . . more than usual."

*Id.* ¶¶ 120-121.

In addition, Plaintiff points out that the investigators credited witness C.G.'s observation about Doe's appearance during a breakfast meeting two days after the event in question as supporting Doe's claim that she was unable to give consent for the sexual activity. *Id.* ¶ 109.

Plaintiff maintains that "Cornell relied on an investigation consisting of a skewed rendition of the facts, cherry-picked witness statements and ignored important qualifying statements, [and] made assessments of credibility and evidentiary weight with respect to each fact witness without any ascertainable rationale or logic." *Id.* ¶10.

### 4.  The "Investigator Model" Denied Plaintiff Due Process

Plaintiff also complains that Cornell's "investigator model"[18] for investigations "effectively obliterate[d] [his] right to defend himself against allegations of the utmost serious nature, namely, sexual assault.  Specifically, [he] was denied the opportunity to challenge the credibility of witnesses, or draw out distinctions and details used by witnesses to qualify their stated observations of Doe's level of intoxication." *Id.* ¶ 71.

---

[18]Plaintiff refers to Cornell's disciplinary investigative procedure as a "single-investigator model," apparently because Policy 6.4 dictates that a single investigator be appointed during the investigative stage. *See* fn. 8, *supra*.  However, because the facts indicate that two individuals served as investigators, the Court will refer to the procedure simply as the "investigator model."

Prasad contends that he was denied the opportunity to confront or cross-examine Doe about important factors such as: (i) her claims of the volume of alcohol consumed; (ii) her actual weight (important to challenging her estimated BAC); (iii) her reliance on "sailboat community values" as an indication that she agreed only to allow Prasad spend the night at her apartment, and in her bed, but not as an indication of her consent to sexual contact; and (iv) her memory lapses for certain portions of the evening. *Id.* Plaintiff argues that "[b]y allowing the JA to take on the role of 'judge, jury and executioner,' there were no safeguards or checks and balances in place along the way to ensure that the JA's ultimate conclusion was objective and sound." *Id.*

Moreover, Plaintiff contends that despite Policy 6.4's requirement that all allegations be proven by the preponderance of the evidence standard,[19] "Cornell's investigation process demonstrated a clear gender bias which resulted in a Decision that did not afford Prasad the requisite presumption of innocence." *Id.* ¶ 124. Plaintiff contends that "the Reviewers improperly placed the burden of proof on [him] to establish that [Doe] consented to the sexual activity, instead of placing the burden of proof on [Doe], the complainant, to establish that she did not consent." *Id.* ¶ 125. Plaintiff asserts that Doe demonstrated her consent to the sexual activity by her words and her actions, yet the Investigative Report "disregarded these key aspects of the sexual encounter, in finding that a preponderance of the evidence supported [Doe's] factual allegations that she did not consent to 'sexual intercourse' (even though it was undisputed that the parties did not

---

[19] Plaintiff asserts that the standard for adjudicating sexual misconduct complaints was revised in 2013 from the "clear and convincing evidence" standard to the "preponderance of the evidence" standard, "[y]et, Cornell failed to provide notice of the change in policy to its student body, including Prasad." Am. Compl. ¶ 130.

have sexual intercourse)." *Id.* ¶ 128. "Upon accepting [Doe's] uncorroborated account of the events, the JA discriminated against Prasad, based solely on his gender. A fair reading of the evidence reveals that [Doe's] account is contradicted and inconsistent, while Prasad's account is corroborated and substantiated. Yet the burden of proof was incorrectly placed on Prasad and his account of the events was inexplicably deemed less credible than [Doe's account]." *Id.* ¶ 129.

### 5. Gender Bias Against Prasad as the Male Accused

Plaintiff contends that, based on his gender, he and Doe were treated differently with regard to deadlines, extensions, and review of documents - with Doe given much more favorable treatment. Plaintiff further asserts:

> Upon information and belief, there are no reported incidents of male complainants against female students for sexual assault and/or there are no reports of female accused students being disciplined for sexual misconduct against male complainants.

> Upon information and belief, Cornell is knowledgeable of the fact that complaints of sexual misconduct are disproportionately lodged by females against males.

> * * *

> Upon information and belief, once a male student is accused of sexual misconduct at Cornell, he will be invariably found responsible. The investigative reports are deliberately drafted against the male student accused.

> Thus, [the Reviewers'] reliance on [Doe's] unsupported statements when specifically contradicted by numerous witness accounts, combined with the omission of portions of Prasad's testimony, evidence a slanted investigation and clear gender bias against the male accused in violation of Prasad's right to fair process.

*Id.* ¶¶ 101-102, 111-112.

Plaintiff argues that "Cornell subjected [him] to disciplinary action . . . in an arbitrary

24

and capricious way, and in discrimination against him on the basis of his male sex.[20]

Cornell failed to adhere to its own guidelines and regulations, and the guidelines and

regulations themselves are insufficient to protect the rights of male students. The decision

reached was discriminatory; given the evidence (or lack thereof), a discriminatory bias

against males was required for a conclusion of sexual misconduct to be reached." *Id.* ¶ 10.

### 6.  The Sanction Was Unwarranted and Disproportionate

Plaintiff also contends that the investigators' recommendation and the Reviewers'

decision to expel him for the conduct of December 13-14, 2014 was based on an outdated

set of rules promulgated for extreme sexual assaults determined under the clear and

convincing standard.  *See id.* ¶¶ 131-133.  He asserts that equating him to "a rapist" who

took advantage of an incapacitated victim because he "saw her as someone he could

exploit," was unfounded, unsubstantiated, and contrary to the numerous exculpatory

statements.  *Id.*  Further, he contends that the sanction, both of expulsion and withholding

his degree for two years with a permanent notation of the disciplinary action taken, was

disproportionately severe because: (1) he and Doe were both near graduation at the time

the investigation concluded, (2) Plaintiff was a student in good standing who excelled

academically with no prior disciplinary record, and (3) Cornell had no reported precedents

for students found responsible for similar conduct. *Id.* ¶ 134.

---

[20] As an example, Plaintiff asserts that Doe's use of alcohol was used to bolster her
allegations of unwanted sexual contact, whereas Plaintiff's consumption of alcohol was not taken
into account as a mitigating factor. Am. Comp. ¶ 104.  Further, he asserts that the investigators and
the Reviewers "took at face value [Doe's] unfounded allegation that she was adhering to German
'sailboat community values' when she offered to allow Prasad to spend the night at her apartment
and sleep in her bed." *Id.* ¶ 108

## IV.    DISCUSSION

Defendant moves to dismiss each claim asserted in the Amended Complaint.  The Court will address Defendants' arguments *seriatim*.

### a.  Title IX

Plaintiff's  First Cause of Action is brought under Title IX of the Education Amendments Act of 1972.  Am. Comp. ¶¶ 141-158.  He alleges that Cornell deprived him, "on the basis of his sex, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of Defendant Cornell's guidelines and regulations."  *Id.* ¶ 149.

### 1.  Title IX Standard of Review

Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline."  *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir.1994).

"[C]ourts have interpreted Title IX by looking to case law interpreting other discrimination statutes, including Title VII of the Civil Rights Act of 1964."  *Doe v. Columbia Univ.*, 101 F. Supp. 3d 356, 366 (S.D.N.Y. 2015)*(citing Yusuf*, 35 F.3d at 715).  "*Twombly* and *Iqbal* notwithstanding, the Supreme Court has held in the Title VII context that, to survive a motion to dismiss, a complaint 'need not contain specific facts establishing a *prima facie* case of discrimination under the framework set forth in *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973)." *Id.* (quoting *Twombly*, 550 U.S. at 569). "Thus, although a plaintiff 'need not allege facts establishing each element of a *prima facie* case of discrimination to survive a motion to dismiss,' the complaint 'must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible.'" *Id.* (quoting *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014)). "In applying *Twombly* and *Iqbal* to employment discrimination claims, courts in this Circuit have further held that the elements of a *prima facie* case 'provide an outline of what is necessary to render [a plaintiff's discrimination] claims for relief plausible.'" *Id.* (quoting *Sommersett v. City of N.Y.*, 2011 WL 2565301, at *5 (S.D.N.Y. June 28, 2011)). "[A] court must dismiss a Title VII claim—and presumably, by extension, a Title IX claim—if the plaintiff 'fail[s] to allege even the basic elements of a discriminatory action claim.'" *Id.* (quoting *Patane v. Clark*, 508 F.3d 106, 112 n. 3 (2d Cir. 2007)). "Naked assertions of ... discrimination without any specific factual allegation of a causal link between the defendants' conduct and the plaintiff's protected characteristic are too conclusory to withstand a motion to dismiss." *Sanders–Peay v. NYC Dep't of Educ.*, 2014 WL 6473507, at *3 (E.D.N.Y. Nov. 18, 2014) (internal quotation marks and citation omitted).

### 2.  Plaintiff's Title IX Claims

Cases attacking university disciplinary proceedings on the ground of gender bias "fall generally within two categories." *Yusuf*, 35 F.3d at 715. In the first category, "erroneous outcome" cases, "the claim is that the plaintiff was innocent and wrongly found to have committed an offense." *Id.* In the second, "selective enforcement" cases, the

"claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.*; *see Doe v. Columbia Univ.*, 101 F. Supp. 3d at 367.   Plaintiff proceeds under both theories.

Under either theory, Plaintiff must plead and prove that "the complained-of conduct was discriminatory."  *Yusuf*, 35 F.3d at 715.   Thus, in order to establish a claim of discrimination under Title IX, Plaintiff "must ultimately show that the defendant discriminated against him . . . because of sex; that the discrimination was intentional; and that the discrimination was a 'substantial' or 'motivating factor' for the defendant's actions." *Doe v. Columbia Univ.*, 101 F. Supp. 3d at 367.   Because courts have held that private party disparate-impact claims may not be brought under Title IX, it is not enough to show that a policy or practice disproportionately affects one sex.  *Doe v. Columbia Univ.*, 101 F. Supp. 3d at 367; *see also Xiaolu Peter Yu v. Vassar College*, 97 F. Supp. 3d 448, 461 n. 6 (S.D.N.Y. 2015).[21]

## A.  Erroneous Outcome

A plaintiff who brings an erroneous outcome Title IX claim "must allege particular

------

[21]The Southern District explained in *Xiaolu Peter Yu*:

Since Title IX is to be interpreted and applied in the same manner as Title VI,  . . .  it follows that Title IX also reaches only intentional discrimination. While the Supreme Court has found that regulations implementing Title VI may reach activities that have a disparate impact, it has also held that there is no private right of action to enforce such regulations. . . .  Accordingly, numerous courts have dismissed private actions to enforce Title IX itself or regulations implementing Title IX when the allegations were based on a disparate impact theory.

*Xiaolu Peter Yu*, 97 F. Supp. 3d at  461, n. 6 (citations omitted).

facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Yusuf*, 35 F.3d at 715. "If no such doubt exists based on the record before the disciplinary tribunal, the claim must fail." *Id.* This is because Congress did not intend "Title IX to impair the independence of universities in disciplining students against whom the evidence of an offense, after a fair hearing, is overwhelming, absent a claim of selective enforcement." *Id.*

> However, the pleading burden in this regard is not heavy. For example, a complaint may allege particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge. A complaint may also allege particular procedural flaws affecting the proof. However, allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss. The fatal gap is, again, the lack of a particularized allegation relating to a causal connection between the flawed outcome and gender bias. A plaintiff must thus also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding. Allegations of a causal connection in the case of university disciplinary cases can be of the kind that are found in the familiar setting of Title VII cases. Such allegations might include, *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender. Of course, some allegations, such as statements reflecting bias by members of the tribunal, may suffice both to cast doubt on the accuracy of the disciplinary adjudication and to relate the error to gender bias.

*Id.* (citations omitted); *see also Doe v. Columbia Univ.*, 101 F. Supp. 3d at 367-68 ("For either [an erroneous outcome or selective enforcement ] claim, the plaintiff must plead and prove that the complained-of conduct was discriminatory. In an erroneous outcome case, therefore, it is necessary, but not sufficient, to allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding. The

plaintiff must also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.")(internal quotation marks and citations omitted); *Bleiler v. Coll. of Holy Cross*, 2013 WL 4714340, at *5 (D. Mass. Aug. 26, 2013)("Under the 'erroneous outcome' standard, the question is whether the College's actions are 'motivated by sexual bias' or if the 'disciplinary hearing process constitutes a 'pattern of decision-making' whereby the [College's] disciplinary procedures governing sexual assault claims is 'discriminatorily applied or motivated by a chauvinistic view of the sexes.'")(quoting *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 756 (E.D. Tenn. 2009)(in turn citing *Mallory v. Ohio Univ.*, 76 Fed. Appx. 634, 640 (6th Cir. 2003) & *Yusuf*, 35 F.3d at 715).

Plaintiff alleges a host of facts demonstrating particular evidentiary weaknesses in the case against him. These include allegations that the investigators failed to question certain witnesses about Doe's outward signs of intoxication; accepted the victim's account of her level of intoxication despite numerous statements to the contrary; misconstrued and misquoted witnesses' statements; used an on-line BAC calculator and Doe's self-reported weight and alcohol consumption to conclude that Doe was in a state of extreme intoxication; accepted Doe's statement that she allowed Plaintiff to sleep in her bed because of her family's "sailboat community values;" drew prejudicial conclusions without sufficient evidentiary support; and cast Plaintiff's actions in highly inflammatory terms.

Plaintiff also points to procedural flaws that, he contends, affected the proof and the outcome of the proceeding. Under Cornell's "investigator model," investigators are charged with determining the scope of the investigation, drafting a summary of the findings, and recommending sanctions. *See* Policy 6.4, p. 19. The fact finders'

30

determinations, in turn, are based almost exclusively upon the content of the Investigative Report. *See id.,* p. 20 (Following the investigation, the reviewer "may either accept or modify the recommendations [of the investigator], or return the report for further investigation."); *see also* Roth Decl., Ex. D (indicating that the witnesses' statements were not provide with the Investigative Report).[22]   While an accused student at Cornell has the ability to submit written comments to the Reviewers, the procedure is unlike that used at other colleges and universities that allow for fact finding hearings with the possibility of questions presented to the complainant and witnesses. *See Xiaolu Peter Yu v. Vassar College*, 97 F. Supp. 3d 448, 458 (S.D.N.Y. 2015)("At the hearing, Yu . . . was able to question all witnesses, although . . . his questions were made through . . . the panel Chair."); *Doe v. Columbia Univ.*, 101 F. Supp. 3d at 361-62 ("[B]oth the complainant and the respondent had an opportunity to give a statement at the hearing and to answer questions posed by the [review] panel.  The panelists were to determine, based on their review of the relevant testimony and documents, which other witnesses (if any)  should testify and, while either the complainant or respondent could suggest questions to ask of the other party or of a witness, the panel ultimately had discretion over the questions it

---

[22]Dr. Murphy stated in her November 10, 2014 memorandum responding to Plaintiff's attorneys' allegations of legal deficiencies in Cornell's disciplinary procedure, *inter alia*, that the Investigative Report would have been "much improved if the JA had included the witness statements in their entirety;" that the JA selected excerpts from witnesses' statements that represented the facts of December 13-14, 2013 out of "context" and that created "discrepancies between the underlying record and the Investigative Report;" and that the "assessments of credibility and evidentiary weight in the report are, at times, confusing." Roth Decl., Ex. D.   While Dr. Murphy explained she did not find that any of these issues undermined her ultimate conclusion, the issue in the instant case is not whether substantial evidence supported the disciplinary determination, but whether Plaintiff was treated unfairly because of his gender.

elected to pose."). Plaintiff argues that, in the context of an adjudicatory procedure based almost exclusively upon the *reported* results of the investigation, and where the investigators evidenced a clear outcome bias, the procedure at Cornell deprived him of the presumption of innocence, shifted the burden to him to prove Doe's capacity to consent, and deprived him of the ability to receive a fair adjudication.

A reasonable fact finder could conclude that, absent extraordinary circumstances, the Reviewers and Dr. Murphy would have accepted the investigators' report and conclusions at face value. The fact that Plaintiff had the opportunity to write to the Reviewers after reviewing only the investigators' summary of the investigation provided little meaningful opportunity to challenge the investigators' conclusions or their rendition of what witnesses purportedly stated. Thus, unlike the situation in *Doe v. Columbia*,[23] Plaintiff presents facts plausibly suggesting that the fact finders' determinations turned on the investigators' report of the evidence. When accepting Plaintiff's allegations that the investigators intentionally misconstrued and misrepresented critical exculpatory evidence, as the Court must do on this motion, Plaintiff presents facts casting an articulable doubt on the accuracy of the outcome of his disciplinary proceeding.

In addition, Plaintiff presents facts plausibly suggesting that considerations of his

---

[23] In *Doe v. Columbia*, the plaintiff's allegations concerning the adequacy of Columbia's investigation of the events in issue were deemed "irrelevant to the outcome of the hearing, as the panel's ruling that [the plaintiff] had engaged in non-consensual sex with Jane Doe did not turn on the events of that night. Instead, the panel's conclusion rested on its finding that 'it [was] more likely than not that [the plaintiff] directed unreasonable pressure for sexual activity towards the Complainant over a period of weeks,' and that 'this pressure constituted coercion.' Thus, as [the Dean] effectively found in affirming the panel's finding, any error in not developing the record with respect to what happened on the night [in question] was arguably harmless as it is not likely to have altered the outcome of the hearing." *Doe v. Columbia*, 101 F. Supp. 3d at 370.

gender motivated Cornell's actions in his disciplinary proceeding. This includes facts indicating the differential treatment Plaintiff and Doe received during the adjudicatory process,[24] an Investigative Report that misconstrued and slanted the evidence against Plaintiff,[25] a drastic turnaround in one investigator's position during the final weeks of the investigation,[26] and the allegation that a gender stereotype adverse to males charged with sexual assaults existed at Cornell causing such disciplinary proceedings to "invariably" end adversely to male respondents. Cornell argues that this last assertion is unsupported by any factual averment and, therefore, must be rejected. Plaintiff counters that no discovery

---

[24] In this regard, Plaintiff points out that Doe was given additional time to submit her appeal despite that Plaintiff's earlier request for additional time during his final examination period was denied, and Doe was allowed to review Plaintiff's appeal whereas he was not allowed to review or comment on Doe's appeal.

[25] Plaintiff asserts that the investigators' decisions regarding what portions of the witnesses' statements to include, what portions to exclude, what portions of the statements or witnesses to treat as credible or incredible, and the context and manner that the events of December 13-14, 2003 were reported are all indications of the outcome determinative mind-set of the investigators. As examples, Plaintiff points out that the investigators accepted Doe's account for her level of intoxication despite several witnesses' contradictory statements, ignored and/or minimized exculpatory evidence, used an on-line BAC calculator and Doe's self-reported weight and alcohol consumption to conclude that Doe was in a state of extreme intoxication, accepted Doe's statement that she allowed Plaintiff to sleep in her bed because of her family's "sailboat community values," and used inflammatory language to describe Plaintiff's conduct.

[26] Plaintiff asserts that on April 16, 2014, Mr. Dupew advised him (in the presence of his Judicial Code Counselor) that his case was "air-tight" because his defense "was fully corroborated by witness testimony," and that, "worst case scenario," Mr. Dupew would not recommend suspension or expulsion. Am. Compl. ¶ 66. Yet in the April 30, 2014 Investigative Report, the investigators concluded that Doe "was intoxicated to the point of being mentally incapacitated and incapable of consent to engage in such sexual activity. Therefore [Prasad] sexually assaulted [Doe] as defined by Cornell University Policy 6.4." *Id.* 72. Further, the investigators recommended that Plaintiff be expelled, or that his degree be held for two years. *Id.* A reasonable inference could be drawn that Dupew's drastic change in position over a two-week period after interviewing the witnesses was the result of either an anti-male bias held by one of the investigators, or an anti-male institutional bias by the JA's Office regarding males charged with sexual assault.

has yet been conducted in this case, so he could not support the "invariable" treatment

contention with a factual averment.

It is possible that Plaintiff could, after conducting discovery, produce statistical

evidence indicating that males are invariably found guilty in sexual assault proceedings at

Cornell. *See Barrett v. Forest Labs,, Inc.*, 39 F. Supp. 3d 407, 432 (S.D.N.Y. 2014) (in

most cases, plaintiffs will be unable to provide reliable statistics before they have access

to discovery).  While statistical evidence of a disparate impact on one gender cannot form

the basis of a Title IX claim, this type of evidence might support Plaintiff's claim that

gender influenced the outcome of his disciplinary proceeding. *See Weser v. Glen*, 190 F.

Supp.2d 384, 395 (E.D.N.Y. 2002)("[s]tatistics may be used as  circumstantial evidence to

support an individual disparate treatment claim").

Further, unlike in *Doe v. Columbia* where a similar "invariable treatment" allegation

was rejected as "wholly conclusory," *see Doe v. Columbia,* 101 F. Supp. 3d at 369,

Plaintiff alleges that anti-male bias was exhibited by the differential treatment he and Doe

received during the administrative process, by the on-sided manner that the investigation

was conducted, and by the outcome determinative style that the Investigative Report was

drafted.  Also unlike the Columbia University case, there is no factual allegation here that

negates the contention that males are invariably found guilty in sexual assault cases. *See*

*Doe v. Columbia,* 101 F. Supp. 3d at 369.[27]

---

[27]In *Doe v. Columbia*, the amended complaint alleged that Columbia University "has been subject to 'great criticism' and 'negative public scrutiny' because the school is 'not being firm enough' in its treatment of sexual assault." *Doe v. Columbia,* 101 F. Supp. 3d at 369 (quoting the amended complaint in that case). The district court found that this allegation negated the claim that males are invariably found guilty in sexual assault proceedings.

Given the totality of the circumstances, including that Jane Doe was treated more favorably than Plaintiff, that the investigators seemingly slanted the Investigative Report against Plaintiff, a drastic change in position of one investigator in the closing weeks of the investigation, and the possibility that male respondents in sexual assault cases are invariably found guilty at Cornell, Plaintiff plausibly establishes a causal connection between gender bias and the outcome of his disciplinary proceeding. *See Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 125-26 (2d Cir. 2004)(An "impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision .... even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the ... process."), *see also Doe v. Washington & Lee Univ.*, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015).[28] Accordingly, Defendant's

---

[28]In *Doe v. Washington & Lee Univ.*, the District Court for the Western District of Virginia explained:

Plaintiff's allegations, taken as true, suggest that [Washington & Lee University's (W & L)] disciplinary procedures, at least when it comes to charges of sexual misconduct, amount to "a practice of railroading accused students." Plaintiff alleges a host of flaws in W & L's handling of his case, ranging from critical omissions in what [W & L's Title IX Officer, Lauren Kozak] and [W & L's Associate Dean of Students, Jason L. Rodocker] included in the witness summaries, to the [Student Faculty Hearing Board's] failure to consider evidence of Plaintiff and Jane Doe's post-incident consensual sexual encounter. . . .

Given the totality of the circumstances, including the alleged flaws in the proceedings and statements made by W & L officials, Plaintiff has plausibly established a causal link between his expulsion and gender bias. For example, gender bias could be inferred from Ms. Kozak's alleged October 5, 2014 presentation, wherein she introduced and endorsed [an article that] . . . posits that sexual assault occurs whenever a woman has consensual sex with a man and regrets it because she had internal reservations that she did not outwardly express. This presentation is particularly significant because of the parallels of the situation it describes

(continued...)

motion on this ground is denied.

### B.  Selective Enforcement

A Title IX  "selective enforcement" claim is based on the premise that "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf*, 35 F.3d at 715.  The decision to initiate the proceeding here was made by Doe, so Plaintiff presents no viable selective enforcement claim against Cornell on this basis.

Turning to the question of whether the severity of the penalty was affected by Plaintiff's gender, "[c]ourts have interpreted that standard to require a plaintiff to 'allege particular circumstances suggesting a meaningful inconsistency in punishment and particular circumstances suggesting that gender bias was a motivating factor behind the inconsistency.'" *Doe v. Columbia*,  101 F. Supp. 3d at 374 (quoting *Scott v. WorldStarHipHop, Inc.*, 2011 WL 5082410, at *5 (S.D.N.Y.  Oct. 25, 2011), *aff'd sub nom. Scott v. Berkeley Coll.*, 599 Fed. Appx. 8 (2d Cir. 2015) (summary order), and citing *Harris v. Saint Joseph's Univ.*, 2014 WL 1910242, at *4 (E.D. Pa. May 13, 2014)).  "[A]pplying that requirement, courts have dismissed claims in the absence of allegations that a school

---

[28](...continued)
and the circumstances under which Plaintiff was found responsible for sexual misconduct. Bias on the part of Ms. Kozak is material to the outcome of John Doe's disciplinary hearing due to the considerable influence she appears to have wielded in those proceedings.

Given these allegations, as well as Plaintiff's charge that W & L was under pressure from the government to convict male students of sexual assault, a reasonable fact finder could plausibly determine that Plaintiff was wrongly found responsible for sexual misconduct and that this erroneous finding was motivated by gender bias.

2015 WL 4647996, at *10 (internal citations omitted).

treated similarly situated members of the opposite sex - that is, members of the opposite sex facing comparable disciplinary charges - differently." *Id.* (citing *Yusuf*, 35 F.3d at 716 (affirming dismissal of a Title IX selective enforcement claim where the plaintiff failed to allege that any woman was treated differently and that the allegedly disparate treatment of another accused student was based on similar disciplinary charges); *Routh v. Univ. of Rochester*, 981 F. Supp.2d 184, 211-12 (W.D.N.Y. 2013); *WorldStarHipHop*, 2011 WL 5082410, at *6; *Doe v. Univ. of the South*, 687 F. Supp.2d at 756-57; *Curto v. Smith*, 248 F. Supp.2d 132, 146-47 (N.D.N.Y.2003), *aff'd in part*, *appeal dismissed in part sub nom. Doe v. Anonymous Unnamed Sch. Employees & Officials of Cornell Univ. Coll. of Veterinary Med.*, 87 Fed. Appx. 788 (2d Cir. 2004), and *aff'd*, 93 Fed. Appx. 332 (2d Cir. 2004) (summary order)).

Plaintiff's Amended Complaint does not include any allegations that female students were treated more favorably than males in similar circumstances. Rather, the Amended Complaint makes only conclusory allegations of the disparate impact of Policy 6.4 based on the assertion that "complaints of sexual misconduct are disproportionately lodged by females against males." Am. Compl. ¶ 102. As discussed above, there is no private cause of action under Title IX for disparate impact claims. Further, Plaintiff seemingly negates the possibility of establishing that female students were treated more favorably than males in similar circumstances by alleging: "Upon information and belief, there are no reported incidents of male complainants against female students for sexual assault and/or there are no reports of female accused students being disciplined for sexual misconduct against male complainants." Am. Compl. ¶ 101.

Having failed to allege factual support for the proposition that female students who were accused of sexual misconduct at Cornell were treated more favorably than male students under similar circumstances, Plaintiff's Title IX selective enforcement claim is dismissed. *See Doe v. Columbia*, 101 F. Supp. 3d at 375; *see also Routh*, 981 F. Supp.2d at 211-12 (dismissing the plaintiff's claim because his complaint "does not plausibly plead facts suggesting that the University ever received a complaint against a female student comparable to that filed against [the plaintiff] ... and treated the female student more favorably."); *WorldStarHipHop*, 2011 WL 5082410, at *6 (dismissing the plaintiff's claim because the complaint failed to allege that the plaintiff was similarly situated to the two other students receiving more lenient treatment).

Plaintiff asks that he be allowed to replead any dismissed claim. *See* Pl. Mem. L. p. 25. "'[T]his circuit strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6).'" *Rojas v. Roman Catholic Diocese of Rochester*, 557 F. Supp. 2d 387, 400 (W.D.N.Y. 2008)(quoting *Porat v. Lincoln Towers Community Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006)). However, "where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (finding leave to replead would be futile where the complaint, even when read liberally, did not "suggest [ ] that the plaintiff has a claim that she has inadequately or inartfully pleaded and that she should therefore be given a chance to reframe."); *Hidalgo v. Johnson & Johnson Consumer Companies, Inc.*, 2015 WL 8375196, at *4 (S.D.N.Y. Dec. 8, 2015)(While "it is the usual practice ... to allow leave

to replead, . . . [w]here  a plaintiff inadequately pleads a claim and cannot offer additional substantive information to cure the deficient pleading, granting leave to amend is futile and should be denied.")(citations and interior quotation marks omitted).   Plaintiff does not allege, or argue the existence of, facts that would support a viable Title IX selective enforcement claim.  Accordingly, dismissal is with prejudice.

### b.  Breach of Contract

Plaintiff's Second Cause of Action is for breach of contract.  Am. Compl., ¶¶ 159-165.  He contends that Cornell breached its "express and/or implied agreements" with him, *id.*, ¶160, and that these "breaches" caused him damage.  *Id.* ¶162.  Plaintiff does not specify the "breaches" that allegedly occurred, but merely quotes from a lengthy portion of Policy 6.4 (presumably as an indication of Cornell's breaches of its agreements with him).  *Id.,* ¶ 161.

"'In New York, the relationship between a university and its students is contractual in nature.'" *Xiaolu Peter Yu*, 97 F. Supp. 3d at  481 (quoting *Papaspiridakos v. Educ. Affiliates, Inc.*, 2013 WL 4899136, at *3 (E.D.N.Y. Sept. 11, 2013) *aff'd*, 580 Fed. Appx. 17 (2d Cir. 2014)).  "[A]n implied contract is formed when a university accepts a student for enrollment: if the student complies with the terms prescribed by the university and completes the required courses, the university must award him a degree.  The terms of the implied contract are contained in the university's bulletins, circulars and regulations made available to the student."  *Papelino v. Albany College of Pharm. of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011)(internal quotation marks and citations omitted).

"To survive a motion to dismiss for a breach of contract claim under New York law,

the complaint must allege facts which show: (1) the existence of an agreement, (2)

adequate performance of the contract by the plaintiff, (3) breach of the contract by the

defendant, and (4) damages." *Habitzreuther v. Cornell Univ.*, 2015 WL 5023719, at *5

(N.D.N.Y. Aug. 25, 2015)(citations and internal quotation marks committed).  "A student

may sue his college or university for breach of an implied contract in certain situations,"

*Routh*, 981 F. Supp. 2d at 207, but "[t]he application of contract principles to the

student-university relationship does not provide judicial recourse for every disgruntled

student." *Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 359 (N.D.N.Y. 2014),

*reconsideration denied*, 2015 WL 1040172 (N.D.N.Y. Mar. 10, 2015).  "'[T]o state a valid

claim for a breach of contract, a plaintiff must state when and how the defendant breached

the specific contractual promise.'" *Habitzreuther*, 2015 WL 5023719, at *4 (quoting *Radin*

*v. Albert Einstein Coll. of Medicine of Yeshiva Univ.*, 2005 WL 1214281, at *10 (S.D.N.Y.

May 20, 2005)).  Thus, while "[a] college is 'contractually bound to provide students with

the procedural safeguards that it has promised,'" *Xiaolu Peter Yu*, 97 F. Supp. 3d at  481

(quoting  *Fellheimer v. Middlebury Coll.*, 869 F. Supp. 238, 243 (D. Vt.1994)), a plaintiff

must identify a specific promise or obligation that was breached in order to pursue a

contract claim. *See Okoh v. Sullivan*, 2011 U.S. Dist. LEXIS 18524, at * 14-15 (S.D.N.Y.

Feb. 24, 2011) ("the mere allegation of mistreatment without the identification of a specific

breached promise or obligation does not state a claim on which relief can be granted").

"Conclusory allegations that a defendant breached an agreement are insufficient to

support a breach of contract claim." *Habitzreuther*, 2015 WL 5023719, at *5 (N.D.N.Y.

Aug. 25, 2015); *see Ward v. N.Y. Univ.*, 2000 WL 1448641, at *5 (S.D.N.Y. Sept.28,

2000)("[B]ald assertions and conclusory allegations claiming that the University's rules or procedures were not followed, do not state a valid claim.").

The Amended Complaint *appears* to indicate that Cornell breached a general agreement to provide Plaintiff an impartial and timely disciplinary hearing, but it is not the Court's function to speculate what Plaintiff intended.  Because Plaintiff does not specify what agreement Defendant violated, and how it was violated, Plaintiff's breach of contract claim must be dismissed.

The dismissal is, in one instance, with prejudice, and, in another, without prejudice to repleading. To the extent Plaintiff intends his breach of contract claim to be a reexamination of the result or penalty of his disciplinary hearing because Cornell acted arbitrarily during the proceeding, repleading will not be allowed.  Plaintiff's remedy to challenge the disciplinary determination on this basis is through a New York Civil Practice Law and Rules Article 78 proceeding, not a breach of contract claim. *See Maas v. Cornell Univ.*, 94 N.Y.2d 87, 92 (1999).[29]  Because the time to institute an Article 78 proceeding

---

[29]In *Maas v. Cornell Univ.*, 94 N.Y.2d 87 (1999), the New York Court of Appeals addressed a claim by a professor who asserted that Cornell breached its agreement with him by failing to follow the procedures it had promulgated for the resolution of sexual harassment claims brought by four students against Maas.  In finding that Maas did not have a cognizable breach of contract claim, the New York Court wrote:

> In assessing this employment relationship between the academic institution and its faculty member, we are satisfied that the University's adherence to its own internal procedures does not qualify for judicial cognizance.

> This Court's case law reflects the policy that the administrative decisions of educational institutions involve the exercise of highly specialized professional judgment and these institutions are, for the most part, better suited to make relatively final decisions concerning wholly internal matters.  This jurisprudential guidepost stems from the belief that these

(continued...)

has expired,[30] a breach of contract claim on this basis is barred.

To the extent Plaintiff intends his breach of contract claim to be for the recovery of monetary damages because a specific agreement was breached, repleading *may* be allowed.[31]  *See Habitzreuther*, 2015 WL 5023719, at *4 ("[C]ourts also look to the relief sought by the plaintiff, and where the plaintiff seeks monetary damages, rather than to

---

[29](...continued)
institutions are peculiarly capable of making the decisions which are appropriate and necessary to their continued existence.

Courts retain a restricted role in dealing with and reviewing controversies involving colleges and universities.  In these so-called "university" cases, CPLR article 78 proceedings are the appropriate vehicle because they ensure that the over-all integrity of the educational institution is maintained and, therefore, protect more than just the individual's right to employment. Thus, a CPLR article 78 proceeding is the route for judicial review of such matters, not a plenary action.  Notably, when litigants fail to avail themselves of the CPLR article 78 avenue, courts may justifiably dismiss plenary claims premised upon alleged failures to follow applicable principles set forth in employee handbooks.

*Maas*, 94 N.Y.2d at 92 (internal citations and quotation marks omitted).

While *Maas* dealt with an employment situation, the holding has been applied in the student disciplinary setting. *See Attallah v. New York Coll. of Osteopathic Med.*, 94 F. Supp. 3d 448, 455 (E.D.N.Y. 2015)("Students in New York schools—both public and private—have frequently sought relief from disciplinary action through an Article 78 hearing. 'It is undisputed that the actions of a private university against a student are subject to Article 78 review and that the courts will intervene if the disciplinary dismissal of a student is arbitrary.'")(quoting *Harris v. Trustees of Columbia Univ. in City of New York*, 98 A.D.2d 58 (1st Dept. 1983), *rev'd on other grounds*, 62 N.Y.2d 956 (1984)).  Thus, assuming that Plaintiff's breach of contract claim is that Cornell breached its agreement to conduct his disciplinary proceeding impartially, timely, and in accordance with the requirements and privileges set forth in Policy 6.4, the claim would be barred.

[30]Plaintiff's appeal from the disciplinary decision was decided on July 16, 2014, Am. Compl. ¶ 81, and an Article 78 proceeding would now be time-barred.  *See* CPLR § 217 (setting a four-month statute of limitations).

[31]Of course, the Court cannot determine whether a legally plausible breach of contract claim exists until a proposed amended pleading is presented identifying specifically when and how an agreement between himself and Cornell was breached.

prohibit or compel an action, a breach of contract action may be cognizable.")(citing *Gally v. Columbia Univ.*, 22 F. Supp.2d 199, 205–06 (S.D.N.Y. 1998)).  Thus, the breach of contract claim, in this regard, is dismissed without prejudice to repleading.

### c.  Breach of the Covenant of Good Faith and Fair Dealing

Plaintiffs Third Cause of Action alleges a breach of the covenant of good faith and fair dealing.  Am. Compl. ¶¶ 166-170.   He asserts that "[b]ased on the aforementioned facts and circumstances, Cornell breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with [him] by meting out a disproportionate sanction of expulsion or withholding his degree for two years, notwithstanding the lack of evidence in support of [Doe's] claim of sexual assault." *Id.* ¶ 167.

> A breach of the implied covenant of good faith and fair dealing claim that is duplicative of breach of contract claims must be dismissed…. New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based on the same facts, is also pled.

*Yu v. Vassar College*, 2015 U.S. Dist. LEXIS 43253, at *91 (S.D.N.Y. Mar. 31, 2015) (internal citations and quotations omitted); *see also Byerly v. Ithaca College*, 290 F. Supp. 2d 301, 205 (N.D.N.Y. 2003), *aff'd* 113 Fed. Appx. 418 (2d Cir. 2004) (dismissing a faculty member's breach of implied covenant of good faith and fair dealing cause of action, which was based on the rights and procedures found in a faculty handbook and guidelines, as duplicative where the claim was based on the same allegation of breach of contract).

Plaintiff's breach of the covenant of good faith and fair dealing claim appears to based on the same facts as the dismissed breach of contract claim.  Consequently, it

appears that any breach of contract claim that Plaintiff might plead in the future would also be based on the same facts underlying the instant covenant of good faith and fair dealing claim.  It would be wasteful of judicial resources to rule on the viability of the instant claim without recognizing that Plaintiff may seek to replead a breach of contract claim based on the same facts as the instant claim.  Accordingly, the breach of the covenant of good faith and fair dealing claim is dismissed, without prejudice to repleading, as potentially duplicative of a breach of contract claim that Plaintiff may seek to add in the future.

### d. Deceptive Business Practices

Plaintiff's Fourth Cause of Action alleges that Cornell engaged in deceptive acts or practices in the conduct of its business in violation of New York General Business Law ("GBL") § 349.  Am. Compl.  §§ 171-183.  He contends that Cornell led him, and the public at large, to believe that Cornell would follow its policies and conduct an impartial investigation if a student, who had paid tuition, was alleged to have committed a sexual assault.  *Id.* §178.  He further alleges that Cornell had no intention of following its own policies and procedures "for Prasad as the male accused of sexual assault," and that Cornell's handling of his disciplinary proceeding demonstrates "Cornell's deceptive practices with respect to males accused of sexual assault at Cornell." *Id.*  ¶¶ 179-180.

To state a GBL § 349 claim,  a plaintiff must allege (1) that a "consumer-oriented" practice was deceptive or misleading in a material respect and (2) that plaintiff was injured thereby.  *Champion Home Builders Co. v. ADT Security Servs., Inc.*, 179 F. Supp. 2d 16 (N.D.N.Y. 2001).   The threshold requirement of such a claim is a deceptive act "that has a broader impact on consumers at large."  *Oswego Laborers' Local 214 Pension Fund v.*

*Marine Midland Bank*, 85 N.Y.2d 20, 25 (1995).  "A private contractual dispute," unique to

the parties, does not meet that threshold requirement. *Id.*

Plaintiff's Amended Complaint does not allege facts showing that Cornell

had a practice that was deceptive to the general public.  Rather, Plaintiff alleges only that

Cornell engaged in deceptive practices specific to him. *See* Am. Compl. ¶ 178.[32]  Such

allegations are insufficient to state a claim under GBL § 349, and this claim is dismissed.

*See Yu*, 2015 U.S. Dist. LEXIS 43253, at *92-93 (dismissing a nearly identical claim

asserted by a male student against a college after he was expelled following an

investigation into a sexual assault complaint by a female student).  Because Plaintiff does

not allege or argue facts that would cure the defective pleading, the dismissal is with

prejudice.

### e.  Equitable Estoppel

Plaintiff's Fifth Cause of Action is for equitable estoppel.  Am. Compl. ¶¶  184 -190.

He asserts that Cornell's various policies indicating that all students would receive certain

procedural rights, and a presumption of innocence, if charged with misconduct constitute

representations and promises "that Cornell should have reasonably expected to induce

action or forbearance by Prasad" in the nature of  the payment of tuition and fees.  *Id.* ¶¶

---

[32]Plaintiff alleges that Cornell

engaged in deceptive practices by causing Prasad to believe that Cornell would follow its policies, copies of which were provided to Prasad and are also available on Cornell's Internet website; and by causing Prasad to believe that if he paid tuition and fees to Cornell, that Cornell would uphold its obligations, covenants and warranties to Prasad described in its policies.

Am. Compl. ¶ 178.

185-187.  Plaintiff asserts that he relied to his detriment on these express and implied

promises or representations by enrolling in, and paying tuition for, his education at Cornell.

*Id.* ¶ 187.

> Under New York law, the elements of equitable estoppel are with respect to
> the party estopped: (1) conduct which amounts to a false representation or
> concealment of material facts; (2) intention that such conduct will be acted
> upon by the other party; and (3) knowledge of the real facts.  The  parties
> asserting estoppel must show with respect to themselves: (1) lack of
> knowledge and of the means of knowledge of the true facts; (2) reliance
> upon the conduct of the party to be estopped; and (3) prejudicial changes in
> their positions.

*Yu*, 2015 U.S. Dist. LEXIS 43253, at *93 (quoting *In re Vebeliunas*, 332 F. 3d 85, 93-94

(2d Cir. 2003) (citations omitted)).  This quasi-contractual cause of action applies only in

the absence of an express or implied agreement between the parties.  *See Yu*, 2015 U.S.

Dist. LEXIS 43253, at *94.

Plaintiff's equitable estoppel claim is clearly based on the same facts as those

underlying his now dismissed breach of contract claim. *See* Am. Compl.  ¶¶ 186, 187

(Plaintiff contends that he relied to his detriment "on [Cornell's] express and implied

promises and representations" that "Cornell would not tolerate, and Prasad would not

suffer, harassment by fellow students and would not deny Prasad his procedural rights

should he be accused of a violation of Cornell's policies.").  For the reasons discussed

above with regard to the covenant of good faith and fair dealing claim, considerations of

economy of judicial resources dictate that this claim also be dismissed, without prejudice

to repleading, as potentially duplicative of any breach of contract cause of action that

Plaintiff might seek to replead. *See Yu*, 2015 U.S. Dist. LEXIS 43253, at *94.

46

### f.  Negligence

Plaintiff's Sixth Cause of action is for negligence.  Am. Compl. ¶¶ 191-195.  He asserts that Cornell breached its duty to conduct an impartial and thorough investigation of the allegations of sexual misconduct against him, thereby causing him harm. *Id.* ¶ 192.

To succeed on a negligence claim, a plaintiff must establish a legal duty, a breach of that duty, proximate causation, and damages.  *Faiz*, 2014 U.S. Dist. LEXIS 164168, at 57.   Plaintiff fails to allege facts plausibly supporting a legal duty separate from that arising from the alleged contract between himself and Cornell. *See* Am. Compl. ¶ 192.[33]  It is well-settled that "a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389-90 (1987).  "[S]imply alleging a duty of care does not transform a breach of contract [claim] into a tort claim." *Faiz*, 2014 U.S. Dist. LEXIS 164168, at *59.   Thus, courts routinely dismiss tort claims where they are duplicative of a simultaneously pled breach of contract claim. *Guilbert v. Gardner*, 480 F.3d 140 (2d Cir. 2007) (affirming grant of summary judgment on a fraud claim where it was duplicative of a breach of contract claim).

Moreover, a claim of this nature "fails as a matter of law because '[t]here is no cause of action in the State of New York sounding in negligent prosecution or investigation.'" *Xiaolu Peter Yu,* 97 F. Supp. 3d at 484 (quoting *Coleman v. Corp. Loss*

---

[33]Plaintiff's allegation that Cornell owed him "a duty of reasonable care to conduct an impartial and thorough investigation of the allegations of sexual misconduct," Am. Compl. ¶ 192, is duplicative of the allegation in his contract-based claims (*i.e.*, that Cornell breached its obligations under its agreement with Plaintiff to follow its own rules regarding student discipline).

*Prevention Assocs.*, 282 A.D.2d 703, 724 N.Y.S.2d 321, 322 (2d Dep't 2001) and citing *Weitz v. State*, 182 Misc.2d 320, 696 N.Y.S.2d 656 (N.Y. Ct. Cl.1999) (applying this rule to "administrative disciplinary charges brought against a college or university student")). Because Plaintiff fails to allege or argue facts plausibly supporting the contention that Cornell breached a legal duty separate from that arising from the alleged contract, Plaintiff's negligence claim is dismissed with prejudice.

### g. New York Human Rights Law

Plaintiff's Seventh Cause of Action is for a violation of the New York Human Rights Law, New York Executive Law § 296(4). Am. Compl. ¶¶ 196-206. He asserts that through the disciplinary proceeding, Cornell discriminated against him on the basis of his sex. *Id.*

Courts employ nearly identical standards when evaluating discrimination claims under Title IX and the New York Human Rights Law. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000); *see Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 764-65 (2d Cir.1998) (analyzing claims under § 296 of the New York Human Rights Law under the same standards used for Title VII and, therefore, Title IX claims), *abrogated in part on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed.2d 106 (2002); *T.P. ex rel. Patterson v. Elmsford Union Free Sch. Dist.*, 2012 WL 860367, at *9 (S.D.N.Y. Feb. 27, 2012)("Claims under the New York Human Rights Law are evaluated under the same standard as analogous claims under Title IX."). For the reasons discussed above with regard to Plaintiff's Title IX erroneous determination claim, Plaintiff has presented facts plausibly supporting the contention that considerations of his gender motivate Cornell's actions in his disciplinary proceeding. Accordingly, the

motion to dismiss Plaintiff's New York Human Rights Law claim is denied.

### h.  New York Civil Rights Law

Plaintiff's Eighth Cause of Action alleges a violation of Section 40-c of the New York State Civil Rights Law.  Am. Compl. ¶¶ 207-216.  He asserts that, through its handling of the disciplinary proceeding, Cornell knowingly and intentionally discriminated against him, or failed to prevent discrimination against him, on the basis of his sex.  *Id.* ¶¶ 210-211.

New York Civil Rights Law § 40-c provides that "no person shall, because of … sex … be subjected to any discrimination in his or her civil rights … by any other person or by any firm, corporation or institution."  N.Y. Civ. R. L. § 40-c(2).  Section 40-d requires that "[a]t or before the commencement of any action under this section, notice thereof shall be served upon the attorney general."  Notice to the Attorney General must be alleged in the pleadings. *See Giamo & Vreeburg v. Smith*, 192 A.D.2d 41, 45-46 (2d Dept. 1993).

New York courts have consistently held that claims under Section 40-c must be dismissed where a plaintiff has failed "to meet the statutory requirements of notice to the Attorney General as specifically required by New York Civil Rights Law § 40-d," *Silver v. Equitable Life Assurance Soc.*, 168 A.D.2d 367 (1st Dept. 1990); *see also Giamo & Vreeburg v. Smith*, 192 A.D.2d 41, 45-46 (2d Dept. 1993), or failed to plead that such notice was provided. *See Hogan v. County of Lewis*, 2015 U.S. Dist. LEXIS 38103, at *40-41 (N.D.N.Y. Mar. 26, 2015); *Cain v. Atelier Esthetique Institute of Esthetics, Inc.*, 2015 U.S. Dist. LEXIS 43652, at *5 (S.D.N.Y. Mar. 27, 2015).

Plaintiff does not allege that notice was provided to the Attorney General under

New York Civil Rights Law § 40-d.  *See*  Am. Compl. ¶¶ 207-216.  Accordingly, Plaintiff's

New York Civil Rights Law §  40-c claim is dismissed without prejudice.

### I.  Declaratory Judgment

Plaintiff's Ninth Cause of Action seeks a declaratory judgment reversing the

disciplinary determination made by Cornell, expunging his disciplinary record, and

declaring that "Cornell's rules, regulations and guidelines are unconstitutional as applied."

Am. Compl. ¶ 221.  "The Declaratory Judgment Act is 'procedural only,' and 'does not

create an independent cause of action." *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244 (2d

Cir. 2012)(citation omitted); *see also In re Joint Eastern & Southern Dist. Asbestos Litig.*,

14 F.3d 726, 731 (2d Cir. 1993).  Because the Ninth Cause of Action does not constitute

an independent cause of action, the cause of action is stricken from the Amended

Complaint.[34]

### V.    CONCLUSION

For the reasons discussed above, Defendant's motion to dismiss the Amended

Complaint [dkt. # 17] is **GRANTED in part** and **DENIED in part**.

The motion is denied as to the Title IX erroneous outcome claim and the New York

Human Rights Law claim.  These claims remain viable.

The motion is granted in that:

(a) The following claims are **dismissed with prejudice**:

---

[34]The Court notes that the last paragraph of the Prayer for Relief seeks a declaratory judgment duplicative of that sought in the Ninth Cause of Action.  Because the parties have not addressed whether the Court could issue the sought-after declaratory judgment if Plaintiff were to prevail on any claim, the Court offers no opinion on this subject.

(1) The Title IX "selective enforcement" claim;
(2) That much of a breach of contract claim seeking a reexamination of the result and/or penalty of Plaintiff's disciplinary hearing based on the contention that Cornell acted arbitrarily during the proceeding;
(3) The New York General Business Law § 349 claim; and
(4) The negligence claim.

(b) The following claims are **dismissed without prejudice to repleading**:

(1) That much of the breach of contract claim seeking monetary damages because of a breach of a specific agreement;
(2) The breach of the covenant of good faith and fair dealing claim; and,
(3) The New York State Civil Rights Law § 40-c claim.

and,

(c) The Ninth Cause of Action **is stricken from the Amended Complaint** because it does not constitute an independent cause of action.

If Plaintiff intends to move for leave to amend the Amended Complaint to assert any of the claims dismissed without prejudice, he must do so within twenty (20) days of the date of this Decision and Order.

**IT IS SO ORDERED.**

Dated: February 24, 2016

Thomas J. McAvoy
Senior, U.S. District Judge