UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

VITO PRASAD,                                      :

                                        :   Civil Action No: 15-cv-322 (TJM/DEP)

                   **Plaintiff,**                    :

                                          :

          -against-                          :   **Jury Trial Demand**

                                          :

                                          :   **SECOND AMENDED**

CORNELL UNIVERSITY,                               :   **COMPLAINT**

                                          :

                   **Defendant.**                   :

------------------------------------------------------------------------X

     Plaintiff Vito Prasad by his attorneys Warshaw Burstein, LLP, as and for his Second Amended Complaint against Cornell University respectfully alleges as follows:

## THE NATURE OF THIS ACTION

     1.     This case arises out of the actions taken and procedures employed by Defendant Cornell University ("Defendant Cornell" or "Cornell") concerning allegations made against Plaintiff Vito Prasad ("Prasad"), a male senior student at Cornell as a result of false allegations of non-consensual sexual activity with fellow Cornell senior student Greta Schneider-Herr ("Herr").

     2.     These allegations purportedly refer to what was clearly consensual sexual activity that occurred on or about December 13-14, 2013 (the "Alleged Incident").

     3.     On February 18, 2014, some two (2) months after the Alleged Incident, Herr contacted Cornell's Office of the Judicial Administrator ("JA"), and reported that she was raped by Prasad on December 13-14, 2013, while she was incapacitated.

     4.     Judicial Administrator Mary Beth Grant thereafter requested that Cornell conduct a formal investigation of the matter and that Dean of Faculty Joseph Burns appoint a

panel of three faculty members (the "Review Panel") to ultimately review the investigative report and make a determination as to the alleged misconduct.

5.       After an excessively delayed investigation process, which included interviews with at least ten (10) witnesses who observed Prasad and Herr in the minutes and hours preceding the Alleged Incident, Cornell's Associate Judicial Administrator, Clint Dupew, prepared an Investigative Report dated April 30, 2014 (the "Investigative Report"). The Investigative Report consisted of a summary of the findings and a recommendation that Prasad be expelled from Cornell, or, in the alternative, that his degree be held for a period of not less than two (2) years during the week of Prasad's anticipated graduation date.

6.       Upon its review of the Investigative Report and responsive statements from Prasad and Herr, on May 20, 2014, the Review Panel issued a Report of the Reviewers, in which they unanimously agreed that "under a preponderance of the evidence, [Herr] both (a) did not give consent to vaginal penetrative sexual activity nor to manipulation of her breasts, and (b) was physically and mentally incapacitated by alcohol consumption to the point that she was unable to give such consent" (the "Decision"). As Prasad's sanction, Cornell initially determined that expulsion was appropriate, and, upon reconsideration, modified Prasad's sanction to withhold his diploma for two (2) years, provided that he meets certain enumerated conditions (the "Sanction").

7.       In addition to the damages sustained by Prasad at Cornell throughout the delayed investigation process, including his inability to attend his own graduation or receive his diploma on graduation day, Prasad has sustained tremendous damages to his career prospects as a result of the Decision and Sanction, including the loss of five (5) job offers to date, due to the fact that he is unable to produce his diploma upon demand to such prospective employers.

8.      Throughout the investigative process, Cornell failed to abide by its own guidelines and regulations and acted in direct violation of federal and/or state law.

9.      A non-exhaustive list of Cornell's wrongful actions include the following: (i) Cornell failed to timely bring the case to a close within sixty (60) days in violation of its policies; (ii) Cornell failed to conduct a thorough and impartial investigation; (iii) Cornell employed a single-investigator model which resulted in a lack of due process for Prasad; (iv) Cornell purportedly performed a Blood Alcohol Content analysis to form conclusions that were unsupported and highly prejudicial; (v) Cornell engaged in an investigation biased against Prasad as the male accused; (vi) Cornell wholly adopted Herr's unsupportable theory of "sailboat community values" as evidence; (vii) Cornell relied on an investigation consisting of a skewed rendition of the facts, cherry-picked witness statements and ignored important qualifying statements; (viii) Cornell made assessments of credibility and evidentiary weight with respect to each fact witness without any ascertainable rationale or logic; (ix) Cornell failed to afford Prasad the requisite presumption of innocence required by a preponderance of the evidence standard; and (x) the Sanction was unwarranted and disproportionate in light of the circumstances, all of which demonstrated substantial procedural errors in violation of Title IX.

10.     When Cornell subjected Prasad to disciplinary action, it did so in an arbitrary and capricious way, and in discrimination against him on the basis of his male sex. Cornell failed to adhere to its own guidelines and regulations, and the guidelines and regulations themselves are insufficient to protect the rights of male students. The decision reached was discriminatory; given the evidence (or lack thereof), a discriminatory bias against males was required for a conclusion of sexual misconduct to be reached.

11.     Prasad has been greatly damaged by the actions of Defendant Cornell: his career prospects have been severely compromised as he is unable to produce a diploma to potential employers; the monies spent on obtaining a college education at Defendant Cornell squandered. Specifically, Prasad has lost five (5) job offers to date, worth an estimated value of approximately $200,000.00 each.

12.     Prasad therefore brings this action to obtain relief based on causes of action for, among other things, violations of Title IX of the Education Amendments of 1972 and state law.

## THE PARTIES

13.     Prasad, is a natural person, citizen of the United States, and resident of the State of California. During the events described herein, Prasad was a student at Cornell and resided at 201 Wyckoff Avenue, Ithaca, New York 14850, a private house not owned by Cornell.

14.     Upon information and belief, Defendant Cornell University is a private, liberal arts college in the city of Ithaca, New York, with an address of 300 Day Hall, Ithaca, New York 14853.

15.     Prasad and Defendant Cornell are sometimes hereinafter collectively referred to as the "Parties."

## JURISDICTION AND VENUE

16.     This Court has diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1332 and under 28 U.S.C. § 1367 because: (i) Prasad and Defendant Cornell are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

17.     This Court has personal jurisdiction over Defendant Cornell on the grounds that it is conducting business within the State of New York.

18.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because Cornell is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.     Prasad Was a Model Student With No Prior Disciplinary Record

19.     Prasad worked diligently for four years at an esteemed public high school in Northern California, where he obtained a 3.83 GPA, scored above the 95th percentile on his SAT's, obtained perfect scores on the SAT II in math and chemistry, and took seven Advanced Placement courses. While in high school, Prasad developed a particular interest in chemistry and became involved in scientific research internships to pursue his interest in the sciences. He was also a varsity athlete in cross country, a member of the track and tennis teams, he started an NGO group on campus, was an Officer of the Astronomy Club, a member of the Science Bowl Club, played the piano for ten years and was named an AP Scholar with Distinction. Prasad's immigrant parents strived for the "American Dream" of educating Prasad at a prestigious University. His work ethic paid off when, as a result of his academic achievements, Prasad received a "Likely Letter" from Cornell University on March 14, 2010, further demonstrating his successful candidacy for an undergraduate education at Cornell.

20.     Setting his sights on an Ivy League education, Prasad applied to Cornell University and was accepted to the College of Arts & Sciences class of 2014 for chemistry. He ultimately transferred to the School of Chemical and Biomolecular Engineering where he focused his studies on chemical engineering.

21.     While a student at Cornell, Prasad was a student in good academic standing, and had no prior history of disciplinary misconduct.

## II.    Cornell's Adjudication Process Under Policy 6.4

22.     When Prasad was first accepted to Cornell as a student he was provided with copies of Cornell's school policies, including the Campus Code of Conduct and Policy 6.4: Prohibited Discrimination, Protected-Status Harassment, Sexual Harassment, and Sexual Assault and Violence ("Policy 6.4"). A copy of Policy 6.4 is annexed hereto as **Exhibit A**. Policy 6.4 sets forth the procedures for the investigation, review and sanction of students accused of sexual misconduct.

23.     The JA is responsible for receiving all complaints and providing procedures to ensure a fair process for the accused and for the complainant. The JA has exclusive responsibility for accepting and processing prohibited discrimination and protected-status harassment complaints, including sexual assault/violence, and will undertake to resolve these complaints impartially, promptly, and confidentially through informal intervention, mediation, or formal investigation. *See,* Policy 6.4, p. 17, **Exhibit A**.

24.     In addition, Policy 6.4 states that upon the JA's initial review of a complaint, if the JA determines that the complaint (a) describes an alleged violation of its policy, it will notify the "accused" that he or she has been named in a complaint and proceed under the policy accordingly; or (b) does not describe an alleged violation, it will notify the complainant that the complaint is dismissed. *Id.*

25.     According to Policy 6.4, if the JA determines that the complaint describes an alleged violation of its policy, an investigation will be commenced. The purpose of such investigation being "to gather evidence relating to the alleged discrimination, harassment, sexual

assault/violence or retaliation to determine whether the accused engaged in conduct constituting discrimination, harassment, or retaliation by a preponderance of the evidence." *See,* Policy 6.4, p. 18, **Exhibit A**.

26.    Cornell's Policy 6.4 expressly covenants to provide the following rights to the accused student in a sexual misconduct investigation:

- To have the investigation completed within 60 days (*See,* Policy 6.4, p. 18, **Exhibit A**);

- To seek the advice of a personal attorney or advisor, who may attend their own clients' or advisees' investigative interview (*See,* Policy 6.4, p. 18, **Exhibit A**);

- To be kept informed of the investigation's status (*See,* Policy 6.4, p. 18, **Exhibit A**);

- To receive a copy of the investigation report summary and be permitted a reasonable opportunity (ten business days) to submit written comments and ask the reviewer to review the evidence, determination and/or recommended sanctions or remedial measures contained in the report (*See,* Policy 6.4, p. 20, **Exhibit A**);

- To receive a copy of the final determination in writing (*See,* Policy 6.4, p. 20, **Exhibit A**).

27.    During the investigation process, under Policy 6.4, the accused student is entitled to utilize the services of a Judicial Codes Counselor ("JCC"), who provides free assistance and representation to those under investigation for violations of Cornell's policies. *See,* Policy 6.4, p. 35, **Exhibit A**.

28.    The complainant is entitled to seek advisement from a discrimination and harassment advisor, victim's advocate, local human resource representative, Office of Workforce Policy and Labor Relations representative or the ombudsman. *See,* Policy 6.4, p. 39, **Exhibit A**.

29.    Pursuant to Policy 6.4, the investigator may dismiss a complaint and close the case where, *inter alia,* the complaint is not supported by sufficient facts, lacks merit based upon

the available evidence, or does not fall within the jurisdiction of the investigator. *See,* Policy 6.4, p. 20, **Exhibit A**.

30.     Upon concluding the investigation, the investigator must produce to the Review Panel a written investigation report, which includes, "the scope of the investigation, a summary of the findings, recommendations for any corrective actions and/or sanctions, any non-punitive, preventative remedies for the complainant…" *See,* Policy 6.4, p. 19, **Exhibit A**.

31.     Before a determination is made, the Review Panel must forward copies of the Investigative Report to the complainant and the accused and provide them with ten (10) business days to respond with further comments for consideration by the Review Panel. *See,* Policy 6.4, p. 20, **Exhibit A**.

32.     Following an unfavorable decision, the accused student has the right to appeal the resolution of a matter within ten (10) business days by asking the vice president for student and academics services ("VPSAS") or his or her designee to review the evidence, determination, and/or recommended sanctions or remedial measures (or lack thereof) contained in the report. *See,* Policy 6.4, pp. 25-26, **Exhibit A**. The VPSAS will conduct a review, and may accept, modify or reject the determination or recommended sanctions and/or remedial measures. An Appeal may be based on any of the following grounds:

- The remedial actions awarded the complainant are not commensurate with the injury or is unjust;

- The sanction is not commensurate with the violation or is unjust;

- The investigator or reviewer violated the fair application of relevant university procedures and such violation may have had a prejudicial effect upon the outcome;

- The investigator or reviewer committed a prejudicial error in interpreting the policy;

- The investigator or reviewer rendered a decision clearly against the evidence;

- New evidence was discovered after the decision and could not have readily been discovered before the decision, which would change the outcome.

*See,* Policy 6.4, p. 26, **Exhibit A**.

## II.   The Alleged Incident: The Night of December 13-14, 2013

33.    On Friday, December 13, 2013, an end of semester event for Chemical Engineering students was held at the Statler Hotel. Prasad and Herr, both seniors and Chemical Engineering majors, attended the event. Prasad and Herr initially met during the spring semester of 2011. Since they were in the same major in the School of Chemical and Biomolecular Engineering, they had all classes together and had become acquaintances.

34.    A cocktail reception began at 6:00 p.m. and dinner was served at 7:00 p.m. The party consisted of dinner and drinks with classmates, Teaching Assistants, graduate students and professors from the Chemical Engineering school. Witness O.G. observed that Herr and Prasad "seemed happy and friendly" and noticed them talking to each other at the event.

35.    All students were given two drink tickets to use during the event. The gathering concluded around 8:30 p.m.

36.    After the holiday party, Herr and some of her friends returned to her apartment, a privately owned apartment off campus about half a block away, to drop off their purses and winter boots. They then joined their classmates, Teaching Assistants, graduate students and professors at a residence located in Collegetown at around 10:00 p.m., where they continued socializing, dancing and drinking. Even though everyone had been drinking, witness M.N. indicated that Herr was *not* intoxicated to the point that she did not know what was going on.

37.     While at the after party in Collegetown, Prasad and Herr participated in a game of beer pong together and continued to talk. Witness M.V. noticed Herr and Prasad getting close and flirting.

38.     Prasad and Herr continued to flirt throughout the evening, by dancing together, talking, and Herr touching Prasad's hair. Witness N.N. indicated Herr "wasn't drunk, maybe a couple of drinks, but not messy drunk." Additionally, Witness L.T. stated that although Herr seemed to consume a lot of alcohol, she "didn't notice anyone having trouble walking or slurring [their] speech."

39.     Prasad consumed approximately five or six drinks over a ten-hour period throughout the evening. Herr alleged she consumed approximately fifteen drinks throughout the evening, consisting of three glasses of wine, half a bottle of Malibu Rum, another third a bottle of rum, two more glasses of wine, a bottle of wine, two shots of unknown hard alcohol and one beer. Although Prasad was in Herr's presence the whole evening, he did not observe her consuming fifteen drinks.

40.     Herr had previously teased her friends for being "lightweights," in reference to their inability to consume as much alcohol as she could. For instance, on Slope Day, she allegedly completed a "century" (a 1.5 ounce shot of beer every minute for 100 minutes), the equivalent to 12.5 beers in 1.67 hours, and was the only one of her friends who did not get sick afterwards.

41.     At around 2:30 or 3:00 a.m. on December 14, 2013, Prasad, Herr, and Witnesses L.T., M.N., M.V. and V.P. left the party together and walked back to Herr's apartment. Some members of this group had to retrieve their belongings dropped off earlier in the evening.

42.     Although everyone had been drinking, no one was very intoxicated as there had been professors present at both the holiday party and the after party. Specifically, neither Prasad nor Herr had trouble walking home despite the snow and icy conditions and neither was slurring their speech. Witness V.P. indicated that everyone was "buzzed" but that Herr did not appear intoxicated, let alone incapacitated. In fact, she was able to walk home through inclement weather, ascend the flight of stairs in her building and unlock the door to her apartment, without any assistance.

43.     Prasad, Herr and Witnesses L.T., M.N., M.V. and V.P. remained in Herr's apartment for approximately twenty-five minutes. They engaged in conversation in Herr's kitchen, discussing various topics such as their previous sexual experiences. The Witnesses indicated that no member of the group appeared overly intoxicated, to the point of being incapacitated.

44.     At some point during the conversation, Herr removed her bra from under her shirt, in front of the whole group. As she did this, she motioned toward Prasad and got closer to him.

45.     When the four friends departed, Prasad remained behind, and Herr did not protest. Witness V.P. testified that Herr seemed fine when he left Herr and Prasad at the apartment. Additionally, Witness M.V. testified that if he felt Prasad was too drunk to be there with Herr, he would have made him leave. Further, M.V. stated that "if [he] felt [Herr] was in any way in danger [he] would not have left."

46.     Herr claims that she agreed to let Prasad spend the night at her apartment, due to the cold weather and the distance to Prasad's apartment. Herr did not have a couch so it was

understood that Prasad would sleep in her bed with her. She attributed this hospitality to her German family's alleged "sailboat community ideals."

47.     After M.N., M.V., L.T. and V.P. departed, Prasad informed Herr that he was interested in her. Prasad and Herr began to kiss while standing up. The kissing continued as they moved towards the bed. They spoke occasionally in between kissing and, at one point, Herr apologized for the mess in her room. They verbally communicated about hooking up, with Herr advising that she was "horny" but that she did not want to have sex. Herr removed her own dress and underwear, and Prasad followed, by removing his pants and underwear. Herr begin to manipulate Prasad's penis and Prasad began to digitally penetrate Herr.

48.     Prasad and Herr engaged in consensual sexual activity for approximately one hour.

49.     Both Prasad and Herr were awake and coherent at all times during the sexual activity, communicating non-verbally by touching, stroking and kissing each other.

50.     Herr demonstrated her consent through both words and actions, by actively participating in the sexual activity, stating her willingness to engage in sexual activities as long as it wasn't sexual intercourse, manually manipulating Prasad's penis, removing her own clothing and underwear and continuing to kiss and touch Prasad throughout the sexual encounter.

51.     Prasad and Herr faced each other during the entire hour of sexual activity and Herr brushed her fingers through Prasad's hair.

52.     Prasad and Herr fell asleep together in Herr's bed and woke up later that morning around 8:30 a.m. when an alarm clock went off.

53.     When they awoke, Prasad and Herr engaged in conversation, including a discussion about her love of rabbits and the fact that she wanted to take a shower, before Prasad indicated that he would leave.

54.     Given they had mutual friends and were a part of the same major, Herr advised Prasad to not "make it weird."

55.     The relationship between Prasad and Herr did not change after the Alleged Incident, as they continued to attend the same classes, sit nearby each other and complete their finals for the winter semester.

56.     On February 18, 2014, more than two (2) months after the sexual encounter, Herr filed a complaint against Prasad, requesting a formal investigation of a matter involving sexual assault and/or sexual harassment. The complaint alleged that Prasad raped Herr on December 14, 2013, while she was incapacitated. A temporary no contact order was immediately put in place on February 24, 2014.

### III.     The JA's Investigation Was Replete With Violations of Policy 6.4

57.     Upon the filing of Herr's complaint on February 18, 2014, Judicial Administrator Mary Beth Grant ("Grant") requested that Dean of Faculty Joseph Burns assemble a panel of three faculty members to review the matter.

58.     On February 18, 2014, Associate Judicial Administrator Clint Dupew ("Dupew") and Coordinator Inclusion and Diversity Program Rose Braman ("Braman") began an investigation into Herr's allegations of sexual misconduct with an interview of Herr.

59.     That same day, the JA contacted Prasad via telephone to request his appearance at the JA's office on February 24, 2014. Prasad was informed that a complaint had been filed against him, but he was not provided any details about the nature of the allegations.

60.     Prasad was caused to suffer considerable stress and anxiety for approximately one week, as he awaited his meeting with the JA and an explanation of the allegations against him.

61.     Six days later, on February 24, 2014, Prasad appeared at the JA office with Judicial Code Counselor David Coriell ("Coriell"). At that time, Grant informed Prasad that Herr had filed a complaint against him relating to the events of December 13, 2013. Grant forced Prasad to sign a paper acknowledging receipt of the complaint, as well as a No Contact Order that Prasad was required to adhere to.

62.     Subsequently, Dupew and Braman began to question Prasad about the evening of December 13-14, 2013. Dupew initially asked a number of very broad questions, none of which focused on the amount of alcohol consumed by Herr, followed by more specific questions regarding the sexual activity.

63.     Thereafter, by email to Dupew dated March 2, 2014, Prasad sent a list of potential witnesses that could speak to the events of the night of December 13-14, 2013. The list included Witnesses L.T., M.N., N.N., M.V., A.P. and O.G.

64.     Nearly two months after his initial interview, on April 16, 2014, Prasad returned to the JA office, accompanied by Coriell, for a follow up interview. Dupew asked Prasad questions similar to those from the first interview, apparently seeking inconsistencies in his statements. During Prasad's second interview, Dupew indicated that Herr, according to her, had consumed an estimated eighteen drinks on the night of the Alleged Incident. Dupew never asked Prasad whether he personally observed this.

65.     At the conclusion of the interview, Prasad inquired as to the status of the Investigative Report, given he was expecting to graduate from Cornell in less than two months.

Dupew advised, in the presence of Coriell, that if he were to find any fault on the part of Prasad, "personally seeing that [Prasad was] a graduating senior, worst case scenario I will not recommend suspension or expulsion. You are too close to graduation and this would not make sense." Mr. Dupew further advised Prasad and Coriell that Prasad's case was "air-tight" in that Prasad's defense was fully corroborated by witness testimony.

66.     At the conclusion of the investigation, investigators Dupew and Braman issued the Investigative Report on May 2, 2014 ("Investigative Report"). Prasad was blindsided to learn that the investigators recommended a "guilty" determination and a sanction of expulsion, or, in the alternative, to hold Prasad's degree for a period of not less than two years.

67.     Additionally, Prasad's review of the Investigative Report revealed the litany of omissions, misstatements, and errors made by the investigators in violation of Policy 6.4.

A. **Cornell's Violation of the Duty to Gather Relevant Evidence**

68.     Dupew failed to "gather evidence relating to the alleged…sexual assault to determine whether the accused engaged in conduct…by a preponderance of the evidence." *See,* Policy 6.4, p. 18, **Exhibit A**.

69.     At no time during the investigation, did Dupew inquire whether Prasad was in possession of any documents or evidence that would support his statement. Such an inquiry would have led Prasad to offer a publicly available photograph of Herr from her online social media page. The photograph depicts Herr sticking her tongue out, in direct contradiction to her claim that she cannot stick her tongue out. The photograph would have been relevant to the issue of Herr's credibility.

70.     Aside from the interviews of Prasad and Herr, the investigation consisted solely of witness interviews. According to the Investigative Report, "No physical or tangential documentary evidence was provided or otherwise considered."

### B. Cornell's Violation of the Duty to Dismiss the Complaint

71.     Where the investigator finds that the complaint "is not supported by sufficient facts, lacks merit based upon the available evidence, or does not fall within the jurisdiction of the investigator," the investigator may dismiss the complaint. *See,* Policy 6.4, p. 20, **Exhibit A**.

72.     Throughout the investigative process, Cornell obtained at least four (4) witness statements which demonstrated that Herr was not exhibiting visible signs of intoxication during the time prior to, leading up to, and/or during the intimate encounter with Prasad.

(i)    Witness M.N. was with Herr at the Statler party, at the after party in Collegetown, and also went back to Herr's apartment afterwards with the group of friends. She stated: "…I did not feel [Herr] was intoxicated to the point she was not aware of what was going on..."; and "They were both drinking but aware of surroundings and such";

(ii)   Witness V.P. was also with Herr at the Statler party as well as the after party and observed Herr "didn't appear intoxicated." In fact, Witness V.P. reported "she seemed fine";

(iii)  Witness N.N. attended both events on December 13, 2013; he indicated Herr "wasn't drunk, maybe a couple of drinks, [but] not messy drunk." He further stated he did not recall anyone "really drunk, crazy, or stumbling at the after-party;" and

(iv)   Witness L.T. who attended the party and returned to Herr's apartment afterwards, indicated that she "didn't notice anyone having trouble walking or slurring [their] speech."

73.     Instead of dismissing the complaint for lack of supporting facts, the investigators disregarded these eyewitness accounts in concluding that Herr was not able to consent to the sexual encounter due to her level of intoxication, a conclusion based solely on Herr's uncorroborated and self-reported level of intoxication.

### C.  **Cornell's Failure to Conduct an Impartial Investigation**

74.     Cornell's Policy 6.4 requires that the investigation of a complaint involving sexual misconduct be conducted thoroughly and impartially. *See,* Policy 6.4, p. 17, **Exhibit A**. Notwithstanding, Cornell performed a one-sided and biased investigation in favor of Herr's allegations of sexual misconduct.

75.     The investigator's impartiality is particularly paramount in misconduct cases at Cornell where it now employs a single-investigator model for the investigation of sexual misconduct cases. Instead of holding a "hearing" before a panel of board members, which was the campus adjudication system in place at Cornell prior to 2013, the investigator now takes on the role of "judge, jury and executioner." The single investigator model effectively forecloses the accused student from defending himself since there are no safeguards or checks and balances in place along the way to ensure that the JA's ultimate conclusion was objective and sound.

### (a)  **The JA's Witness Interviews Were Misleading and Improperly Summarized**

76.     When the JA conducted interviews with knowledgeable witnesses, several witnesses stated they were confused and misled by the questions presented by the JA; the JA's questions were not straightforward; and the JA failed to provide any context so as to allow for the full and fair discovery of facts and details each witness had to offer.

77.     For example, the Investigative Report severely misrepresented the testimony provided by Witnesses L.T., M.N. and M.V. by selectively omitting portions of their statements and presenting others out of context.

78.     Witness M.V. is quoted in the Investigative Report as stating that the after-party "was getting rowdy and people were getting drunk." However, Witness M.V. wrote a letter to the JA stating, *inter alia*, that Dupew "did not properly summarize my testimony," and that the

Investigative Report "downplays the situation and only highlights the moments that appear strange with no context to why they ever occurred."

79.     The Investigative Report quotes Witness L.T. as stating "[Herr] was intoxicated, [but the witness was] not sure of [Herr's] level of drunkenness. [Though][Herr] seem[ed] to consume a lot of alcohol." Witness L.T. subsequently advised, however, that she was inaccurately misquoted. Not only is "intoxicated" not a part of her lexicon, but Witness L.T. also does not recall making any statement about Herr's level of "drunkenness." The JA haphazardly pieced together L.T.'s testimony to fit into Herr's narrative. Moreover, the JA officer who interviewed L.T. erroneously advised that everything L.T. said would be kept confidential from both Prasad and Herr, which obviously was a false assurance.

80.     Similarly, the Investigative Report substantially altered Witness M.N.'s testimony by stringing together different portions of her dialogue and omitting other portions in order to create an account that fit Herr's narrative. Subsequent to her review of the Investigative Report, Witness M.N. clarified that she specifically advised the investigator that although Herr did consume alcohol on December 13, 2013, they were at a holiday party with the Chemical Engineering department; thus, no one drank to the point of blacking out in front of their professors. She further specified that while everyone did consume alcohol, no one was visibly intoxicated beyond the typical jovial mood that occurs when a group of friends drink together. Thus, the JA investigator misconstrued his long and arduous dialogue with M.N. in concluding that M.N.'s testimony implied "[Herr] was drinking….more than usual."

81.     Dupew's line of questioning and method of investigation was misleading, inaccurate, and, therefore, arbitrary and capricious.

**(b) The JA Accepted Illogical and Unchallenged Evidence in Favor of Herr**

82.     Using an unverified online Blood Alcohol Content ("BAC") calculation tool from Cornell's own Gannett Health Services, the investigators nonsensically determined that, based solely on Herr's self-reported alcohol consumption and unsubstantiated body weight, her BAC was approximately .33, a level resulting in effects similar to "surgical anesthesia."

83.     The investigators arrived at their BAC conclusion without questioning Prasad, or Witness L.T. or Witness M.N. about Herr's alcohol consumption, despite the fact that Prasad as well as L.T. and M.N. were with Herr throughout the evening.

84.     Dupew's BAC calculation was also informed by Herr's self-reported weight, which was directly contradicted by Witness L.T.'s testimony that Herr's weight is substantially more than her self-report.

85.     The Investigative Report omits Witness L.T.'s account of the evening, which directly contradicted Herr's self-reported alcohol consumption. Specifically, Witness L.T. recalled that Herr consumed significantly less than reported by Herr herself.  Had Dupew considered this eyewitness testimony, Herr's estimated BAC level would undoubtedly have been altered considerably.

86.     Witnesses also indicated there was no readily apparent change in Herr's behavior subsequent to the sexual encounter with Prasad; in fact, when she went out for her friend's birthday in January 2014, she consumed a "fishbowl" and "heavily flirt[ed]" with Witness L.T.'s ex-boyfriend.

87.     Notwithstanding several witnesses' concurrence that Herr was not incapacitated, the JA illogically concluded that Herr was "intoxicated to the point of being mentally incapacitated and incapable of consent to engage in …sexual activity."

88.     Additionally, the investigators failed to corroborate Herr's claim that she was adhering to German "sailboat community values" when she offered to allow Prasad to spend the night at her apartment and sleep in her bed.  The wholesale adoption of Herr's unsupported claim without any independent investigation violated Cornell's duty to conduct an impartial investigation.

### (c)  Prasad Was Denied Any Opportunity to Challenge Herr's Allegations

89.     Prasad was denied the opportunity to challenge the credibility of witnesses. For example, Witness C.G. had breakfast with Herr two days after the Alleged Incident, and described Herr's appearance as "disheveled," in order to suggest the truth of Herr's allegations that she was raped two days earlier. Prasad was unable to challenge Witness C.G.'s hearsay statements and irrelevant observations, whether directly or through the investigators.

90.     Unable to draw out distinctions and details used by witnesses to qualify their stated observations of Herr's level of intoxication, Prasad was placed in an indefensible position.

91.     There was no opportunity for Prasad to confront or cross-examine Herr about important factors such as her self-reported number of alcoholic drinks consumed, actual weight, German "sailboat community values" or convenient memory lapses for certain portions of the evening.

### (d)  Investigation Report Failed to Redact Prejudicial Evidence

92.     The JA admitted evidence into the record that would likely mislead the Review Panel or cause it to confuse the issues in violation of Policy 6.4.

93.     The Review Panel was presented with illogical evidence regarding Herr's BAC at the time of the alleged sexual misconduct based on her self-reported consumption of an unlikely fifteen drinks on December 13-14, 2013.

94.     Several witnesses' testimony as well as Herr's own testimony undermine the credibility of the JA's BAC calculation; for instance, Herr recalled a conversation she had with Prasad, she recalled the different types of alcohol allegedly consumed throughout the evening, and she recalled utilizing sailing social customs allegedly learned from her parents. The JA, therefore, illogically calculated Herr's estimated BAC level without any corroboration and rendered a medical/forensic analysis thereon without the benefit of any medical training or expert opinion.

95.     Further exacerbating the JA's irreconcilable conclusion, Dupew advised the Review Panel, in an email dated May 7, 2014, that he "believe[d] the Complainant's BAC may have actually been higher; up to a tenth of a point higher…"

96.     Notably, had Herr's BAC been up to a tenth of a point higher, a BAC of .43 is nearly fatal. Hence, if Herr's self-reported consumption is to be believed, it would certainly be the case that witnesses would have noticed an extreme level of intoxication, yet none of the witnesses interviewed reported this.

97.     When questioned by the Review Panel as to how exactly Dupew determined the number of drinks consumed by Herr, Dupew admitted that the numbers used in his BAC calculation were based solely on Herr's self-reported account. Ultimately, the Review Panel was pacified by Dupew's unsupported explanation for his BAC calculation.

98.     The inclusion of such unsubstantiated evidence unfairly prejudiced Prasad and led to a wrongful finding that Prasad "raped and sexually assaulted" Herr because she was too incapacitated to consent.

99.     Cornell's failure to redact such prejudicial evidence constituted a violation of its duties to provide an "adequate, reliable, and impartial investigation" and a "prompt and equitable" process under Policy 6.4 and Title IX.

**(e)  The Investigative Report Contained Material Errors, Omissions and Misstatements**

100.    The Investigative Report mischaracterized Prasad as a predator, mischaracterized Herr's state of intoxication, and mischaracterized the testimony leading up to and during the encounter. Such mischaracterizations and assessments demonstrated a bias in favor of Herr's narrative that she was too intoxicated to consent.

101.    According to the Investigative Report, Herr had breakfast with her close friend, Witness C.G., two days after the Alleged Incident, on the morning of Monday December 16, 2013. Witness C.G. described Herr's appearance as "disheveled," and stated she looked "tired and with messy hair." As Witness C.G. was not present on the evening of December 13, 2013, any statements she made regarding the Alleged Incident constituted mere hearsay.

102.    Notably, the Investigative Report misrepresented the testimony provided by C.G. in stating that this breakfast took place the morning *after* the Alleged Incident, on Saturday December 14, 2013, when in fact it did not take place until two days later, on December 16, 2013.

103.    Further, the Investigative Report erroneously attributed Herr's disheveled appearance to the Alleged Incident, despite the fact that the sexual activity between Herr and Prasad occurred more than two days prior, and Herr had presumably taken at least one shower in the interim.

104.    Despite Vice President of Student and Academic Services Susan Murphy's subsequent acknowledgement of this error, the Investigative Report was neither corrected nor

was the JA's Decision modified accordingly in violation of Cornell's duty to conduct an impartial investigation.

105.    Also, the following key details were completely omitted from the Investigative Report:

(i)     Prasad stated that when they awoke the next morning, he and Herr engaged in conversation, including a discussion about her love of rabbits and the fact that she wanted to take a shower before Prasad indicated that he would leave.

(ii)    Witness M.V. stated: (i) "I felt like she was interested in him and it made me uncomfortable that I was there"; (ii) "[Herr] didn't say anything to any of us about being alone with [Prasad] so we felt like they were OK"; and (iii) "If I felt that [Prasad] was too drunk to be there with [Herr] I would have made him leave.  And if I felt [Herr] was in any way in danger I would have not left, or made [Prasad] leave."

(iii)   Witness M.N. stated: (i) "...I did not feel [Herr] was intoxicated to the point she was not aware of what was going on..."; and (ii) "They were both drinking but aware of surroundings and such." Notably, M.N. **never stated** that "[the Complainant seemed tipsy; she had a fair amount, but was able to walk," yet this statement was erroneously attributed to Witness M.N. in the Investigative Report and was accepted as a finding of fact about Herr's level of intoxication.

(iv)    Witnesses M.N., L.T. and M.V. all stated that Prasad was with the group when everyone walked over to Herr's apartment.  L.T., M.V. and O.G. all indicated that Prasad and Herr were interacting, even flirting, with each other throughout the evening, during the holiday party and at the after-party. Notwithstanding, the JA prejudicially mischaracterized Prasad as "following the group" and "checking in" on Herr out of concern for her, then proceeding to engage in "predatory behavior" and "[take] advantage of an intoxicated individual."

106.    In no way do the collective statements from the witnesses lead to the conclusion that Prasad was a "sexual predator" or engaged in "predatory behavior," yet that was the conclusion presented to the Review Panel.

107.    Additionally, throughout the Investigative Report, the JA makes assessments of credibility and evidentiary weight with respect to each fact witness without any ascertainable

rationale or logic. Overall, such credibility and evidentiary weight assessments clearly demonstrated a bias in favor of Herr's narrative that she was too intoxicated to consent. For instance:

(i) C.G. was deemed "extremely credible" and "significant weight was given to this witness since she was the first person to whom [Herr] gave an account after the incident." However, significantly, C.G. was best friends with Herr, was not present on the evening in question, and merely served the function of a receptacle of self-serving statements by Herr. Moreover, the Investigative Report erroneously noted that C.G. had breakfast with Herr the morning after the Alleged Incident, on December 14, 2013. However, as acknowledged subsequently by Vice President Susan Murphy, this information was inaccurately presented by the investigators, as C.G. did not see Herr until *two days later,* on Monday, December 16, 2013. Thus, any reference to Herr's "disheveled" or "messy" appearance as reported by C.G. simply cannot be attributed to the events of December 13, 2013. Accordingly, the fact that C.G.'s statements were given "significant weight" is extremely problematic as her testimony was merely used to prejudice Prasad;

(ii) A.L. was "extremely credible" and "weight was give[n] only as to [Herr's] likelihood of intoxication." However, A.L. never provided any observations of intoxication specific to Prasad or Herr. He only stated, in general terms, that "most people [were] drunk" and that whenever he talked to Herr that evening, she had a "cup in [her] hands." There is no basis for extrapolating from this statement that the "cup in [Herr's] hands" was a *different* cup each time, nor does it indicate how much time had elapsed during his observations and what, if any correlation, that might have on how many cup(s) Herr may have had during that time. At best, A.L.'s observations are neutral, and, at worst, they do not provide any insight into Herr's level of intoxication;

(iii) M.N. was found to be "extremely credible" and "significant weight was given to this witness as she was present throughout many of the events leading up to the alleged assault." However, the JA ignored M.N.'s qualifications, "…but not incapacitated" and "but was able to walk" and even prejudicially misquoted her as stating that "[Herr] seemed tipsy; she had a fair amount, but was able to walk." In fact, M.N. *never* stated that Herr seemed tipsy;

(iv) V.P. was considered "credible," but "seemed to underestimate the effects of alcohol when compared to other's account." For the

first time, the JA does not assess the witness as "extremely credible" and passes negative judgment on the witness's observations of the evening, which coincides with the fact that this was the first witness to blatantly state that "[Herr] didn't appear intoxicated" and that "she seemed fine."   Apparently, V.P.'s observations undermined the JA's narrative that Herr was unable to consent, so the JA undermined V.P.;

(v) Witness H.P. was found to be "extremely credible" and "significant weight is given to this witness as to his ability to observe independently that [Herr] was intoxicated and he himself was not in an intoxicated state."   However, H.P.'s own statement admits that he has no basis for passing judgment on Herr's level of intoxication, "intoxicated, not terribly, but…[he] had never seen her intoxicated."   Notwithstanding, the JA illogically accords "significant weight" to H.P.'s assessment of Herr's level of intoxication. Furthermore, as Witness L.T. recounted, the JA's conclusion about H.P.'s own intoxication was inaccurate, "On our way, we ran into [HP] who [MN] and [Herr] both knew.   It was kind of an awkward exchange of words because [HP] was obviously *very intoxicated*."   H.P. was observed in this very intoxicated state at 3:00 a.m. that morning, according to L.T.'s account.   The JA's significant reliance on H.P. as an "extremely credible" witness strains credulity;

(vi) Witness N.N. was found "credible" and "some weight was given to this witness since he was neutral on what was observed yet, he was not able to speak to anything directly related to the allegations."   This assessment couldn't be further from the truth. N.N. stated that he "attended the events [in question] on December 13, 2013" and that he "observed [Herr] to be drinking" that "[Herr] wasn't drunk, maybe a couple of drinks, [but] not messy drunk." Contrary to the JA's assessment, N.N.'s observation of Herr's level of intoxication is "directly related to the allegations" and demonstrates that Herr was not drunk;

(vii) L.T. was "credible" and "some weight was given to this witness since she was consistently present throughout."   M.N. was "present throughout many of the events," and assessed as "extremely credible" and given "significant weight."   However, L.T. was also "consistently present throughout," yet, inexplicably, labeled as merely "credible" and accorded "some weight."   L.T. indicated that she "didn't notice anyone having trouble walking or slurring [their] speech." Importantly, L.T. provided a supplemental statement (submitted as Exhibit 1 to Prasad's Appeal from the Report of the Reviewers on June 3, 2014), wherein she refutes the

number of drinks Herr claims she consumed that evening, refutes Herr's actual body weight, and advised that Herr called her a "lightweight" because "[she] is unable to consume alcohol the way [Herr] does." In the face of such damning evidence, it is no coincidence that L.T.'s statements were only given "some weight."

108.    Overall, the Investigative Report's cherry-picked statements from the witnesses' observations, the omission of key, qualifying facts and outright fabrication of supporting facts, combined with the JA's slant on the witnesses' accounts of the evening regarding Herr's level of intoxication leads to the foregone conclusion that she was "mentally incapacitated."

### (f) Grant's Conflict of Interest Compromised the Impartiality of the Investigation

109.    On May 2, 2014, long after the investigation had concluded, Grant identified the existence of a potential conflict of interest between herself and a Review Panel member who was "a friend of [hers]."

110.    While Grant acknowledged this conflict of interest, she did not take any measures to eliminate the conflict prior to the Review Panel member's receipt of the Investigative Report.

### D. Cornell's Failure to Conduct a Timely Investigation

111.    Cornell failed to conduct a timely investigation of the allegations and failed to timely bring the case to a close within 60 days in violation of Policy 6.4. *See,* Policy 6.4, p. 18, **Exhibit A**.

112.    Cornell was first notified about Herr's possible allegations of sexual misconduct as early as February 18, 2014. However, the investigation was not completed until the Investigative Report was issued on May 2, 2014, which was 73 days following the JA's first meeting with Herr. The "response period" of the investigative stage did not conclude until May 20, 2014, which was 91 days after Cornell's investigation began.

113.     Pursuant to Policy 6.4, Cornell must complete its investigation in 60 days unless an extension is required for necessity or good cause.

114.     The JA offered several countless excuses for this delay, including "the office has been plagued with some illnesses" and "I have been out of town on a family matter," or "I wound up not having time after the hearing." In fact, in a recent article in the Cornell Daily Sun dated March 11, 2015, Cornell admits that the JA "has repeatedly failed to meet deadlines outlined by Cornell's Policy 6.4 and federal recommendations when handling sexual assault investigations" and acknowledged the harmful effects this delay has on accused students (*See* http://cornellsun.com/blog/2015/03/11/speedy-thorough-handling-of-sexual-assault-cases/). None of the JA's excuses referenced the complexity of the case, number of witnesses or other substantive case-related reasons for the delay to constitute "good cause."

115.     Although Policy 6.4 requires Cornell to "keep both parties informed on the investigation's status," Cornell did not keep Prasad so informed.

116.     The first update Cornell provided was on April 7, 2014, 48 days after the investigation had begun, which apologized for the extreme delay in his case.

117.     Nearly one month later, 72 days after the investigation had begun, Prasad still had yet to receive the Investigative Report or status update. Prasad contacted the JA to request a status update on the timing of the investigation report.

118.     Despite its own self-imposed guidelines, Cornell engaged in a dilatory investigative process by delaying the questioning of witnesses, and acting without any sense of urgency to resolve the matter despite Prasad's upcoming, and anticipated, graduation date.

119.     On April 30, 2014, Grant assured Prasad that he would receive a copy of the Investigative Report later that evening. Grant's assurances proved false. Cornell did not transmit

the report to Prasad until May 2, 2014 thereby causing him additional stress and anxiety while he continued to wait.

120.    By the time Cornell transmitted the Investigative Report to Prasad, he was in the middle of final examinations. Since the Investigative Report was 14-pages, single-spaced, and contained various witness interviews and information gathered over several months of investigation, Prasad requested a five (5) business day extension (until May 23, 2014) to respond.

121.    Notwithstanding its own delay and failures to adhere to its policies, Cornell denied Prasad's reasonable 5-business day extension request. Sexual Assault Investigatory Panel Chair Irby Lovette ("Lovette") reasoned that the extension must be denied on the grounds that permitting same would potentially result in Prasad and Herr running into each other at graduation. However, Lovette's justification was severely undercut by the fact that Prasad and Herr had sat an arm's length away from each other in class all semester. Lovette indicated he would only permit an extension until 1:00 p.m. on the following Monday, May 19, 2014.

122.    Prasad submitted his written input on May 19, 2014, within ten (10) business days of receipt of the Investigative Report, in accordance with Policy 6.4.

123.    Herr submitted her written input on May 15, 2014.

124.    As it turns out, Prasad's severely delayed case was just one of many cases during the 2013-2014 year in which Cornell failed to adhere to the 60-day timeline in violation of Policy 6.4 and Title IX. *See*, Cornell Sun Article, "J.A. Missing Sexual Assault Investigation Deadlines," **Exhibit B**.

125.    In approximately one dozen Policy 6.4 cases filed in 2014, not a single case met the 60-day timeline. *See*, *Id*.

126.     On May 26, 2015, December 2, 2015, and June 16, 2016 the Department of Education Office of Civil Rights opened investigations against Cornell for violations of Title IX related to its handling of cases of sexual assault.

127.     Cornell's significant failure to bring the case to a close within 60 days caused great stress and uncertainty to Prasad's ability to plan his graduation, including making arrangements for his out-of-town family and friends to attend his graduation.

**IV.     The Decision, Sanction & Appeal**

128.     The Review Panel, comprised of three faculty members appointed by the Dean of Faculty, met on May 19, 2014 to discuss the matter, and finalized their decision on May 20, 2014. The Report of Reviewers dated May 20, 2014 agreed with all recommendations made by the JA investigators and concluded as follows:

> After fully reviewing and discussing the Investigative Report and the Responses from both parties, including a review and careful point-by-point discussion of the Respondent's Response document and associated Exhibits, the panel has unanimously accepted the principle findings of the investigative report and supports the recommended penalty of expulsion outlined therein. The Reviewers find no reason to suspect that the report and/or investigative process were inherently biased against the Respondent.

129.     Thereafter, Prasad diligently submitted his Appeal from the Report of Reviewers on June 3, 2014, in accordance with the ten (10) business day deadline imposed by Policy 6.4. Yet, Cornell inexplicably provided substantial leeway to Herr, in allowing her a thirteen (13) business day/seventeen (17) calendar day extension until June 20, 2014 to submit her Appeal to the Report of Reviewers. Herr was provided an extension without question, in comparison to the substantial resistance encountered by Prasad in response to his prior request

for an extension. Moreover, while Herr was permitted an opportunity to review and respond to Prasad's Appeal, Prasad was never provided an opportunity to even review Herr's Appeal.

130.    By letter dated July 16, 2014, Vice President for Student and Academic Services Susan H. Murphy advised that she concurred with the finding that Herr "did not give consent to the sexual activity that occurred on December 14, 2013." She further noted, "while one might disagree with the precision of the calculation of the blood alcohol level cited by the investigator, I conclude, based on the many statements provided, that the complainant consumed considerable quantities of alcohol and consequently was not able to consent to the sexual activity."

131.    The Decision for expulsion was modified in that Prasad would be permitted to return to Cornell and receive his diploma after two years, upon full compliance with certain enumerated conditions.

132.    Notwithstanding, in addition to the damages sustained throughout the delayed investigation process, including Prasad's inability to attend his own graduation or receive his diploma, Prasad has sustained tremendous damages to his career prospects as a result of the Decision and Sanction, including the loss of five (5) job offers to date, due to the fact he is unable to produce a diploma.

V.    **The Recommended Sanction Was Unwarranted and**
      **<u>Disproportionate in Light of the Circumstances</u>**

133.    The JA improperly relied on a "Public Record" from February 10, 2010 to justify its recommendation that expulsion was the appropriate remedy to impose on Prasad. The referenced "Public Record" refers to appropriate sanctions issued to an individual who rapes another member of the Cornell community. Equating Prasad to a rapist, who took advantage of an incapacitated victim, and "saw her as someone he could exploit," was entirely unfounded and

damaging. Notably, not one of the witness statements obtained during the investigation process established that Herr was intoxicated to the point that she was not able to consent. Yet, the Review Panel accepted at face value Herr's unsubstantiated statements and disregarded exculpatory witness observations in making this assessment.

134.    Additionally, in making its Decision, the JA relied on a set of "rules" written by Cornell University Law School Professor Cynthia Bowman back in 2010. Ironically, following the Office of Civil Rights Dear Colleague Letter of 2011 and Cornell's subsequent decision to change the evidence standard, Cynthia Bowman publicly expressed great concern over what that set of rules would do to the rights of students, acknowledging in an article dated April 4, 2012 that "[t]he consequences for someone expelled for sexual assault are enormous and will follow him throughout his life, leading to rejection by other schools…a great deal of stigma … [t]o impose those consequences on someone requires a rigorous standard of proof and many due process protections to ensure fairness." *See* http://cornellsun.com/blog/2012/04/04/rights-advocates-spar-over-policy-on-sexual-assault/. Nonetheless, the Review Panel relied on this set of rules in determining that Prasad's expulsion was warranted.

135.    Notably, Dupew is no longer employed by Cornell. Upon information and belief, a substantial changing of the guards has occurred within the Cornell Judicial Administration since the conclusion of Prasad's case in 2014. Upon information and belief, Cornell's disciplinary investigations have been completely moved out of the JA's office, and are now conducted entirely by Workforce, Policy and Labor Relations (WPLR).

136.    As both Prasad and Herr were last semester seniors at the time the investigation concluded, there was little to be gained in meting out the severe sanction of expulsion or withholding Prasad's degree for two years. Further, the Sanction was disproportionately severe

in that Prasad was a student in good standing, excelled academically, had no prior disciplinary record, and Cornell had no reported precedents for a student found responsible for similar charges.

137.   As a result of Cornell's actions, Prasad's economic future is significantly compromised.

### VI.   Gender Bias Against Prasad as the Male Accused

138.   Cornell was required to conduct an impartial and unbiased investigation process. *See*, Policy 6.4, p. 17, **Exhibit A**.

139.   Cornell engaged in a biased fact finding process in violation of Title IX.

140.   Cornell demonstrated significant procedural errors in violation of Prasad's rights to fair process.

141.   Cornell's failure to afford a balanced treatment of the evidence received from Herr versus Prasad also constituted a violation of its duties to provide an "adequate, reliable, and impartial investigation" and a "prompt and equitable" process under Title IX.

142.   Upon information and belief, there are no reported incidents of male complainants against female students for sexual assault and/or there are no reports of female accused students being disciplined for sexual misconduct against male complainants.

143.   Upon information and belief, Cornell is knowledgeable of the fact that complaints of sexual misconduct are disproportionately lodged by females against males.

144.   In fact, individuals of the Cornell community have indicated that when males are accused by female complainants of sexual misconduct, they are invariably found guilty.

145.   At all times, Herr's voluntary (and admittedly gluttonous) use of alcohol was used to bolster her allegations of unwanted sexual touching.  Yet, Prasad's consumption of

alcohol that evening was not taken into account as a "mitigating factor" for the same alleged actions.

146.    Cornell's disparate and discriminatory treatment of Prasad with respect to the use of alcohol on the evening of December 13-14, 2013 is evident in the JA's citation in the Investigative Report to the annual report of the Judicial Administrator dated December 17, 2009, which states: "The fact that an accused person had been drinking, is neither a defense to sexual assault nor an exonerating circumstance…"; and the annual report of the Judicial Administrator dated April 13, 2010, which provides: "[F]ailure to recognize that the victim was too drunk to consent is no defense to a charge of sexual assault as defined by the Cornell Code and in the case law interpreting it."

147.    The "Public Record" from the University Review Board dated December 17, 2009 further advises: "Although the Judicial Administrator bears the burden of proof on lack of consent, she is entitled to satisfy that burden through the complainant's testimony alone; corroboration is not required." Such a biased and one-sided policy plainly drafted in favor of a female complainant and against a male accused is extraordinarily prejudicial.

148.    Thus, the JA's citation to the annual reports of the Judicial Administrator dated December 17, 2009 and April 13, 2010 ("Annual Reports"), and the Annual Reports themselves, demonstrate Cornell's bias against male students accused of sexual misconduct in violation of Title IX.

149.    Additionally, the Review Panel took at face value Herr's unfounded allegation that she was adhering to German "sailboat community values," when she offered to allow Prasad to spend the night at her apartment and sleep in her bed. Nowhere does the JA cite to any

supporting evidence of such a phenomenon, nor does the JA provide a basis for its wholesale adoption of same.

150.     Furthermore, while the testimony from at least five eyewitnesses indicated Herr was able to provide consent for the sexual activity with Prasad, the only support for Herr's claim that she was not able to give consent comes directly from Herr herself, and Witness C.G., who was not present on the evening of December 13-14, 2013. Nonetheless, the Review Panel found Herr's account more credible than numerous eyewitness accounts which contradicted her testimony.

151.     Moreover, the Investigative Report conveniently omitted significant details provided by Prasad during his two interviews that go toward the essential issue of Herr's consent. Specifically, Prasad described the Alleged Incident in considerably more detail than what was represented in the Investigative Report; for instance, the behaviors and actions of Herr that unmistakably demonstrated both her initiation of the sexual encounter, as well as her receptiveness to the sexual activity. Yet, because his testimony was inconsistent with the testimony provided by Herr, the JA elevated Herr's testimony as sacrosanct, then deliberately omitted portions of Prasad's testimony which were inconsistent with hers. The remainder of his testimony was mischaracterized within the Investigative Report. In fact, an individual of the Cornell community emphatically believes that the Investigative Report was slanted in that it did not accurately and/or thoroughly represent Prasad's version of the evening.

152.     Upon information and belief, once a male student is accused of sexual misconduct at Cornell, he will be invariably found responsible. The investigative reports are deliberately drafted against the male student accused.

153.     Thus, the Review Panel's reliance on Herr's unsupported statements when specifically contradicted by numerous witness accounts, combined with the omission of portions of Prasad's testimony, evidence a slanted investigation and clear gender bias against the male accused in violation of Prasad's right to fair process.

### VII.    Failure to Abide by the Requisite Preponderance of the Evidence Standard

154.     The U.S. Department of Education Office of Civil Rights and Cornell's Policy 6.4 require that a preponderance of the evidence standard be used to evaluate allegations of sexual misconduct. Policy 6.4 defines "preponderance of the evidence" as: "The greater weight of the credible evidence required to establish a meritorious claim under this policy, including claims of sexual harassment, assault, or violence (e.g. it is more likely than not that sexual harassment, assault, or violence has occurred). This preponderance is based on the more convincing evidence and its probable truth and accuracy, not on the amount of evidence."

155.     The preponderance of the evidence standard does not equate to judging the accused as guilty until proven innocent. In fact, nowhere in the Department of Education's guidelines or Cornell's policies is such a standard referenced. However, Cornell's investigation process demonstrated a clear gender bias which resulted in a Decision that did not afford Prasad the requisite presumption of innocence.

156.     Specifically, the Review Panel improperly placed the burden of proof on Prasad to establish that Herr consented to the sexual activity, instead of placing the burden of proof on Herr, the complainant, to establish that she did not consent.

157.     Cornell's Policy 6.4 defines consent as follows: "*words or actions* that show a voluntary agreement to engage in mutually agreed-upon sexual activity. Consent is not present

when one is incapable of consent, subject to coercion or threat of coercion, or subject to forcible compulsion."

158.    Herr demonstrated her consent to the sexual activity through her words, by verbally agreeing to participate in the sexual encounter, as well as through her actions, by actively engaging in kissing Prasad, manually stimulating his penis, removing her own clothes and underwear, and touching and stroking Prasad throughout the sexual encounter.

159.    Yet, the Report of Reviewers disregarded these key aspects of the sexual encounter, in finding that a preponderance of the evidence supported Herr's factual allegations that she did not consent to "sexual intercourse" (even though it was undisputed that the parties did not have sexual intercourse).

160.    Upon accepting Herr's uncorroborated account of the events, the JA discriminated against Prasad, based solely on his gender. A fair reading of the evidence reveals that Herr's account is contradicted and inconsistent, while Prasad's account is corroborated and substantiated. Yet the burden of proof was incorrectly placed on Prasad and his account of the events was inexplicably deemed less credible than Herr's.

161.    Furthermore, upon information and belief, the standard utilized by Cornell in investigating sexual misconduct complaints was revised in 2013 from a "clear and convincing evidence" standard to the much lower "preponderance of the evidence" standard. Yet, Cornell failed to provide notice of the change in policy to its student body, including Prasad. Upon information and belief, Cornell now provides training related to its sexual misconduct policies to all incoming students, a practice demonstrating the level of importance Cornell places on advising its students of the applicable standards. Thus, the failure of Cornell to properly advise

Prasad as to the change in its governing standard related to sexual misconduct cases was in and of itself a violation of Title IX.

### VIII.   Prasad's Entire Future is Severely Damaged by Cornell's Actions

162.     In addition to damages sustained as a result of the delayed investigation process, Prasad's inability to attend his own graduation or receive his diploma on graduation day caused tremendous damages to Prasad's career prospects, including the loss of five (5) job offers to date.

163.     The economic damages sustained as a result of the loss of *each* job offer has an estimated value of $200,000.00.

164.     Even though Prasad will be permitted to receive his diploma in two years, his academic and disciplinary record is irrevocably and irreversibly tarnished and will not withstand scrutiny by a potential employer.

165.     As a result of Defendant Cornell's actions, Prasad's parents' financial resources used to provide Prasad with an Ivy League education have been squandered.

166.     Without appropriate redress, the unfair outcome of the Hearing will continue to cause irreversible damages to Prasad, with no end in sight. Prasad seeks redress from this Court to undo the wrongs occasioned by Cornell.

### AS AND FOR A FIRST CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972

167.     Prasad repeats and realleges each and every allegation hereinabove as if fully set forth herein.

168.     Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

169.     Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972, even though there is very little direct federal funding of school sports.

170.     Upon information and belief, Defendant Cornell receives federal funding for research and development.

171.     Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (*emphasis added*).  Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[1]

172.     The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also *"[accord] due process to both parties involved..."*[2]

173.     The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment...";

---

[1] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn.98-101.
[2] *Id.* at 22 (emphasis added).

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint..."[3]

174.   A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults." [4]

175.   Based on the foregoing, *supra,* at ¶¶ 22-164, Defendant Cornell has deprived Prasad, on the basis of his sex, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of Defendant Cornell's guidelines and regulations.

176.   Based on the foregoing, *supra,* at ¶¶ 22-164, Defendant Cornell conducted its investigation of the Alleged Incident and subsequent investigation and review, in a manner that was biased against the male being accused. From the outset, the Investigative Report, Report of the Reviewers and Appeal Decision were slanted in favor of Herr and took her statements at face value. Absent from the Decision or the Sanction is corroboration for Herr's allegations that she was mentally incapacitated and therefore unable to consent, or that her Blood Alcohol Content was as determined by the JA.

177.   Cornell has created an environment where an accused male student is fundamentally denied due process by being prosecuted through the conduct process under a

---

[3] *Id.* at 20.
[4] *Id.* at 21.

presumption of guilt.    Such a one-sided process deprived Prasad, as a male student, of educational opportunities at Cornell on the basis of his sex.

178.    During the investigation, no credible or reliable evidence was presented in support of Herr's claim that she lacked the ability to consent; to the contrary, all of the eye-witnesses to her behavior just prior to the Alleged Incident concurred that she was in control and was not intoxicated. Notwithstanding, Defendant Cornell accepted Herr's claim that she lacked the ability to consent over Prasad's claim that he did not perceive anything about her that would suggest she could not consent, revealing gender discrimination against the male accused in Cornell's investigation process.

179.    Defendant Cornell had no intention of following its own policies and procedures for Prasad as the male accused of sexual misconduct when it found Prasad responsible for sexual misconduct in the face of contradictory witness statements demonstrating Herr was not incapacitated.

180.    Defendant Cornell's stated policies and procedures, together with its violations thereof with respect to Prasad only, as the male accused of sexual assault, demonstrate Defendant Cornell's gender-biased practices with respect to males accused of sexual assault at Cornell.

181.    Based on the foregoing, *supra,* at ¶¶ 22-164, Defendant Cornell imposed sanctions on Prasad that were disproportionate to the severity of the charges levied against him and without any consideration of his clean disciplinary record at Cornell.

182.    Based on the foregoing, *supra,* at ¶¶ 22-164, Defendant Cornell's guidelines and regulations are set up to disproportionately affect the male student population of the Cornell University community as a result of the higher incidence of female complainants of sexual misconduct against male complainants of sexual misconduct.

183.     Based on the foregoing, *supra,* at ¶¶ 22-164, male respondents in sexual misconduct cases at Cornell are discriminated against solely on the basis of sex.   They are invariably found guilty, regardless of the evidence, or lack thereof.

184.     As a result of the foregoing, Prasad is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR A SECOND CAUSE OF ACTION
### Breach of Contract

185.     Prasad repeats and realleges each and every allegation hereinabove as if fully set forth herein.

186.     A contractual relationship existed between Defendant Cornell and Prasad at all relevant times hereto.

187.     Defendant Cornell was required to act in accordance with Policy 6.4 when investigating and adjudicating allegations of sexual misconduct.

188.     Based on the foregoing, Defendant Cornell has materially breached its contractual relationship with Prasad by failing to comply with its obligations, standards, policies and procedures set forth in Policy 6.4 during the investigation and adjudication of Prasad's case.

189.     In breach of its obligations under Policy 6.4, Defendant Cornell failed to, *inter alia,* (i) gather relevant evidence, (ii) dismiss the complaint for lack of supporting evidence, (iii) conduct an impartial investigation; and (iv) conduct a timely investigation.

190.     As a direct and foreseeable consequence of these breaches, Prasad sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

191.     Prasad is entitled to recover damages for Defendant Cornell's breach of the express and/or implied contractual obligations described above.

192.     Based on the foregoing, Defendant Cornell breached and violated the covenant of good faith and fair dealing inherent in every contract arising therefrom.

193.     As a result of the foregoing, Prasad is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR A THIRD CAUSE OF ACTION
### Violation of New York State Human Rights Law

194.     Prasad repeats and realleges each and every allegation hereinabove as if fully set forth herein.

195.     Defendant Cornell is an education corporation organized and operating as such under the laws of the State of New York.

196.     The New York State Human Rights Law § 296(4) provides "[i]t shall be an unlawful discriminatory practice for an education corporation or association ... to permit the harassment of any student or applicant, by reason of his race, color, religion, disability, national origin, sexual orientation, military status, sex, age, or marital status[.]" N.Y. Exec. Law § 296(4).

197.     Cornell's Policy 6.4 states, among other thing:

> Cornell University's commitment to diversity and inclusiveness is grounded in providing an environment that is **free from all prohibited discrimination**, protected-status harassment, sexual assault/violence, and bias activity, in particular when such actions are directed at a member or group of the Cornell community because of that individual's or group's actual or perceived age, color, creed, disability, ethnicity, gender, gender identity or expression….

> Cornell University prohibits its faculty, administrative and academic staff members, postdocs, and undergraduate and graduate students from engaging in any form of prohibited discrimination, protected-status harassment, sexual harassment,

and sexual assault/violence, and expects these individuals to refrain from committing acts of discrimination, bias, or sexual assault/violence within the university's jurisdiction.

198.     Based on the foregoing *supra,* at ¶¶ 138-153, Cornell permitted discrimination against Prasad on the basis of his sex.

199.     Based on the foregoing *supra,* at ¶¶ 138-153, Cornell authorized, condoned and/or acquiesced to discriminatory conduct against Prasad.

200.     Based on the foregoing *supra,* at ¶¶ 138-153, Cornell knew or should have known of such discriminatory conduct and failed to undertake action to prevent it.

201.     Defendant Cornell engaged in the following discriminatory acts or practices against Prasad as the male accused: Cornell subjected Prasad to disciplinary action in an arbitrary and capricious way, and in discrimination against him on the basis of his male sex; upon accepting Herr's uncorroborated account of the events, the JA discriminated against Prasad, based solely on his gender; Cornell failed to adhere to its own guidelines and regulations, and the guidelines and regulations themselves are insufficient to protect the rights of male students; the Decision was discriminatory in that given the evidence (or lack thereof), a discriminatory bias against males was required for a conclusion of sexual misconduct to be reached.

202.     Based on the foregoing facts and circumstances, Cornell engaged in unlawful discriminatory practices in violation of N.Y. Exec. Law § 296(4).

203.     As a direct and proximate result of the above conduct, Prasad sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

204.     As a result of the foregoing, Prasad is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Prasad demands judgment against Defendant Cornell University as follows:

(i)     on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding Prasad damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)     on the second cause of action for breach of contract, a judgment awarding Prasad damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)     on the third cause of action under New York State Human Rights Law § 296(4), a judgment awarding Prasad damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)     awarding Prasad such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated:   New York, New York
         July 28, 2016

                                     **WARSHAW BURSTEIN, LLP**
                                     **Attorneys for Plaintiff Vito Prasad**

                                     **By:** _____
                                     **Kimberly C. Lau, Esq. (517016)**
                                     **555 Fifth Avenue**
                                     **New York, New York 10017**
                                     **(212) 984-7700**
                                     klau@wbcsk.com